# EXHIBIT B

**07 C 7116**

**JUDGE LEFKOW
MAGISTRATE JUDGE COX**



# REGISTERED REPRESENTATIVE
# COMPLIANCE MANUAL

**LaSalle Financial Services, Inc.**
135 S. LaSalle Street
Chicago, Illinois 60603

## TABLE OF CONTENTS

**SECTION**                                                                 **PAGE**

I.     INTRODUCTION ...................................................................1

II.    DEPARTMENT REFERENCES ..............................................2

III.   COMMUNICATIONS WITH THE PUBLIC ............................3
   A.     Sales Area .......................................................................3

   B.     Disclosures .......................................................................3
      1. Oral Disclosures ............................................................3
      2. Written Disclosures ........................................................3

   C.     Sales Literature ................................................................4
      1. Approvals .......................................................................4
      2. Content and Disclaimers .................................................4

   D.     Advertising Materials .......................................................4

   E.     Correspondence ...............................................................5
      1. Outgoing .........................................................................5
      2. Incoming .........................................................................6

   F.     Electronic Communications (E-Mail, Web Sites, Chat Rooms)...........6

   G.     Telemarketing – Do-Not-Call List .....................................6

   H.     Agreements and Other Documents.....................................7

   I.     Customer Complaints .......................................................7
      1. Written Complaints .........................................................7
      2. Oral Complaints ..............................................................8

   J.     Communications with Regulators and Attorneys .................8

   K.     Service of Process, Requests for Information, Subpoenas.........8

   L.     Guest Speaking Engagements ...........................................8

IV.    CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION ..........10
   A.     Confidential Information ..................................................10

   B.     Material, Nonpublic Information ......................................10

   C.     Rumors...........................................................................11

## TABLE OF CONTENTS

D.  Privacy Statement .................................................................................................. 11

## V.  CURRENCY TRANSACTIONS ....................................................................... 12

A.  Accepting Cash and Currency .......................................................................... 12

B.  Record Keeping and Reporting Obligations ................................................. 12

## VI.  CUSTOMER ACCOUNTS ............................................................................ 13

A.  Suitability ........................................................................................................... 13

B.  Recommendations and Solicitations .............................................................. 13

C.  Risk Assessment ................................................................................................ 13

D.  Account Documentation .................................................................................. 14
  1. New Accounts ............................................................................................. 14
  2. Circumstances Regarded as Increased Risk to the Firm ........................ 14
    a)  Customer's Background ....................................................................... 14
    b)  Customer's Business/Activities ......................................................... 14
    c)  Customer's Product and Service Needs ............................................ 15
    d)  Customer's Source of Funds .............................................................. 15
  3. Required Information .................................................................................. 15

E.  Accounts for Minors ......................................................................................... 16

F.  Court Appointment Accounts ......................................................................... 17

G.  Accounts for Securities Industry Personnel ................................................ 17

H.  Changes in Account Information ..................................................................... 17
  1. Retail Customer Account Changes ........................................................... 18
  2. Death of a Customer ................................................................................... 18

I.  Customer Checks, Securities, and Holding Mail ......................................... 18

J.  Wire Transfers ................................................................................................... 19

K.  Options Accounts .............................................................................................. 19

L.  Margin Accounts ............................................................................................... 19

## VII.  MUTUAL FUNDS ......................................................................................... 20

A.  Communications with the Public .................................................................... 20

B.  Sales Literature Relating to Mutual Funds .................................................... 20

C. Prospectus Delivery Requirements ............................................................................21

D. Mutual Fund/Unit Investment Trust Sales Practices and Documentation ................21
    a)   Switching..................................................................................................21
    b)   Breakpoint Sales.......................................................................................22
    c)   Sales of Multiple Class Mutual Funds ....................................................23
    d)   Selling Dividends ....................................................................................24
    e)   529 Plans .................................................................................................24
    f)   NAV Entry Privilege ...............................................................................24

E. Mutual Fund Due Diligence ......................................................................................24

VIII.    PROFESSIONAL CONDUCT ..............................................................25

A.    Prohibited Practices ............................................................................................25

B.    Private Securities Transactions ..........................................................................25

C.    Selling Away .......................................................................................................26

D.    Outside Business Activities .................................................................................26

E.    Gifts and Gratuities ............................................................................................26

F.    Reportable Matters .............................................................................................27

G.    Fraudulent Schemes ...........................................................................................27

H.    Continuing Education .........................................................................................28
    1.  Regulatory Element............................................................................................28
    2.  Firm Element.....................................................................................................28

I.    Annual Compliance Meeting ..............................................................................28

J.    Annual Employee Questionnaire ........................................................................29

IX.    REGISTRATIONS ..............................................................................30

A.    Individual Registrations .....................................................................................30
    1.  Regulatory Filings..............................................................................................30
    2.  Activities of Registered Personnel ....................................................................30
    3.  Activities of Unregistered Personnel.................................................................31

B.    Employee and Employee-Related Brokerage Accounts .....................................31

C.    Surveillance of Employee Accounts ...................................................................32

X.    SALES AND TRADING PRACTICES .............................................33

# TABLE OF CONTENTS

A.   **Prohibited Activities** ....................................................................................................33

B.   **Suitability** .................................................................................................................34
   1. General ....................................................................................................................34
   2. Senior Citizens/Elderly Customers ..........................................................................34
   3. Selling to Non-English Speaking Customers .............................................................34

C.   **Discretion** ..................................................................................................................34

D.   **Bond Transactions** ......................................................................................................35

E.   **Refusing Transactions** .................................................................................................35

F.   **Errors** ........................................................................................................................35

G.   **Markups and Commissions** ..........................................................................................36

H.   **Restricted Securities and Beneficial Ownership Rules** ....................................................36

I.   **Penny Stock Transactions** ...........................................................................................36

J.   **Initial Public Offerings/Freeriding & Withholding** ..........................................................36

K.   **Retail Options Sales** ...................................................................................................37

L.   **Fee-Based Accounts** ...................................................................................................37

**XI.   INSURANCE & ANNUITY PRODUCTS** ......................................................**38**

A.   **Variable Annuities** ......................................................................................................38
   1. Suitability ...............................................................................................................38
      a) Investment Objective .........................................................................................38
      b) Time Horizon ...................................................................................................38
      c) Liquidity Needs .................................................................................................38
      d) Tax Considerations ............................................................................................38
      e) The Aggregation Rule ........................................................................................38
      f) Diversification ...................................................................................................38
      g) Market Fluctuation ............................................................................................39
      h) Other Retirement Plans ......................................................................................39
      i) Qualified Accounts ............................................................................................39
      j) Bonus Credits ...................................................................................................39
      k) Elderly Customers .............................................................................................39
      l) Summary..........................................................................................................40
   2. Prospectus Delivery Requirement .............................................................................40
   3. Replacement of Variable Annuities/1035 Exchanges ..................................................40

B.   **Fixed Annuities** ..........................................................................................................41
   1. Suitability ...............................................................................................................41
      a) Investment Objective .........................................................................................41
      b) Time Horizon ...................................................................................................41

c)   Liquidity Needs ..................................................................................41
d)   Tax Considerations ............................................................................41
e)   The Aggregation Rule .......................................................................41
f)   Other Retirement Plans ......................................................................41
g)   Qualified Accounts ............................................................................41
2.   Insurance Licenses and Appointments ....................................................42
3.   Replacement of Fixed Annuities/1035 Exchanges ..................................42

C.     **Variable Universal Life** ...........................................................................42
1.   Suitability.................................................................................................42
a)   Investment Objective .........................................................................43
b)   Time Horizon .....................................................................................43
c)   Liquidity Needs ..................................................................................43
d)   Diversification ...................................................................................43
e)   Market Fluctuation ............................................................................44
f)   Elderly Customers .............................................................................44
g)   Summary ............................................................................................44

XII.     **INVESTMENT ADVISORY SERVICES** ...............................**45**

A.     **Registration** ............................................................................................45

B.     **Wrap Accounts**........................................................................................45

C.     **Disclosure Document** ..............................................................................45

D.     **Advisory Contract** ..................................................................................46

E.     **Other Advisory Services**.........................................................................46

XIII.     **EXHIBITS** ..............................................................................**47**
1.   Mutual Fund/Unit Investment Trust Acknowledgment form ....................47
2.   Variable Insurance Product Acknowledgment form .................................47
3.   Fixed Annuity/Insurance Policy Acknowledgment form ..........................47
4.   Unsolicited Customer Acknowledgment form .........................................47
5.   Noncooperative Countries Regarding Anti-Money Laundering ...............47
6.   Photo Identification Matrix .....................................................................47
7.   Anti-Money Laundering Handbook ..........................................................47
8.   Option Account Agreement ......................................................................47
9.   Margin Application and Disclosure Agreement ........................................47
10.  Statistical Market Information Disclosure ...............................................47
11.  Customer Acknowledgment Switch Letter ...............................................47
12.  NASD's Expense Analyzer ......................................................................47
13.  B Share Customer Acknowledgment form ...............................................47
14.  Approved Product List .............................................................................47
15.  Outside Business Activity Notification form ............................................47
16.  Gift form..................................................................................................47
17.  Annual Compliance Questionnaire .....................**Error! Bookmark not defined.**
18.  407 Letter ................................................................................................47
19.  Code of Ethics .........................................................................................47

## TABLE OF CONTENTS

20.     Investment Advisory Compliance Manual ........................................................................47

## I.    INTRODUCTION

This LaSalle Financial Services, Inc. ("LFS" or the "Firm") Registered Representative Compliance Manual (the "Manual") has been prepared to set forth the policies and procedures relating to the securities and investment advisory activities of the Firm.

LFS is a broker/dealer and registered investment adviser, registered with the Securities and Exchange Commission "("SEC"), is a member of the National Association of Securities Dealers, Inc. ("NASD"), and the Municipal Securities Rulemaking Board ("MSRB"). As such, the Firm is subject to the rules and regulations of those regulatory bodies. The Firm also is registered as a broker/dealer in all fifty states and the District of Columbia and, therefore, is subject to the securities laws of those jurisdictions. As a bank affiliated broker/dealer offering non-deposit investment products to the customers of its affiliated banks, the Firm is subject to the terms of the Interagency Statement as well. The Firm is also a licensed insurance agency in certain states, and is subject to the insurance laws and regulations of those states.

LFS is a wholly-owned subsidiary of LaSalle Bank N.A. and is an affiliate of several bank and trust companies, including ABN AMRO Bank, N.V., and Standard Federal Bank N.A. The Firm also is affiliated through common ownership with other registered broker/dealers. The Firm operates from its primary offices as well as through Offices of Supervisory Jurisdiction located in Chicago, Illinois and Boca Raton, Florida. The Firm utilizes the clearing, custody, and securities processing services of National Financial Services for its retail activities and the services of its affiliate, ABN AMRO Incorporated, for its institutional activities.

The Manual is intended to be used in conjunction with, to supplement, and to supersede all other previously issued policy and procedures manuals applying to the business activities, operations, and employees of the Firm. The policies and procedures set forth herein apply to all individuals who are employees of the Firm and registered with the Firm. The Manual is not intended to be a complete text of the laws and rules governing securities activities. Rather, it is meant to provide guidelines for daily operations and to set forth the necessary procedures for persons carrying out the Firm's securities activities. Situations may arise which require clarification or a more detailed explanation of the applicable rules or laws concerning a particular transaction or course of business conduct. Such inquiries should be directed to the employee's supervisory principal or the Compliance Department.

The securities laws and rules under which the Firm operates are constantly changing. As changes affecting securities activities occur, amendments or supplements will be added to the Manual. These amendments or supplements will become a part of the Manual and must be complied with by all employees of the Firm. Any employee or registered person who fails to comply with any provision of the Manual, with any applicable state or federal rule, regulation or statute, the rules of the SEC, NASD and MSRB, or who causes or permits such a failure may be subject to disciplinary action, including dismissal for cause, suspension, fine, or change in job assignment or responsibilities.

The Manual is the property of the Firm and may not be reproduced, in whole or in part, or distributed outside the Firm without the knowledge and approval of the Director of Compliance.

The Manual does not create or constitute any guarantee of employment.

## II.    DEPARTMENT REFERENCES

Chairman of the Board and Chief Executive Officer ..................................................... Thomas P. Zidar

President and Director ................................................................................................... Terry McCaffrey

Chief Administrative Officer ......................................................................................... Deborah T. Stotts

Chief Compliance Officer .............................................................................................. Anthony P. Pecora

National Director of Retail Sales and Marketing ...................................................... Louis C. Mastropietro

Retail Operations Manager ........................................................................................... Pamela Staton

Financial Operations Principal ..................................................................................... Thomas M. Paulus

Midwest Sales Manager ................................................................................................ Robert E. Klein

LaSalle Broker Dealer Services Division Manager ....................................................... Patrick J. Kelly

Municipal Securities Division Manager ....................................................................... Michael J. Smale

Standard Insurance Services Division Manager .......................................................... Anthony A. Curti

Wealth Management Division Manager ........................................................................ D. Lynn Boucher

Corporate Finance Division Manager .......................................................................... Michael Bastian

ABN AMRO Mortgage Capital Markets ........................................................................ Maria Fregosi

Capital Markets Business Unit Manager ...................................................................... Jennifer Falconer

FX/Derivatives Business Unit Manager ........................................................................ Camille E. Rudge

Corporate Capital Business Unit Manager ................................................................... Jeffrey A. Sirota

Senior Registered Options Principal ............................................................................ Thomas J. Boland

Compliance Registered Options Principal .................................................................... Peter J. VanHouten

Anti-Money Laundering Compliance Officer ............................................................... Michael Grossman

### III.    COMMUNICATIONS WITH THE PUBLIC

It is the policy of the Firm that all communications with the public, whether oral or written, be based on the principles of fair dealing and good faith, be truthful, in good taste and not exaggerated, unwarranted or misleading, conform to regulatory requirements, and be handled consistent with the provisions of this policy statement. In addition, all communications relating to products and services are to be designed to provide their recipients with a sound basis for evaluating the facts presented and the risks associated with the products.

Communications with the public that contain or are related to proprietary material or nonpublic information are subject to particular policies governing their use. See CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION, p. 10.

### A.  Sales Area

Banks must market non-deposit products in a manner that does not mislead or confuse the customers as to the nature of the products or the risks associated with them. To help establish in the customer's mind that these are not insured, bank-sponsored products, the sales process must be conducted in a location separate from the area where business involving insured deposits is conducted. At a minimum, this is achieved through the use of signage which prominently displays the name of the Firm offering these products.

In no case should tellers and other employees located in the routine deposit area (teller line and teller window) make general or specific investment recommendations regarding non-deposit investment products or qualify a customer as being eligible to purchase such products, or accept orders for such products, even if unsolicited. Tellers and other employees who are not authorized to sell non-deposit investment products may refer customers to individuals whom the Firm has specifically designated, licensed and trained to assist customers interested in such products.

### B.  Disclosures

#### 1.  Oral Disclosures

When advertising or otherwise marketing securities to customers or prospective customers, Registered Representatives (RRs) are to ensure that customers are fully apprised of the nature of the investments in accordance with securities and banking regulations. Each RR is to make oral disclosures to a customer at the beginning of the RR's presentation that the products offered:

- Are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

The content of the presentation should also be structured to eliminate the possibility of customer confusion regarding who is offering the products and the Firm's relationship to its affiliate banks. Failing to orally disclose potential risks and associated fees or misrepresenting the investment would be a violation of regulatory rules and could lead to disciplinary action against the Firm and RR.

#### 2.  Written Disclosures

RRs will provide the client with the appropriate acknowledgment form upon the sale of any mutual fund, unit investment trust, variable annuity, variable life, other life insurance or fixed annuity product. The RR will go over each of the applicable bullet points listed on the acknowledgment form and ask the customer to initial (where applicable) and sign the form. The RR must also sign and date the acknowledgment form. The White copy is sent to the OSJ, the Pink copy is kept by the RR and the

Canary (Yellow) copy is given to the customer. Exhibits 1, 2 and 3 provide hyperlinks to the current acknowledgment forms.

It is the RR's responsibility to obtain a signed acknowledgment form for each sale of a mutual fund, unit investment trust, variable annuity, variable life, fixed annuity, or life insurance product. If a client is adding to an existing position and has signed an acknowledgment form which is current (not older than one year), or if the addition is less than $1,000, an additional acknowledgment form is not required. It is the RR's responsibility to ensure that a current acknowledgment form is sent to the OSJ.

### C. Sales Literature

#### 1. Approvals

All sales literature is to be reviewed by Compliance prior to use, and approved by a principal in the business unit utilizing the material. Sales literature for purposes of this policy includes any written communication (other than advertising), distributed or made generally available to customers or the public. Sales literature includes circulars, research reports, market letters, performance reports or summaries, form letters, seminar texts and reprints or excerpts from any other advertisement, or published articles.

Pre-approved form letters are maintained in the Marketing Department in Chicago. As with any mailing, a copy of the form letter must be maintained together with a copy of the mailing list and date of mailing in the outgoing correspondence file at the branch.

#### 2. Content and Disclaimers

All sales literature is to contain the following prominently displayed in generally readable type size:

- the name of the Firm;
- the name of the person or entity preparing the sales literature;
- the date the material was originally published; and
- any statements sufficient to make the information not misleading, including attention to the fact that information may not be current.

Sales literature which references employees, services, or products of affiliates of the Firm are to include statements that identify the relationship between the Firm and its affiliates. Services and products of the Firm are to be clearly identified as such in a way that makes it clear they are not offered by the Firm's affiliates or insured by federal agencies insuring affiliates' deposits.

Any employee offering an opinion, orally or in writing, on a particular product or service, is to have a reasonable basis for it.

Material that relates to options must include a description of the general nature of options or options strategies. If the literature includes a description of options strategies, it also needs to explain clearly and with equal emphasis the risks and rewards of such strategies and that options are not suitable for all investors. All advertising and/or sales literature relating to options must be approved in advance by a Compliance Registered Options Principal ("CROP"). When discussing options, it is also a good practice to mention that an Options Clearing Corporation ("OCC") disclosure document is available and will be provided on request.

### D. Advertising Materials

All advertising materials are to be reviewed by the Compliance Department and approved by the responsible principal in the business unit prior to their being made available or distributed to customers, potential customers, or other non-employees. "Advertising materials" as used in this

policy means material published or designed for use in a newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape displays, signs or billboards, movies, telephone directories (unless it is a listing of the Firm's name, address and telephone number only), or other public media.

The Compliance Department is responsible for ensuring all necessary regulatory approvals have been obtained, for making any changes requested by regulators prior to the use of such materials, and for maintaining a central file of all advertising materials. All such advertising and sales literature shall conspicuously disclose that such non-deposit investments:

- are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

Such disclosure shall also be featured conspicuously in:

- all written or oral sales presentations by employees; and
- periodic customer statements that include information on both deposit products and non-deposit investments.

Under no circumstances may material marked "For Broker/Dealer Use Only" or "Agent Use Only" be sent or shown to clients or other members of the public.

Because of the special regulatory consideration given to advertising relative to registered investment companies (including mutual funds, variable contracts, and unit investment trusts) any employee that wants to prepare or disseminate advertising materials concerning these products is encouraged to seek the guidance of the Compliance Department prior to drafting the materials.  See also MUTUAL FUNDS at page 20.

### E.  Correspondence

#### 1.  Outgoing

All letters must be on Firm letterhead and in good business form, be free of extravagant statements, reflect caution in speaking of future markets or earnings, and should carefully avoid definite forecasts unless an identified source for the forecast is included.  Outgoing written correspondence of RRs must be reviewed and approved by a Principal prior to mailing if it pertains to any of the following:.

- A recommendation to purchase or sell a security or information pertaining to a security to ensure that the re commendation is based on facts.

- A security which is subject to a current effective registration statement (this always applies to shares of open-end investment companies and Direct Access Notes or DANS) to ensure that a copy of a prospectus is enclosed; that such enclosure is indicated in the letter; and that any statements made in the letter are based on the facts indicated in the prospectus.

- Correspondence that includes a portfolio review.

The RR must keep a copy of the correspondence in the outgoing correspondence file at their hub branch, and send a copy to the OSJ.

Following are important points to consider in the preparation of correspondence:

- If a prospectus is required, the letter must include a statement that one is enclosed.
- All statements must be reasonable and accurate.

**COMMUNICATIONS WITH THE PUBLIC**

- Correspondence must comply with the NASD's sales literature rules.

### 2. Incoming

Incoming written correspondence to any of the OSJs will be opened by sales assistants or administrative personnel who are supervised by the Department/Branch Manager. Special attention must be paid to incoming checks and securities, which must be brought to the Cashier/Operations Department upon receipt.

Originals of incoming written correspondence received in the branch offices must be forwarded to the OSJ. The RR is required to keep a copy in the hub branch incoming correspondence file.

## F. Electronic Communications (E-Mail, Web Sites, Chat Rooms)

The following types of electronic communications require the review and approval by a supervising principal, Regional Sales Manager (RSM) and, when necessary, Compliance Department, prior to use:

- Bulletin board postings – Advertising
- Chat rooms – Speaking Engagements
- Group electronic mail – Sales Literature
- Web sites – Advertising

Pursuant to NASD Rule 3010, registered employees having contact with the public are required to have the electronic correspondence they may receive and send be monitored by a supervising Principal. The supervising Principal will review all electronic correspondence that has been quarantined by the Firm's electronic correspondence monitoring system, and may also review a portion of both incoming and outgoing electronic correspondence that is not quarantined. The electronic mail account (ABNAMRO.com) given by the Firm to its' employees represents Firm property, and should not be abused or misused. All employees are prohibited from soliciting or communicating with customers, sending mass mailings, advertising, or conducting any other types of business related activity on the Internet from a personal e-mail account.

No outgoing e-mail correspondence from an employee may contain: (a) any untrue statement or omission of a material fact or otherwise false or misleading information; (b) promises of specific results or exaggerated or unwarranted claims; (c) opinions for which there are no reasonable basis; (d) projections or forecasts of future events which are not clearly labeled as forecasts; or (e) nonpublic (inside) information or proprietary information.

## G. Telemarketing – Do-Not-Call List

The Firm and its representatives are subject to NASD Rule 2211 relating to outbound calls and the maintenance of a "Do-Not-Call" list. Telemarketing scripts must be approved by a Principal, reviewed by Compliance and maintained in the OSJ advertising files. In telemarketing, RRs shall not:

- make outbound telephone calls to the residence of any person for the purpose of soliciting the purchase of securities or related services at any time other than between 8 a.m. and 9 p.m. local time at the called person's location, without the prior consent of the person; or
- make an outbound telephone call to any person for the purpose of soliciting the purchase of securities or related services without disclosing promptly and in a clear and conspicuous manner to the called person the following information: (1) the identity of the caller and the Firm's name; (2) the address or phone number of the branch office or OSJ in which the caller may be contacted; and (3) that the purpose of the call is to solicit interest in a security.

**COMMUNICATIONS WITH THE PUBLIC**

- These restrictions and requirements, however, do not apply to telephone calls by an RR for the purpose of maintaining and servicing the accounts of existing, active customers of the Firm which are assigned to the RR.

In the event a person states that they do not wish to receive telephone solicitations from the Firm or its registered representatives, the RR must promptly notify the Director of Compliance to ensure the person's name is added to the Do-Not-Call list.

In addition, the U.S. Federal Communications Commisssion's ("FCC") Telemarketing Rule, in effect as of October 1, 2003 allows consumers to "opt out" of unwanted telemarketing calls. Existing customers of LFS and of LFS' affiliates are exempt from the national "Do-Not-Call" regulations. However, calls based upon referrals from existing clients are not exempt. Therefore, prior to calling a potential customer whose phone number was provided by an existing customer, associated persons must check to see if that telephone number is maintained on the national "Do-Not-Call" list, and must refrain from calling the potential customer if their number does appear on that list. Violators may be subject to fines of up to $11,000 per violation. Telephone numbers may be checked against the "Do-Not-Call" list on the Firm's Datamart site.

## H.  Agreements and Other Documents

Employees are not permitted to execute any document, contract, or letter agreement on behalf of the Firm without the prior approval of a supervisory principal. Contracts, letters, including form letters, or other documents that request any employee's signature or the signature of an officer or another on behalf of the Firm, are subject to this pre-approval policy. Employees are not authorized to act on behalf of the Firm in connection with any agreements, settlements, or other matters which would create an obligation of the Firm to a third party.

## I.  Customer Complaints

Monitoring customer complaints is a required and critical part of any compliance program. Complaints can jeopardize the Firm's and employees' reputations and can have legal and regulatory implications. A customer complaint is any communication from a customer that makes claims against the Firm or any of its employees.

The two types of customer complaints that the Firm and its employees may have to address are written and oral complaints. Both are described below, as well as the procedures an RR must follow when presented with either type of complaint.

Under no circumstances should an employee attempt to settle a claim or allegation made against the employee or the Firm and relating to the employee's job responsibilities or activities on behalf of the Firm without the approval of their supervisor.

### 1.  Written Complaints

If an RR receives a customer complaint, whether received via e-mail or in written form, the RR must immediately forward the original complaint to Compliance and a copy to their supervising principal or RSM. Concealing a customer complaint is a serious offense and can be grounds for immediate dismissal. The RR also must keep a copy of the complaint in their hub branch office customer complaint file.

Upon receipt of the written complaint, a compliance officer will investigate the matter and prepare a written response to the customer, if applicable. To aid the compliance officer in the investigation and response, the RR will be required to provide a written statement addressing each allegation raised in the customer complaint letter. The RR may also be required to provide Compliance copies of additional documentation, notes, memos, etc.

The Compliance Department will maintain a customer complaint file containing all of the relevant information and a record of the resolution of the complaint.

### 2. Oral Complaints

If an RR receives an oral customer complaint that is merely operational in nature, the RR may first attempt to resolve the issue at the branch level. If the RR is unsuccessful, the RR's RSM will attempt to resolve the issue. If the complaint is eventually submitted in written form, the procedures for handling written customer complaints must be followed. However, an RR must immediately report any oral complaint alleging sales practice violations to the RR's supervising Principal or RSM and to Compliance.

### J. Communications with Regulators and Attorneys

Communications and filings relative to the securities activities and business of the Firm made with regulatory agencies or representatives of self-regulatory organizations to which the Firm is subject or of which it is a member, are to be made by or through the Chief Executive Officer, President, the Financial and Operations Principal, the Director of Compliance, or their designees. Further, employees of the Firm are not to speak to regulators (e.g., SEC, NASD, OCC, state securities or insurance regulators) or attorneys or provide materials to them relating to the business of the Firm without the prior knowledge and approval of the Chief Executive Officer, President, the Financial and Operations Principal, the Director of Compliance, or the Firm's legal counsel. In addition, the Director of Compliance is to be notified promptly whenever a representative of a regulatory agency or self-regulatory organization or an attorney contacts any of the Firm's employees in any manner for any purpose whatsoever. This policy helps ensure accurate information is provided.

### K. Service of Process, Requests for Information, Subpoenas

Messengers seeking to serve the Firm or any of its employees with subpoenas or other legal documents are to be directed to the Firm's legal counsel. If legal papers are inadvertently received by Firm personnel, they should promptly be referred to the Firm's legal counsel, with a copy as appropriate to the Director of Compliance. A notation should be made by the recipient of the document recording the place of service and the name of the individual effecting service. In connection with the service of process, no document should be signed by any employee which would indicate that service was timely or otherwise proper.

On occasion, employees may receive telephone calls requesting information about the Firm, a customer, or an account. Employees should be discrete and prudent in identifying the caller and providing only general, public information (such as the Firm's address, the name of an individual to whom materials can be sent, etc.). *As a general rule, requests for information should be referred to a Principal, and under no circumstances is any information concerning a customer, any account, or any transaction to be given to any party until the party's identity and entitlement to the information has been confirmed.*

From time to time, financial institutions may seek to obtain voluntary liens on the Firm's accounts for customers. Such requests are to be referred to Compliance. Under no circumstances should an employee agree to accept such a lien or notice of such an impediment on an account.

### L. Guest Speaking Engagements

Employees who are invited to make appearances or to speak publicly about the business, products, services, or other activities of the Firm are to obtain the written approval of a Principal and Compliance prior to accepting any such invitation. In requesting such approval, the employee must provide the following information in writing:

**COMMUNICATIONS WITH THE PUBLIC**

- the name of the sponsoring group, the presiding officer or program chairman, and the entity's mailing address;
- the subject to be discussed and the outline or text to be used;
- the date of the engagement;
- the approximate number and type of attendees; and
- other speakers' names.

In deciding to grant or deny approval, consideration should be given to the qualifications of the employee to address the subject and the nature of the audience. Employees' opinions in such a context or otherwise are always to be clearly distinguished as their own and as not necessarily representing the official position of the Firm.

## CONFIDENTIALITY AND MATERIAL NONPUBLIC INFORMATION

IV.    **CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION**

This policy and the policies on Employee and Employee-Related Brokerage Accounts (see p. 31), SALES AND TRADING PRACTICES (see p. 33) and the LaSalle Bank Corporation Standards of Conduct are collectively designed to prevent the misuse of material, nonpublic information by the Firm and its employees.

It is the policy of the Firm that all proprietary, customer, trading, and account information acquired by the Firm or any of its employees is to be maintained in strictest confidence. Additionally, material, nonpublic information, as defined in this policy, may not form the basis of any improper proprietary, customer, or employee transaction.

Employees are to be particularly cognizant of the legal, regulatory, and ethical issues surrounding confidential and material, nonpublic information and the impact of its internal communication, use, and disclosure on the business activities of the Firm and its affiliates.

Failure to comply with this and related policies may subject employees to disciplinary action, including dismissal, and may result in civil or criminal liabilities to employees, the Firm, or its management.

### A.    Confidential Information

In the normal course of business, employees may be given or may acquire information about the business of the Firm, its customers, or its affiliates that is not available to the general public. This information is deemed to be confidential and may include trading and investment details and customer income or financial data. All employees are responsible for respecting and maintaining the confidential nature of information that concerns the business of the Firm, its customers, and its affiliates.

Whether orally or in writing, confidential information may only be disclosed within the Firm or to employees of the Firm's affiliates who need to know the information to perform their job functions. In particular, specific customer transactions or orders are not to be discussed with bankers or other employees of the Firm's affiliates unless there is a legitimate business need to do so.

All employees are to exercise reasonable care in how and where they discuss, document, and store the confidential information that relates to the business activities of the Firm and its customers. Confidential business and customer information should not be disclosed outside of the Firm and its affiliates except for legitimate and legal business reasons or as required by law. Employees should be discreet about discussing or exposing written confidential information in public areas such as elevators, halls, and restaurants. Documentation and files of a confidential nature, such as order tickets, customer account opening forms, monthly statements, and memoranda are to be maintained in a secure place where their confidentiality will not be compromised by people unaffiliated with the Firm.

Any instance in which the security or confidentiality of the Firm's files or data may have been compromised is to be promptly brought to the attention of the President, the Director of Compliance, or a Principal, who is to report such instance, as appropriate, to law enforcement or corporate authorities.

### B.    Material, Nonpublic Information

Some confidential information is also material, nonpublic information and, therefore, subject to the restrictions of federal and state securities laws and other governmental regulations as to its communication and use.

Information is material if a reasonable investor would be likely to consider the information important when deciding to buy or sell a security. Material information may include earnings estimates, dividend

## CONFIDENTIALITY AND MATERIAL NONPUBLIC INFORMATION

projections, merger, acquisition, disposition or tender offer plans, previously undisclosed or contingent liabilities, business plans, and product innovations.

Nonpublic information refers to information about the internal affairs of a corporate issuer of securities that is not publicly available to other investors through disclosures in public filings, corporate releases, or by dissemination through publications or news services with general distribution. Material information should be treated as nonpublic until it is clear the information can be deemed otherwise.

Employees may not trade in their own account, or direct others to trade on their behalf or for their benefit, while in possession of or after exposure to material, nonpublic information relating to the securities that are the subject of the trade. Employees who possess material, nonpublic information are also prohibited from "tipping" others either by sharing the material, nonpublic information wrongfully or offering trading recommendations or strategies based on the information.

Employees who have reason to believe customers may be seeking to place a trade while in possession of material, nonpublic information are to bring the matter immediately to the attention of a supervising principal, RSM, or Compliance and are to decline to take the order.

### C. Rumors

Rumors are detrimental to the marketplace and may be of particular harm to specific industries or businesses. Also, rumors may have originated from material, nonpublic information and may subject those who circulate or act upon them to civil or criminal liabilities. Accordingly, employees should not circulate, trade, or cause another to trade or act upon unsubstantiated rumors.

### D. Privacy Statement

At account opening, RRs must give a current copy of the Firm's privacy policy to any new customer if that customer does not have a pre-existing relationship with another ABN AMRO affiliate.

## V.   CURRENCY TRANSACTIONS

It is the policy of the Firm to comply with all regulatory requirements relating to the handling, record keeping and reporting of cash and currency. No employee may assist any person in making a deposit or structuring a transaction such as to evade this policy or the currency reporting requirements, nor may an employee act or fail to act in such a way that would cause the Firm to be in noncompliance with currency reporting requirements.

Currency, as used and referred to in this policy statement, means the coin and paper money of the United States or of any other country that circulates in and is customarily used and accepted as money in the country in which issued. Currency includes U.S. silver certificates, U.S. notes and Federal Reserve notes, but does not include bank checks or other negotiable instruments not customarily accepted as money. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in any foreign country.

### A.   Accepting Cash and Currency

It is against Firm policy to accept cash or money orders from customers. Instances in which a customer seeks to deposit a series of checks, which are each under $10,000 but which exceed $10,000 in the aggregate are to be brought to the attention of the Anti-Money Laundering ("AML") Compliance Officer.

### B.   Record Keeping and Reporting Obligations

If, for some reason, an exception to the general policy prohibiting the acceptance of cash or money orders is granted by the AML Compliance Officer, all deposits of currency are to be separately designated as such on the Firm's deposit slips and are also to be noted as such in the cash receipts blotter. The customer is also to be advised that further deposits aggregating to $10,000 or more will be reported as required by federal laws and regulations. The AML Compliance Officer is responsible for reviewing the account and any affiliated accounts of a customer paying cash for potential multiple, same day currency transactions.

The AML Compliance Officer is responsible for ensuring that all appropriate regulatory filings as may be required are made in timely fashion relative to currency transactions.

## VI.    CUSTOMER ACCOUNTS

It is the policy of the Firm to use diligence in knowing the essential facts relative to each of its customers and to have records documenting a customer's identity, investment objectives, investment experience, financial resources, and authority to trade.

### A.    Suitability

Prior to opening a new account, it is the responsibility of the RR to use due diligence in learning the facts about each prospective customer sufficient to "know the customer" and to determine whether it is appropriate for the Firm to do business with such customer. Additionally, in recommending to a customer the purchase, sale, or exchange of any security, each RR shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts disclosed by such customer as to his or her financial situation and needs.

Further, the RR is responsible for taking reasonable steps to ensure the customer is aware of the Firm's suitability determination. Further, if a customer demands to make an inappropriate investment, the RR should counsel the customer against such a course of action. *See* SALES AND TRADING PRACTICES, p. 33. Customers should always be encouraged to be accurate and complete in supplying information on which the Firm relies.

### B.    Recommendations and Solicitations

RRs recommending the purchase or sale of any security are to have a reasonable basis at the time of each recommendation that the purchase or sale is suitable for the customer based upon the customer's financial resources, tax status, investment objectives, trading experience and history, and any other relevant information as recorded on the Firm's documentation and as known to the RR.

RRs who are Financial Consultants in LFS' retail divisions (LaSalle Financial Services and Standard Financial Services) are prohibited from recommending or otherwise soliciting transactions in individual equities for their customers' accounts.

Customers wishing to trade individual stocks on an unsolicited basis in their brokerage accounts must complete the Unsolicited Customer Acknowledgment form. See Exhibit 4. This document must be renewed on an annual basis. These transactions must also be marked "unsolicited" at the order entry stage (Streetscape® users must select the "unsolicited" option on the order entry screen). This ensures that "unsolicited" appears on the customer's confirmation.

No recommendations to customers may be made when the RR is in possession of or has been exposed to material, nonpublic information. *See* CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION, p. 10.

### C.    Risk Assessment

Prior to establishing a relationship with a customer, RRs are required to perform a risk assessment of the customer and potential relationship. RRs must complete a Customer Profile form for each new account and, when applicable, additional account documentation to use as an aid in determining potential risks. At a minimum, the following information must be ascertained and documented on the Customer Profile form regarding each customer:

- customer's background
- customer's business/activities
- customer's product and service needs
- the source and nature of the customer's funds or assets

## CUSTOMER ACCOUNTS

Although the risk assessment is a subjective process, RRs are to consult with their supervising principal, RSM, or Compliance if they have any concerns or if they want additional guidance. Moreover, all instances in which a customer's behavior is suspicious in nature when providing, or refusing to provide, the above information must be brought to the attention of the Compliance Department.

### D. Account Documentation

#### 1. New Accounts

RRs may accept new customers only after a Customer Profile is completed. The RR must give the customer a copy of the profile, including the customer agreement portion containing the arbitration agreement and a copy of a summary of the Firm's Business Continuity Plan. RRs must, however, obtain Customer Profiles for all new accounts, including direct business (e.g., 529 plans and other mutual fund accounts maintained with the mutual fund vendor, variable annuities, variable life, fixed annuities, and insurance) as well as accounts introduced to LFS' clearing firm, National Financial Services, LLC ("NFS"). All information required by applicable laws, rules, regulations and company policies must be obtained prior to the sale of any investment product. In order for the new business to be accepted and approved by a Principal, the completed Customer Profile and any additional account documents must be submitted to the Back Office. For certain types of accounts (e.g., guardianships, conservatorships, B/D/A IRAs), the RR must submit the profile to the back office and cannot enter orders until the account has been approved and entered into the NFS system. In addition, it is the policy of the Firm that all direct vendor business (529s and other mutual funds held direct, variable annuities, variable life, fixed annuities, and other insurance products) accepted by an RR must be processed through the Back Office rather than mailed in by the RR to the direct vendor.

#### 2. Circumstances Regarded as Increased Risk to the Firm

The following identifies increased risk areas that warrant additional due diligence and approval from the Business Unit Manager or supervisory Principal. In addition, all accounts that exhibit one or more of these risk areas must be reviewed by the AML Compliance Officer before the account may be accepted:

##### a) Customer's Background

- Persons holding high public offices (e.g., government officials, senior executives of a government owned company, politicians, important political party officials and their family or company relations, especially in those countries that are known to be vulnerable to corruption and fraud).
- Customers having a permanent address in a high money-laundering risk country (e.g., countries indicated by the Financial Action Task Force as being noncooperative in combating money laundering). A list of such countries is available on the Compliance intranet site.
- Customers having a permanent address in a country under economic or other sanctions by recognized national or international bodies (e.g., Dutch National Bank, European Commission, United Nations, Office of Foreign Assets Control, including those regarded as involved in or supporting terrorist activities).
- Foreign government accounts (embassies, consulates, etc.)

##### b) Customer's Business/Activities

- Business/activities that are known to be vulnerable to illegal or criminal activities.
- Business/activities that are subject to strong negative public opinion.
- Where it appears that the legal entity is not carrying out any trading or economic activities, or is not actively participating in the economy of the country in which their office is registered.

## CUSTOMER ACCOUNTS

### c) Customer's Product and Service Needs

- Products and services that are known to be especially vulnerable to illegal or criminal activities.
- Products involving financial transactions and constructions that are unusual to a client or a client's business, taking into account all relevant circumstances.

### d) Customer's Source of Funds

- After assessing the source and nature of funds, there is a reasonable doubt as to whether or not the money or monetary instrument offered or passed to the Firm is the proceeds of crime, or the credit facilities offered by the Firm might be used for criminal purposes.

### 3. Required Information

As a general rule, accounts will not be opened for customers who refuse to sign or provide account documentation or who make material changes to the documentation's standard language. Instances in which customers refuse to sign the Firm's account forms or in which they will only agree to sign if standard language is changed or deleted are to be referred to Compliance. At a minimum, the following information is required prior to establishing an account for a client:

*Name:* In all cases, the customer's account should read in the customer's legal name or, in the case of institutional accounts, in the name of the legal entity responsible for the account. Opening an account under a fictitious name is strictly prohibited. Customers wishing to change the name on an existing account are to establish by court order or otherwise their legal entitlement to use of a different name.

*Address:* In all cases, a customer's account opening documentation is to reflect the customer's legal address where the customer is domiciled. Unless an exception is approved by Compliance, new accounts may only be opened for persons who reside within the United States and who provide their legal domestic address. Customers who open accounts while residing in the U.S. but who later relocate to another country will be reviewed by Compliance on an annual basis. Customers may use a post office box for mailing purposes only; and this must be approved by Compliance. Account documentation can be provided to a customer in care of a third party only if the customer has completed a limited power of attorney or otherwise provided a written directive to the Firm authorizing the third party to accept service or account trading documentation on the customer's behalf. Customer documentation may not be sent in care of an employee. In all cases, the customer's legal domestic address must also be maintained on file.

*Social Security or Tax Number:* A social security number (for individuals) or tax identification number (for entities such as corporations, trusts, pensions and other institutional accounts) is necessary in order to comply with the regulations of the Internal Revenue Service and with other federal agencies and regulatory bodies. Custodial Accounts require the social security number of the minor. Conservatorships and guardianships require the social security number of the ward. Trust accounts require the appropriate tax identification number as provided by the trustee(s). Joint accounts require the social security numbers of all named individuals on the account. Authorized individuals of a bank, estate, fiduciary account, investment club, non-incorporated organization or association, partnership, pension plan and profit sharing trust, or trust accounts are to certify the tax identification numbers of these types of accounts.

*Signature:* Under no circumstances are RRs or other employees to sign a customer's name to account documentation, including, but not limited to, customer agreements, trading authorizations, stock powers, letters of authorization to transfer funds or securities, or address change requests. RRs and other employees are also prohibited from signing any name other than their own and from altering, falsifying or destroying customer or Firm documents or records.

*Customer Identification:* All RRs are required to verify the identity of the clients they establish an account relationship with according to the Firm's current Customer Identification Program ("CIP"), generally by obtaining a copy of, or documenting, the information from a valid photo ID from each

## CUSTOMER ACCOUNTS

person who has an ownership interest in any investment account. For minor accounts and guardianships/conservatorships, the required CIP information must be obtained from the adult custodian/guardian/conservator. An RR may document that a customer has a pre-existing relationship with an affiliate bank in lieu of obtaining an ID. A valid photo ID is generally limited to the following: state-issued driver's license, state-issued identification card, military ID, passport, Matricula or resident alien card. Further, if the RR obtains a photocopy of the ID, they are responsible for forwarding the photocopy, which must include the RR's original signature and date the photocopy was made, to the OSJ. Verification of the customer's identity may not be required if the customer has a pre-existing account relationship with LFS. For a description of account registrations and required identification procedures, refer to Exhibit 6, Photo ID Matrix.

A fuller description of the Firm's CIP may be found in the Anti-Money Laundering Policies and Procedures Manual ("AML Handbook"). For a hyperlink to the AML Handbook, refer to Exhibit 7.

*Financial Status:* In order to have a better understanding of their clients' current financial status, each RR will obtain, at a minimum, the following financial information: current income, liquid net worth, net worth (excluding value of the equity and liability portions of their primary residence), tax status, investment objectives, and other information that would be considered material. It is against the policy of LFS to recommend that customers borrow against their home equity in order to fund an investment product.

*Institutional Accounts:* Documentation for institutional accounts must specify the nature of the entity (corporation, profit-sharing trust, etc.), a street address (not post office box), a description of the business, the names and phone numbers of persons authorized to transact business for the account, and settlement instructions. In the case of a trust, the "Trustee Certification of Investment Powers" must be completed and signed by all current trustees.

All questions regarding account titling and required documentation in support thereof should be referred to Operations.

### E.  Accounts for Minors

An account opened for an individual below the age of majority (usually 18 or 21 depending upon the age of competency in the person's state of residence) may only be opened consistent with the Uniform Gifts/Transfers to Minors Act. Generally, under state law, assets may be retained in a minor's account until the minor reaches the age of majority, or as provided by the respective state statute (*e.g.*, In Illinois, a minor reaches age of majority at 18, but they may not take possession of the custodial assets until they reach age 21). Accounts should designate the name of the custodian who is responsible for the account for the benefit of the minor.

If the custodian of a minor's account is unable to continue acting in that capacity, the minor may be able to appoint the custodian's replacement, depending upon the age of the minor and the law of the state where the minor child resides.

Custodial accounts for minors may not trade on margin.

Firm policy prohibits a person who is a minor in their state of domicile from opening a securities account in their own name.

For CIP purposes, the adult custodian is considered "owner" of the account and must be identified according to the Firm's CIP policies and procedures.

Questions concerning the specific administration of accounts for minors should be referred to the Compliance Department.

### F.  Court Appointment Accounts

Certain types of "fiduciary" accounts involve appointment of an individual by a court order which vests that person to act as fiduciary on behalf of another person or a deceased person's estate. Examples are executors, administrators, personal representatives, guardians, conservators, etc. When such persons seek to open accounts and conduct business with LFS, special care must be taken by the RR to ensure that the account ownership is established correctly. In general, the account should be opened in the name of the fiduciary and with the social security number or taxpayer identification number of the estate or protected natural person (*e.g.,* the minor or adult protected person).

The RR also must obtain a copy of the court order (dated within 60 days) that evidences the authority of that person to act as fiduciary. In some cases, the court order may limit the fiduciary's investment authority to certain types of financial products. For example, in the case of a guardianship or conservatorship, the court order may restrict the fiduciary to insured bank products and may prohibit other investment products. Any such limitations must be strictly adhered to. Before opening a new conservatorship or guardianship account, an RR must receive approval from both Compliance and the Midwest Sales Manager or National Sales Manager. Any questions in this regard should be directed to Compliance.

In some cases, a probate or other court overseeing a fiduciary account may seek an account inventory from the RR assigned to the account. RRs should never sign court documents without first consulting with their supervisor and, as necessary, the Legal Department.

### G.  Accounts for Securities Industry Personnel

Special rules apply when opening an account for persons associated with an NASD, NYSE member firm or for employees of any domestic securities exchange. This includes accounts in which such persons have a financial interest or over which they may exercise discretionary authority (for example, through that employee's spouse, children, trust, or partnership).

Accounts as described above may only be opened:

- with the written approval of the other member firm or securities exchange (by an individual other than the person opening the account); and
- after the other member firm or securities exchange has designated an individual to receive duplicate confirmations and statements on the account.

Also, the customer should be advised that written permission from the other member firm or securities exchange, generically referred to as a 407 Letter, must be received and that duplicate confirmations and statements will be provided on the account.

After the account is opened, RRs are to use reasonable diligence to determine that transactions for the accounts of such securities industry customers do not adversely affect the interests of the other member firm or securities exchange.

### H.  Changes in Account Information

RRs are responsible for periodically reviewing the information pertaining to their customers for accuracy, completeness, and currency. In particular, information subject to change, such as employer, salary, trading experience, and investment objectives, is to be specifically reviewed with each customer on a regular basis and appropriate changes made to the Firm's customer records. RRs are required to update customer information on the customer profile every three years for active accounts. An account is considered active if a transaction (*e.g.,* deposit, withdrawal, purchase, liquidation, or incoming transfer) has occurred within the past three years.

## CUSTOMER ACCOUNTS

### 1. *Retail Customer Account Changes*

All changes to retail customer account instructions are to be made via the customer's written authorization. These include, but are not limited to, changes of:

- mailing address*
- payment instructions
- dividend/interest payment instructions
- security delivery instructions

*Address changes may be accepted directly by the Operations Department with written instructions from the customer sent via facsimile or regular mail. Upon receiving an address change request, National Financial Services, LLC., our clearing firm, will send a written notice to both the old and new addresses.

Instances of a customer desiring to change the account's address to a post office box number, to the address of another customer, or to the same address as an employee (unless it is an employee-related account) should be specifically brought to the attention of Compliance for review.

### 2. *Death of a Customer*

Immediately upon becoming aware that a customer has passed away, the RR is to notify Operations. Operations is then responsible for notifying the Trade Desk and clearing firm as appropriate.

All open orders for a deceased customer's account or accounts are to be immediately canceled by the Trade Desk once notified by an Operations Principal, and no additional transactions may be executed or orders accepted until the necessary legal documents have been received and approved by an Operations Manager.

### I.  Customer Checks, Securities, and Holding Mail

LFS does not accept third-party checks for deposit to a customer account.

If securities to be deposited into an account are registered in the names of persons not listed on the account, such persons must sign an authorization relinquishing their ownership of such securities.

As a general rule, a customer's checks and securities will be delivered to the customer's account address or to an address provided by the customer in writing with instructions to that effect. Checks and securities may not be provided to the RR for delivery to a customer. A check may be made payable to a payee other than a customer only with the customer's written authorization. Journals (transfers) of assets or securities from one account to another may only be accepted upon written authorization from the customer(s) who own the transferring account. A Letter of Instruction ("LOI") with only one signature is acceptable if the journal is to a like registration. If the journal is to a different account registration, the signatures of all account owners are required on the LOI. A signature guarantee is additionally required in cases involving a journal to a third-party account (involving a completely new registration with no common owners from the transferring account).

RRs and/or Sales Assistants receiving securities or checks directly from customers must keep records of receipt and promptly transmit such securities or checks to the Cashier, no later than by noon of the next business day.

LFS does not hold customer mail as a matter of policy.

### J. Wire Transfers

LFS requires customers wishing to engage in wire transfer activity to sign an Electronic Funds Transfer Agreement and a Wire Transfer User Authorization Form prior to initiating any wire transfer request. The RR or LFS' Operations area will authenticate the setup for new users. After the customer is set up to request wire transfers, they may do so by phone, fax, letter or in person. After the client initiates a wire transfer request, the RR or Operations will authenticate the request. In the case of a written request, a Letter of Instruction-Fed Wire request is submitted, signed by the client. Clients who place wire requests by telephone will be required to provide a Security Code chosen by them previously. LFS' Operations area will perform callbacks and verify client signatures on file. The Operations Department reviews a daily wire transfer report generated by NFS and investigates all wires of $500,000 and greater. Wires are also subject to the anti-money laundering screening tool employed by NFS and any suspicious transactions are reported to LFS for investigation by the Compliance Department. Finally, NFS' Margin department must approve disbursements greater than $100,000.

### K. Options Accounts

Prior to accepting an order from a customer to purchase or write an option contract (even if the customer currently has an existing cash or margin account), the customer must submit a completed Option Account Agreement; the Senior Registered Options Principal specifically must approve in writing the customer for options trading and the level of trading approved; and the customer must have been furnished the appropriate options disclosure document(s). By signing the Option Account Agreement, the customer is (1) verifying the background and financial information upon which the account has been approved for options trading; (2) indicating that they are aware of and agree to be bound by the rules of the NASD applicable to the trading of option contracts (including the position and exercise limits); (3) confirming that they have received a copy of the current disclosure document(s); and (4) acknowledging that they are aware of and agree to be bound by the rules of The Options Clearing Corporation. If, for some reason, a customer has failed to provide a signed Option Account Agreement within 15 days of opening the account, no opening transactions will be allowed in the account.

Additionally, the RR is under a continuing obligation to send the customer a revised Option Account Application for verification within 15 days after the RR becomes aware of any material change in the customer's financial situation. *See* Exhibit 8 for a hyperlink to the current Option Account Agreement.

### L. Margin Accounts

Individual customers and certain legal entities may want margin privileges, but not all accounts are eligible for margin. Specifically, accounts that require a fiduciary generally are not eligible for margin privileges (*e.g.,* UTMA, conservator, transfer on death (TOD), estate, IRA, and guardianship). Those accounts that are eligible (*e.g.,* individual, joint, trust, corporate, etc.) must complete the Margin Account Application, which includes the Truth in Lending Statement, and be provided a copy of the Margin Disclosure Statement. Upon completion of the Firm's Customer Profile and the Margin Account Application, a Principal must approve the account before any non-cash (margined) transaction is executed. A hyperlink to Margin Application and Disclosure Statement is provided as Exhibit 9.

RRs are responsible for knowing, and enforcing, what kinds of securities may be purchased on margin. Questions about whether a security purchase is marginable are to be referred to the Trade Desk.

The Margin Department of the Firm's clearing agent (currently NFS) will notify the RR of Regulation T and maintenance margin calls as set by the clearing firm. The Credit Officer of the clearing firm is responsible for periodically reviewing the accounts trading on margin and for adjusting those accounts' margin requirements.

**VII.     MUTUAL FUNDS**

All mutual fund transactions executed or taken for execution by an RR of the Firm for any of its customers must conform to all applicable state and federal securities and banking laws, the rules and regulations of self-regulatory organizations of which the Firm is a member, and the Firm's policies as contained in this Manual (including as supplemented, modified, clarified or explained by the Firm's Compliance Bulletins).  As with the sales of other investment products to customers, RRs are to handle mutual fund transactions in accordance with the policy statements on <u>COMMUNICATIONS WITH THE PUBLIC</u> (p. <u>3</u>); <u>PROFESSIONAL CONDUCT</u>(p.<u>25</u>); and <u>SALES AND TRADING PRACTICES</u> (p. <u>33</u>).

### A.  Communications with the Public

Communications, including sales literature, research, or advertising relating to mutual funds are to be truthful, in good taste and not misleading, conform to all regulatory requirements, and be approved consistent with the policies contained in this manual.

### B. Sales Literature Relating to Mutual Funds

As described above, sales literature relating to mutual funds is to be reviewed by Compliance and approved by a Principal of the business unit utilizing that material prior to its use.  If the sales literature includes a specific rating, it also must include a description of the criteria used to arrive at that rating.

Because of the special regulatory consideration given to sales literature relating to registered investment companies (including mutual funds, variable contracts, and unit investment trusts), any employee that wants to prepare or disseminate sales literature relative to these products is required to seek the guidance of Compliance prior to their drafting.  Customers who are sent or given publications of mutual fund independent rating services are also to be provided a current fund prospectus at or prior to providing any such literature.

Materials regarding mutual funds that deviate in any way from those previously reviewed by Compliance and approved by a business unit Principal are subject to re-approval.  If any such materials include a specific rating, they are also to include a description of the criteria used to arrive at that rating.

When advertising or otherwise marketing mutual funds to customers or prospective customers, RRs are to ensure that customers are fully apprised of the nature of these investments in accordance with securities and banking regulations.  One of the following product disclosures must appear conspicuously on account opening documentation, customer correspondence, and any other form of communication to customers:

> Products offered through* LaSalle Financial Services, Inc., member NASD/SIPC, and a licensed insurance agency, are not insured by the FDIC or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

OR

## NOT A DEPOSIT
## NOT INSURED BY FDIC OR ANY GOVERNMENT AGENCY  -  NO BANK GUARANTEE  -  MAY LOSE VALUE

Products offered through LaSalle Financial Services, Inc.,(LFS),, member NASD/SIPC and a licensed insurance agency.

*A divisional name can be inserted here (*e.g.,* LaSalle Financial Services, a division of LaSalle Financial Services, Inc., etc.)

Generic market and product brochures of an informational nature may be provided to appropriate customers with the prior review by Compliance and approval from a business unit Principal. Statistical tables, charts, graphs or other illustrations are to disclose the source of the information if not prepared internally. Statistical market information is to contain the disclaimer that appears at Exhibit 10. Statistical Market Information Disclosure.

## C. Prospectus Delivery Requirements

When RRs present any sales literature to clients or prospects that describes a specific mutual fund, the RRs are required to provide a current prospectus for each mutual fund mentioned. If no sales literature is presented, a current mutual fund prospectus must be provided to the client at or prior to the sale of the fund(s). A current prospectus is one that is no older than than thirteen months from date of issue. The dates of issue for mutual fund prospectuses are usually printed on the front or inside cover. RRs are permitted to print a current mutual fund prospectus directly from the respective fund company's web site.

## D. Mutual Fund/Unit Investment Trust Sales Practices and Documentation

Principal sales of investment company shares and unit investment trusts are to be executed at the next-quoted public offering price after the order is received and in accordance with the Firm's sales agreement with the underwriter. Firm policy prohibits "late trading," and thus, orders accepted after the trading deadline will be executed on the next business day. If available, quantity discounts on single purchases, letters of intent, and rights of accumulation should be discussed with customers. RRs must indicate to the Trade Desk if an order is subject to a Letter of Intent or related accounts that would qualify for Rights of Accumulation.

In addition to the policies on sales practices described in this policy statement and elsewhere, RRs may not in connection with mutual fund or investment company sales:

- state or indicate that the product is appropriate for short term investing
- favor or disfavor a particular fund or fund family on the basis of the commission structure
- fail to fully disclose any and all charges or fees relating to the transaction
- demand or require commissions or fees from any source as a condition to the sale or distribution of the product
- offer or promise commissions or fees to any source as a condition to the sale or distribution of the product

### a) Switching

RRs may not recommend unsuitable mutual fund "switching." Unsuitable switching is a prohibited sales practice whereby an RR changes or recommends that a customer change their investments from one mutual fund to another, <u>without a basis for believing that such a switch is appropriate in light of changes to a customer's financial resources or investment objectives</u>.

If a customer's investment objectives or financial resources have changed such that a mutual fund or unit investment trust with a different investment objective has become more suitable to the customer's needs then:

- sufficient information needs to be documented to show that the customer's investment objective can be better served because it is not the policy of the Firm to suggest switching to a different fund family absent such evidence; and

- the customer needs to be advised that they may be forgoing future reductions in sales charges by investing outside the fund family or may be paying an additional sales charge (or becoming subject to a new contingent deferred sales charge) on the purchase of a new fund, as opposed to the nominal fee that may be charged for exchanging within the same fund family.

If it is agreed that it is in the best interest of the customer to change investments, the customer must complete the Customer Acknowledgment Switch Letter. Any contingent deferred sales charges (CDSCs) must be discussed with the customer and documented on the Switch Letter. The Switch Letter must also document a material benefit to be realized by the customer which justifies the switch. A hyperlink to the most current version of the Customer Acknowledgment Switch Letter is included as Exhibit 11.

Changes in investments other than exchanges of mutual funds may also be considered a switch, e.g. annuity 1035 exchanges (variable to variable, fixed to variable, fixed to fixed, or variable to fixed), or switches between annuities (variable or fixed) and mutual funds. A switch letter must also be completed in such cases, and a material benefit justifying the switch must be documented. Full disclosure must be made of any death benefit loss and any CDSCs on the surrendered product, as well as any new CDSC on the product purchased. An RR should not recommend any switch unless it is in the customer's best interests.

### b) Breakpoint Sales

RRs must not engage in the practice of mutual fund "breakpoint sales." A breakpoint sale is a prohibited sales practice whereby a recommendation is made to customers that they make mutual fund investments in amounts selected because they are just below the pre-established points at which the sales charges are reduced. Mutual fund breakpoints are determined by fund families and may not be individually negotiated.

RRs are required to advise customers of the savings available in purchasing amounts above the breakpoint, whether such savings could be achieved through letters of intent or rights of accumulation. RRs should assure themselves that purchases of mutual funds in amounts just below the sales charge "breakpoint" are appropriate and suitable based upon the customer's financial resources and investment objectives and that full disclosure regarding letters of intent and rights of accumulation has been made. Most fund families will allow a letter of intent to be backdated over a certain period of time, and an investment will qualify for a breakpoint so long as the customer agrees to invest at or over a breakpoint threshold over a definite future period of time. RRs should consult a fund's prospectus or Statement of Additional Information for detailed information regarding their rules governing letters of intent or rights of accumulation.

RRs must be sensitive to breakpoint sales for multiple as well as individual transactions, whether those transactions occur on the same day or over time. Larger class B share purchases may be considered violations of the breakpoint sales rules where a customer could instead invest in the fund company's A shares at reduced cost (see discussion below). Sales of mutual funds in more than one fund family in total amounts that would qualify for a breakpoint if they were all invested in one fund family's A shares should generally be avoided, unless the customer cannot realize their investment objectives by investing in one fund family. Under the rights of accumulation privileges at most fund families, holdings in the same fund family maintained in accounts held at other firms, holdings in shares classes other than class A, holdings by other family members in the same household (including multiple accounts by the same owner), as well as additions to pre-existing positions or new purchases of other A share funds in the same family generally will serve to qualify a customer for a breakpoint discount. RRs must be familiar with the breakpoint rules of the mutual fund families they recommend so as to ensure that their customers receive the appropriate breakpoint discounts to which they are entitled.

### c) Sales of Multiple Class Mutual Funds

Some mutual fund companies offer multiple fund share classes, with differing fee schedules within the specific fund to achieve the different classes of shares. For example, funds with A shares come with up-front sales charges and B shares have contingent deferred sales charges. Generally, the expenses or management fees for B shares are raised, temporarily or permanently, to offset the commissions paid to brokers and representatives. Generally, at some later point in time (subsequent to the expiration of the surrender period), B shares convert to A shares, with their attendant lower operating costs. C shares have no upfront sales charges but typically come with a short surrender period (e.g., one year) and with higher operating costs similar to B shares. However, C shares usually never convert to A shares and thus are generally the most expensive class of shares to own over longer time periods. As such, C shares are generally suitable investments only for customers with shorter investment time horizons and who invest in mutual funds which are consistent with a shorter time horizon.

RRs are responsible for being familiar with the costs and benefits of each type of shares, for carefully explaining to customers the benefits and financial implications of each type, and for ensuring that the particular type of share offered is consistent with the customer's needs and investment objectives. In assessing which share class is best, RRs should consider the size of the initial investment and the possibility of future contributions to the customer's account. The RR should inform the customer that they may benefit from investing in A shares because of the ability to receive discounts on sales charges of large purchases and the lower ongoing fees and expenses of the A shares. Large individual or multiple purchases of B shares, either within one mutual fund family or within more than one family, may constitute a violation of the breakpoint sales rules when such investments can be made within one family's A shares at a substantially reduced cost.

Many mutual fund companies set dollar amounts at which they no longer accept trades for B or C shares. Generally the fund's prospectus or statement of additional information (SAI) will outline the requirements for a particular fund and will provide a brief cost analysis comparing the purchase of B or C shares versus A shares. RRs should only present B or C shares as a possible option when it is beneficial for the customer. In order to make this determination, an RR must include in their sales discussions with the customer a comparison of the 12b-1 fees, front-end sales charges, and the impact of time on these costs and charges. RRs should utilize the mutual fund expense analyzer tool found on the NASD's website in order to facilitate this comparison. A hyperlink to the NASD's expense analyzer is attached as Exhibit 12.

In order to ensure that customers have been provided adequate information and are making an informed decision in connection with their purchase of multiple share mutual funds, customers who purchase B share transactions in an amount of $100,000 or more must sign the B Share Customer Acknowledgment form. A hyperlink to this form is included as Exhibit 13. An order for B shares in amounts of $100,000 or more will not be processed by the trade desk without the signed acknowledgment. The Acknowledgment must be signed for individual B share trades of $100,000 or more and for multiple B share trades within one or more mutual fund families that in the aggregate total $100,000 or more. An RR also must have such trades pre-approved by the National Sales Manager.

Purchases of B shares in an amount of $250,000 or greater are not permitted, either as individual B share trades or for multiple B share trades within one or more mutual fund families that in the aggregate total $250,000 or more, whether those trades are placed the same day or over a short period of time.

Some mutual fund families may offer other share classes as well, but the same principles discussed above should govern RRs' recommendations of such other shares classes. Namely, the RR must conduct a comparative analysis of the respective costs, advantages and disadvantages of each share class, the impact of time on these costs and charges, and the likelihood of additional future investments. The RR must then disclose these facts to the customer. Generally, RRs should

recommend only the share class that is most cost advantageous for the customer in light of these various factors.

### d)  Selling Dividends

No RR shall, in recommending the purchase of a mutual fund, state or imply that the purchase, shortly before an ex-dividend date, is advantageous to the purchaser, unless there are specific, clearly described tax or other advantages to the purchaser. In addition, no RR shall represent that distributions of long-term capital gains by an investment company are or should be viewed as part of the income yield from an investment in such company's securities.

### e)  529 Plans

RRs who recommend and sell mutual funds through 529 college savings plans must ensure that their customers are aware that they may be able to purchase in-state 529 plans that may afford them preferential state income tax treatment, and that may also be purchased at costs lower than those charged by 529 plans made available though mutual fund vendors with whom the Firm maintains a selling agreement.  Such disclosures must be documented in the Notes section of the Customer Profile.  These considerations should also govern RRs recommendations regarding 529 plans to their customers.

### f)  NAV Entry Privilege

From time to time, certain mutual fund vendors with whom the Firm maintains a selling agreement may offer, in limited circumstances, an NAV entry privilege to customers who transfer funds from another mutual fund family (e.g., who transfer funds from a class A, B or C mutual fund at another mutual fund complex).  RRs must enable their customers to avail themselves of this opportunity, where applicable, and generally may not recommend purchases in the new fund family which entail an upfront sales load or CDSC.

### E. Mutual Fund Due Diligence

The Firm's product selection committee meets at least annually to select the fund families that will be included in the Firm's Preferred Provider Program.  The committee conducts due diligence on various fund families and selects only those that meet its criteria.  The Preferred Provider Program generally includes a select group of some of the largest and most well-known mutual fund families that offer a broad spectrum of investment products.   A hyperlink to the Approved Product List is included as Exhibit 14.

RRs, however, may solicit orders for mutual funds not in the Preferred Provider Program, and are encouraged to do so when it is in the best interests of the customer (e.g., a customer has a position in a fund and wishes to add to that position, or may obtain a breakpoint discount by investing in a fund family outside of the Preferred Provider Program).  RRs that recommend non-preferred mutual funds may be required to conduct due diligence to establish that the non-preferred fund is superior to similar mutual funds offered through preferred providers.

VIII.    PROFESSIONAL CONDUCT

It is the policy of the Firm that all employees conduct themselves in accordance with industry regulations, provisions of applicable state and federal laws, and the highest standards of good business practices.

Employees are to remain in good standing with all self-regulatory organizations and in all jurisdictions where they conduct the Firm's business in order to continue to remain qualified to receive compensation. In particular, an employee generally becomes unqualified to receive compensation upon a finding that the employee has violated the rules of any governmental or regulatory authority to which the employee is subject or upon a felony conviction.

In addition to complying with the policies and approval requirements as contained in this policy statement, employees are also to comply in full with the provisions of LaSalle Bank Corporation's Standards of Conduct Policy, including specifically adhering to the proscriptions and obtaining approvals as required by that document in addition to those required by this Manual.

### A.  Prohibited Practices

Employees are specifically prohibited from the following:

- using their positions with the Firm or knowledge or expertise gained in the course of their association with the Firm, whether actually or by appearance, for private gain, for the benefit of any enterprise which is or could be in direct or indirect competition with the Firm, or to obtain favors or benefits personally, for a family member or for another person;
- misappropriating for themselves any corporate opportunity which the Firm is financially, strategically, or legally able to undertake;
- making or receiving any payment on behalf of or for the benefit of the Firm, either domestically, or abroad, for the purpose of acquiring or retaining business, obtaining business concessions or attempting to influence a governmental decision or activity;
- borrowing or lending money or securities to any customer of the Firm unless such customer is a family member of the employee and the borrowing or lending is unrelated to any transaction or business activity conducted at or through the Firm;
- suggesting or allowing the Firm's name to be used or listed in any prospectus or offering circular in connection with a transaction in which the Firm is not directly involved and which has not been properly approved by management;
- suggesting, directly or indirectly, that they, the Firm, or any of the Firm's affiliates will guarantee a customer against loss;
- misrepresenting the Firm's name, logo or their status with the Firm. Employees are not permitted to execute any document, contract or letter agreement on behalf of the Firm;
- Employees are not authorized to act on behalf of the Firm in connection with any agreements, settlements or other matters which would create an obligation of the Firm to a third party; and
- forging signatures of customers or others; or altering, falsifying or destroying customer or Firm records or documents.

*See also* the Prohibited Activities section of SALES AND TRADING PRACTICES, p. 33.

### B.  Private Securities Transactions

Private securities transactions, which are governed by state and federal securities laws and by the provisions of self-regulatory organizations, have implications for both the participating employee and the Firm. Accordingly, employees that want to, or are solicited to, engage in a private securities transaction outside the regular course or scope of their employment are to seek the approval of their

supervising principal or RSM and Compliance in advance by providing a written request detailing the terms and the employee's role in the proposed transaction. If approval is granted, the Firm will be required to supervise the employee in the transaction and may, accordingly, condition the approval on certain conditions or terms relative to the employee's participation.

Employees with any questions relative to whether a transaction would be subject to or exempt from the regulations governing private securities transactions should consult with their supervising principal, RSM, or Compliance.

### C. Selling Away

Selling any financial instrument by an RR outside of LFS is strictly prohibited. Financial instruments include, but are not limited to, any security or insurance product. Providing advisory or financial planning services outside the Firm also is strictly prohibited.

### D. Outside Business Activities

Employees are encouraged to be good citizens and to participate voluntarily in community, philanthropic, or charitable activities as they wish. Activities that would require significant amounts of the employee's time or attention during regular business hours or that would necessitate the employee's soliciting money from or having interaction with the Firm's customers must be approved in writing by the employee's business unit manager in advance. RRs must submit an Outside Business Activity Notification form to their business unit manager who will review it and forward it to Compliance for final review. A hyperlink to the current version of the Outside Business Activity Notification form is included as Exhibit 15.

Employees may accept employment or compensation for outside activities (including speaking engagements, teaching, or writing), run for public or elected office, or become affiliated as an officer or director with another organization or entity only with the prior approval of their business unit manager and Compliance. When deciding whether to grant approval, the nature and extent of the employee's job responsibilities, the proposed activity, and any actual or potential conflict or relationship between the entity or organization and the Firm will be considered. Material information on approved employment and affiliations is to be reported to Compliance when requested. LFS may in its discretion restrict any outside business activity that is deemed to be a potential conflict of interest or is considered inconsistent with any agreement the RR has with the Firm.

No employee may accept a finder's fee from any third party, other than an affiliate of the Firm, without the prior approval of their business unit manager. Employees seeking approval to accept such a fee are to submit the request with all appropriate documentation in writing to their business unit manager who may, after consulting the Director of Compliance, require the fee to be paid to the Firm which, in turn, will issue its own check to the employee.

Employees are precluded from having a controlling ownership or financial interest in any organization or entity engaged in whole or in part in any securities, financial, or similar business, other than those affiliated with the Firm.

### E. Gifts and Gratuities

Employees may only give or accept anything of value in connection with the business activities of the Firm if such gifts or gratuities are:

- valued at less than $100 per year, per recipient; or
- customer entertainment involving an occasional meal, a ticket to a sporting event or the theater, or any comparable entertainment, which is neither so frequent nor so extensive as to raise any question of propriety. Such customer entertainment should have a legitimate business purpose and such expenses should be reasonable.

In addition, insurance laws in all but two states (California and Florida) prohibit rebating. Rebating is a sales practice in which an insurer or an insurance producer offers a prospect an inducement to purchase an annuity contract or insurance policy. For example, an insurance producer might provide a rebate by sharing the commission the producer earns on a sale with the purchaser of an insurance policy. Anti-rebating laws are one of several methods the states use to ensure all insureds are treated fairly and that all insureds in the same underwriting classification are treated alike. Please make certain that no promotions exist where customers are given a "gift" or "free service" for purchasing an annuity or insurance product.

Employees offering or giving gifts to customers or others in connection with the business of the Firm consistent with the above policy should be sensitive to the potential conflicts of interest and appearance of impropriety which such gifts may create. Employees are encouraged to consult with their supervising principal, RSM, or Compliance regarding the giving, or receiving, of any gift or gratuity which is likely to be misunderstood or reflect poorly on the employee or the Firm.

RRs are to complete the Gift form and forward it to Compliance. A hyperlink to the current copy of the form is included as Exhibit 16.

## F.  Reportable Matters

RRs and other persons registered with LFS are reminded it their responsibility to keep their Form U-4 current and to notify Compliance promptly of any changes. An RR must immediately notify his or her supervising principal and Compliance if the RR is, or becomes, engaged in the following circumstances:

- any suspension or revocation of the employee's license or any refusal of registration by any self-regulatory organization or government body;
- is charged, convicted of, or pleads no contest to any felony; regardless of whether or not the matter involves the employee acting in the course of employment with the Firm;
- is charged, convicted of, or pleads no contest to any misdemeanor involving the purchase or sale of any security or crime involving dishonesty (e.g., fraud, bribery, perjury, forgery); regardless of whether or not the matter involves the employee acting in the course of employment with the Firm;
- is named in any civil complaint;
- files for personal bankruptcy, either voluntary or involuntary;
- is in control of an organization that filed for bankruptcy;
- name change (e.g., marriage);
- changes in personal residence address; or
- engages or changes in outside business activity.

Generally updates to Form U-4 must be made within 30 days through NASD's WebCRD, and the Firm may be subject to fines of $10 per day up to a maximum of $300 for late disclosure. If the Firm is subjected to a late disclosure fee due to failing to receive timely notice from an employee regarding an update to their Form U-4, any such fine will generally be charged to the employee.

## G.  Fraudulent Schemes

On occasion, employees may be approached by individuals who claim to have access to substantial sums of money and who seek to make that money available to the Firm or to employees for loans or investment at advantageous rates or on terms more favorable than those usually available. Solicitors may be seeking up front fees or expenses or a written acknowledgment from the employee or the Firm that could be used to attest to a third party that it is a bona fide transaction. Indicators that a proposed transaction may not be legitimate can include the following:

- a borrower's interest cost well below prevailing interest cost on funds from usual sources;
- no repayment of principal by borrower until the term of the loan expires;

- a loan to be secured by government-backed securities with coupon interest payments paid to borrower;
- an undisclosed foreign principal has deposited money in an undisclosed bank in Europe or the Caribbean;
- promises that money will be transferred to the borrower's U.S. bank as soon as pertinent documents are executed; or
- the borrower is asked to pay an advance fee before the transfer is effected and the identities of the lender and foreign bank are revealed.

Under no circumstances should an employee give a solicitor any statement in writing or provide any documents, such as letters, agreements or proposals, guaranteeing the availability of quantities of securities, without their business unit manager.

## H.  Continuing Education

The Securities Industry Continuing Education Program was approved by the SEC and the various self-regulatory organizations in 1995.  The program is divided into two components: the Regulatory Element and the Firm Element.

### 1.  Regulatory Element

The Regulatory Element of the Securities Continuing Education Program requires all registered persons to complete a prescribed computer-based training session within 120 days of the second anniversary of their initial registration and every three years thereafter.  The Compliance Department will send a memo to the RR when the continuing education notification is received from the NASD.  Registered persons that do not complete the regulatory element within the prescribed time frame will have their registration deemed inactive until such time as the requirements of the program have been satisfied.  Any person whose registration has been deemed inactive shall cease all activities as a registered person and will be prohibited from performing any duties and functioning in any capacity requiring registration.

### 2.  Firm Element

The Firm Element of the Securities Industry Continuing Education Program is applicable to all registered persons and their supervisors who have direct contact with clients in the conduct of the Firm's securities sales, trading, or investment banking business.  Firm Element is an annual education program administered by the Firm that is designed to enhance the securities knowledge, skill, and professionalism of the Firm's covered persons.  The content of Firm Element training is derived from a self-analysis of the Firm's training needs.  The analysis takes into consideration the size of the firm, organizational structure, business activities, and regulatory developments, to name a few.  The Firm's annual anti-money laundering training will be incorporated into the annual Firm Element training program.

## I.  Annual Compliance Meeting

Each RR is required to attend an annual compliance meeting, given by the Director of Compliance or their designee.  Compliance will keep a written record of attendees and store it in the Compliance Department located at the Chicago OSJ.  The topic(s) and any presentation material for the meeting will be approved in advance by the Director of Compliance.  General topics from which specific material will be chosen include but are not limited to, current regulatory issues or developments affecting the financial products LFS offers, current Firm compliance issues, or matters raised by inquiries of the Firm by regulatory bodies.

**PROFESSIONAL CONDUCT**

J.   **Annual Employee Questionnaire**

Each associated person is required to complete the employee questionnaire.  Each associated person will complete the employee questionnaire upon hiring and at least annually thereafter.  The questionnaires will be maintained by the Compliance Department.

## IX.    REGISTRATIONS

It is the policy of the Firm that both it and its employees be appropriately qualified and registered with all applicable regulatory bodies relative to the business conducted and job functions performed. Further, no employee of the Firm may solicit for sale or sell any security that is not properly registered or exempt from registration pursuant to federal rules and regulations and those of the jurisdiction where the customer involved in such sale or offer resides.

### A.  Individual Registrations

Prior to conducting business for or on behalf of the Firm, employees are to be appropriately qualified and licensed for products and investments sold or offered for sale and for job functions performed.

Each supervisory principal or RSM is responsible for ensuring no employee in their area of responsibility:

- conducts any securities business on behalf of the firm in any jurisdiction where the Firm and that employee are not properly registered or exempt from registration; or
- performs any job function requiring a qualifying license or registration that employee does not have.

All activities required to be performed by a securities principal are to be performed only by individuals appropriately qualified and registered.

### 1.  Regulatory Filings

Employees are responsible for providing all requested information at the time of their employment with the Firm and thereafter to ensure that regulatory filings made in connection with their application as registered persons with the Firm are complete and accurate. Employees are to immediately notify Compliance if they become aware that any personal or professional information previously provided to the Firm or to a regulatory body has become inaccurate, and they are to cooperate fully in supplying such information as is necessary to bring regulatory filings and Firm records into complete accuracy.

The Compliance Department is responsible for filing the forms necessary to register employees with regulatory bodies as appropriate to an employee's qualifications and job responsibilities;   It is the RSM or designated principal's responsibility to obtain a Pre-Hire Consent Form from prospective employees so that Compliance can check their record on the NASD's WebCRD. Employees should direct questions concerning their registrations to Compliance.

Any supervisor that becomes aware of a job assignment, whether by promotion, demotion, leave of absence, or termination that affects the accuracy of the Firm's regulatory filings is to promptly notify the Compliance Department, who will make any necessary filings to ensure the Firm's records are complete and accurate. In addition, the Compliance Department will provide a copy of such filings to the employee.

As a matter of policy, the Firm will not carry registrations for individuals not actively engaged in the securities business of the Firm. Registration for non-employees of the Firm who provide compliance, audit, or other legitimate administrative support to the Firm may be carried consistent with regulatory rules and with the approval of the Director of Compliance.

### 2.  Activities of Registered Personnel

Only RRs that are appropriately registered may open new accounts, solicit customers, orders and perform the inquiries necessary to know a customer.

If a customer is a part-time resident of two states, the customer must at the time of each trade be domiciled in a state where the RR is registered. The new account form should record the address

that corresponds to the state of domicile (even if the mailing address is different) and should include a brief statement explaining the two state residences.  In other instances, RRs may not accept an account or transaction for a customer who is domiciled - or whose primary domicile - is in a jurisdiction in which the RR is not registered to conduct securities business.

Personnel who are authorized and licensed to sell non-deposit investment products may receive incentive compensation for transactions entered into by customers.  However, incentive compensation programs must not be structured in such a way as to result in unsuitable recommendations of sales being made to customers.

### 3.   Activities of Unregistered Personnel

Unregistered employees of the Firm may perform routine administrative and clerical functions at the direction of the RR or others.  RRs, however, are generally responsible for the actions of their sales assistants.  Thus, any transcription or clerical errors by a sales assistant may be charged to the RR's net or gross commission.  Unregistered personnel may assist the RRs in an administrative capacity only and may perform other routine clerical duties.  Unregistered personnel may not accept orders, distribute any sales literature or advertising, recommend securities, or handle customer funds or securities except in an administrative fashion.

When permitted by applicable regulations, the Firm may agree to pay employees of the Firm's affiliates a referral fee for directing a potential customer to a registered person.  Any such fee cannot be dependent upon the opening of an account, the size of an account opened, the execution of a transaction, or the volume of such customer's business.  The referral fee is to be a nominal, one time per referral, flat dollar amount paid solely for the referral.  The amount and use of referral fees must be approved in advance by Compliance.

### B.   Employee and Employee-Related Brokerage Accounts

Employees are required to notify the Firm of brokerage accounts held at another broker/dealer ("outside brokerage account"). This includes accounts in which the employee has a financial interest (e.g., other household accounts) or over which they may exercise discretionary authority.  The notification shall be in writing prior to opening the account or at the time the employee becomes associated with the Firm for accounts that exist prior to the employee's affiliation with LFS.  The Compliance Department will in turn send the broker/dealer holding the account a "407 letter" granting permission for the employee to hold the account at the outside broker/dealer and instructing the broker/dealer to provide duplicate account statements and confirmations to the Compliance Department (or the employee's business unit manager).  For a sample 407 letter, refer to this hyperlink to Exhibit 17.

Employee and employee-related brokerage accounts are also subject to the Firm's Code of Ethics, effective January 7, 2005.  Under the Code of Ethics, certain employees ("Covered Employees") are required to pre-clear certain of their personal securities transactions.  For a hyperlink to the Code of Ethics, see Exhibit 18.

Generally, employees may freely trade securities and commodities in their own employee accounts consistent with their financial resources, investment objectives, and trading experience.  Employees may not use an employee-related account or any other customer account to do any trade or act for their benefit which would be prohibited in an employee account.

Employees are responsible for ensuring that all trading in their employee accounts, regardless of whether such accounts are at the Firm or elsewhere, conforms to the following principles:

- Employees may not trade, attempt to trade, or cause to have trades executed on their behalf or for their benefit while in possession of or after exposure to material, nonpublic information relating to the subject of the trade.

- Employees may not trade their employee accounts in such a way that the trading interferes with the fulfillment of their business duties and responsibilities.
- Employees may not execute or cause another to execute their employee trades at the Firm in any manner or in any way that would disadvantage or take unfair advantage of any customer transaction. If, on any given day, an employee or employee-related account receives a more advantageous price than that received for a customer's solicited order for the same security, a contemporaneous memorandum substantiating the unusual or extenuating circumstances affecting the price differential and indicating the approval of the Director of Compliance is to be made and retained by the RR entering the order for the employee account.
- Employees may not deliberately trade in tandem with or ahead of any customer or in contemplation of any customer trade.
- Employees may not deliberately structure their trades or timing of trades such as to create an appearance of activity or liquidity or to affect or influence improperly the bid, offer, or market price of any security.
- Employees may not trade in "hot issues." *See* Initial Public Offerings/Freeriding & Withholding, p. 36.

### C.  Surveillance of Employee Accounts

Trades in employee and employee-related accounts are subject to regular review by their supervisory principal, RSM, or Compliance, who may at their discretion, place special constraints or restrictions on any employee or employee account if deemed necessary or appropriate. Such restrictions may include, for example, the following:

- prohibiting trading in certain investments for certain periods,
- directing that an employee or employee-related account be closed, or
- requiring that an employee trade only on a cash basis.

Any such restrictions are to be strictly adhered to regardless of whether the accounts are maintained at the Firm or elsewhere. If an employee violates any account restrictions, the Firm, at its discretion, may cancel any trade, keep all profits (or donate them to a charity) and require the employee to absorb any losses.

## X.   SALES AND TRADING PRACTICES

It is the policy of the Firm that each transaction executed or taken for execution by an employee for any of its customers or prospective customers conform to all applicable state and federal securities laws, the rules and regulations of the NASD and the Firm's policies as contained in this Manual.

In particular, all purchases and sales of securities are to be consistent with the Firm's intention to achieve:

- full and fair disclosure of the character of the product to the customer;
- a thorough understanding by the customer of the investment product involved; and
- strict adherence to the highest business ethics and to just and equitable principles of trade.

*See also* MUTUAL FUNDS, p.20

### A.   Prohibited Activities

All employees are to refrain from the following concerning the Firm's customers and their activities:

- offering tax or legal advice in connection with any solicitation or transaction;
- warranting or guaranteeing, either verbally or in writing, the present or future value or price of any product, or that any company or issuer of securities will meet its promises or obligations;
- agreeing to repurchase at some future time a product from a client for the employee's own account, for the account of the Firm, or for any other account, except for a bona fide repurchase transaction made in the regular course of the Firm's business;
- acting as a personal custodian of securities, stock powers, money or other property belonging to a customer or holding a power of attorney relative to securities or financial transactions (other than for a customer who is a relative of the employee);
- borrowing from, lending to, or arranging for the extension or maintenance of credit to, a customer (other than for a customer who is a relative of the employee);
- sharing with any customer either profits or losses resulting from a security transaction, funding a customer's account or guaranteeing the payment of any debit balance in a customer's account (other than through the joint participation in an established employee account, approved as required by Compliance);
- rebating to any person or entity any part of the compensation received for orders taken and executed;
- forwarding or agreeing to forward confirmations or statements (other than interested party duplicate confirmations and statements) other than to the official mailing address of the customer; and
- acting as Trustee, Successor Trustee, Executor, Administrator, Personal Representative. Guardian, Conservator, Custodian, or other fiduciary capacity for the account of a customer or customer's estate (other than for family or related accounts);
- effecting customer securities transactions that are not authorized by the customer (unauthorized trades); and
- recommending excessive trading activity in customer accounts ("churning") in light of the customer's investment objectives and financial situation.

*See also* PROFESSIONAL CONDUCT, p.25.

## SALES AND TRADING PRACTICES

### B. Suitability

#### 1. General

Employees are to ensure that in opening as well as in maintaining accounts for customers sufficient information is obtained about the customer for the RR to know the customer and to make a determination as to whether it is appropriate for the Firm to do business with such customer. RRs are to be cognizant of the information known on their customers and its accuracy, completeness, and currency. As many customers effect only periodic transactions, the RR should confirm with such customers that the information on which the Firm and the RR base their suitability determination is current and that no significant changes have occurred since the customer's last transaction.

The determination of suitability requires the RR to exercise good judgment on a case by case basis. If a customer insists on purchasing a product that, in the opinion of an RR, is inconsistent with the customer's account information on file and known to the RR, the customer should be told of the RR's concerns and the Firm's obligation to resist a customer's efforts to acquire an inappropriate investment. If the customer wishes to disregard the RR's advice and execute a trade that is clearly unsuitable, the trade should be refused.

#### 2. Senior Citizens/Elderly Customers

Regardless of the type of product sold, care should be taken when dealing with suitability issues for elderly persons. To help address this matter, RRs are required to ask their customers who have attained the age of 75 or greater with whom they consult for their financial affairs and if the customer would like to include this person in their decision making process. The RR also must offer to speak with the customer's "trusted advisor" by phone or in person concerning the recommended investment and document such discussions. RRs must document in the Notes section of the Customer Profile their discussions with the customer about any such "trusted advisor."

As with all clients, RRs must conduct a thorough review of the customer's financial situation, including their current asset allocation. As a general rule, an individual should have no more than the remainder of 100 minus their age at market risk. For example, an 80 year old person generally should have no more than 20% of their assets invested in the equity markets. Obviously, circumstances can vary, but this is a good starting point.

#### 3. Selling to Non-English Speaking Customers

Because of the possibility of customer confusion or misinterpretation when assisting customers that do not read or speak English, such customers must be accompanied by a "trusted advisor" during any sales presentation. The trusted advisor must be of legal age; must speak and read English; and must speak the customer's foreign language. Further, if the RR does not speak the customer's language, a Bank or other affiliate employee who also speaks that language must be present during the sales presentation. The RR must document the name and relationship of the advisor and, if applicable, the name of the Bank or other affiliate employee.

### C. Discretion

If specifically requested by a customer, RRs may exercise time and price discretion relative to a particular transaction. However, the time and price discretion shall expire as of the end of the business day on which it is granted, absent a specific, written indication signed and dated by the customer. RRs may not exercise time or price discretion on a good-til-canceled (GTC) basis unless it is pursuant to an order in an institutional account with valid GTC instructions issued on a "not held" basis. RRs may not accept discretionary authority, either written or oral, from a customer other than that which is specifically limited to time and price discretion. Any exercise of time and price discretion must be reflected on the order ticket.

## SALES AND TRADING PRACTICES

RRs are to accept orders only from the customers named on an account or from an individual specifically empowered by written authorization to exercise discretion as to trades for that customer. Thus, for retail accounts, if an account owner wants someone else to be able to direct transactions in their account, the account owner must appoint that third party by executing a limited trading authorization, or pursuant to a valid power-of-attorney.

### D. Bond Transactions

When discussing a bond's rating with a customer, RRs are to disclose the name of the service providing the rating and carefully identify the specific bond to which the given rating applies.

RRs must make full disclosure of the relevant features, costs, risks and characteristics on solicited bond and other fixed income transactions. For example, an RR should explain to the customer the inverse relationship between interest rates and fixed income prices and the impact of interest rate movements on the value of a customer's principal as reflected on their statement; how "premium" or "discount" bond prices work, where applicable; accrued interest; how call features operate (the instrument is callable only at the discretion of the issuer); interest payments (the "coupon"); and other risks that may be involved in each particular case (e.g., credit risk, inflation risk, etc.). Investors must be aware that they may not receive back the full amount of their principal invested if they sell prior to maturity or call date or if they purchase a fixed income instrument at a premium. In general, these same issues affect investors who purchase bond or fixed income mutual funds, but there may be other features of bond mutual funds that are unique and which must also explained to the investor. For example, in a bond fund there is generally no maturity date as such and thus unlike a purchaser of an individual bond who knows they will receive par value back at maturity, there is no guarantee of what value will be received back by a bond fund investor at any future time of redemption.

### E. Refusing Transactions

If an employee has reason to believe that doing business with, or any specific transaction for, a customer would violate the rules or regulations of any federal or state governmental body or any self-regulatory organization, the transaction or business is to be refused and Compliance promptly notified.

Employees are to immediately report to their supervisory principal any situation they have reason to believe a customer or prospective customer placing a trade may be in possession of material, nonpublic information relating to the subject of the trade. Under no circumstances is an RR to accept or process such an order without the explicit approval of their supervisory principal.

RRs are not to accept a sell order from a customer in any situation in which they have reason to believe the customer or prospective customer offers or seeks to sell stolen securities. All such instances are to be promptly reported to Compliance.

RRs are to refuse to accept or to execute any order:

- for a product as to which they are not licensed;
- for a customer that resides in a state where the RR is not registered to do business; or
- for a security which is not registered or exempt from registration under federal and state securities laws.

RRs are to refuse any transaction that they have reason to believe may have been structured or timed to create an appearance of activity or liquidity or to affect or influence improperly the bid, offer, or market price of any security. Situations in which such structuring may be implicated are to be brought to the attention of a supervisory principal or a compliance officer immediately.

### F. Errors

Errors are expensive and can damage the Firm and an employee's reputation. Errors can result from misunderstandings with the customer as to the terms of an order, from data entry or processing

## SALES AND TRADING PRACTICES

mistakes, or from an unscrupulous act. Financial responsibility for errors that are controllable by the diligence of an employee may be charged against the employee's compensation at the discretion of the employee's supervising principal, RSM, or the Chief Operating Officer. Under no circumstances should an employee change the Firm's documentation or attempt to resolve an error in contravention of the appropriate involvement of the RR's supervisory principal, RSM, or Compliance.

Customers should be reassured that losses in and charges to their accounts resulting from legitimate errors will be promptly corrected. Under no circumstances should an RR suggest, imply, or promise a customer that the customer's account is guaranteed against loss or risk of loss due to market fluctuations.

### G.  Markups and Commissions

It is the Firm's policy that markups on securities must be in full compliance with the rules of the NASD relating to markups and markdowns. For agency transactions, customers normally are charged commissions consistent with the Firm's published commission rate tables.

### H.  Restricted Securities and Beneficial Ownership Rules

Customers presenting restricted or "legended" securities for sale are to have such restrictions cleared prior to acceptance of the order. Sales of restricted securities that will be made pursuant to the "safe harbor" provisions of SEC Rule 144, 144A, or 145 are subject to special restrictions, including holding and sale periods, quantities which can be sold, and documentation. Normally, customers that seek to sell restricted securities are responsible for seeking their own legal counsel concerning the limitations and requirements of the rules and the filing of all necessary regulatory forms.

Beneficial owners of more than 5% of any registered class of voting equity securities are subject to special integrated disclosure rules under Sections 13(d) and 13(g) of the federal securities laws.

Questions relating to these matters should be referred to the Operations Department.

### I.  Penny Stock Transactions

Penny stock, as used and referred to in this policy, means an equity security which is not traded on a national securities exchange or included in the NASDAQ National Market System and which in a particular transaction trades below $5.00. It is the Firm's policy to accept penny stock orders on an unsolicited basis only. As such, each RR is required to have the customer complete an Unsolicited Customer Acknowledgment form prior to placing the order. A hyperlink to the Unsolicited Customer Acknowledgment form is located as Exhibit 4.

### J.  Initial Public Offerings/Freeriding & Withholding

Employees of the Firm are prohibited from purchasing an initial public offering of a security that trades at a premium to the public offering price in the secondary market ("hot issues"). In addition, RRs are not to execute purchases of such securities for any of the following individuals or accounts:

- employee and employee-related accounts;
- accounts of directors, officers, employees, and associated persons of any NASD member firm;
- senior officers of banks, insurance companies, registered investment companies, registered investment advisory firms, and any other persons within such organizations whose activities influence or include the buying or selling of securities; or
- accounts in which any of the above named individuals have a beneficial interest or which are for members of their immediate families.

**SALES AND TRADING PRACTICES**

### K.  Retail Options Sales

It is the Firm's policy to accept option orders on an unsolicited basis only. Accordingly, each RR is required to have a completed Unsolicited Customer Acknowledgment form on file prior to placing the order.  *See* Exhibit 4.

Procedures for opening option accounts are included on page 19.

### L.  Fee-Based Accounts

RRs who recommend the opening of a fee-based account must ensure that this is an appropriate arrangement for the customer in each case.  Similarly, RRs should generally avoid recommending loaded mutual funds in fee-based accounts, since the combination of the sales charge (front-end or back-end) and the asset-based fee may result in total fees charged to the customer that may be excessive.  An RR who recommends a fee-based account must make full disclosure to the customer of the fees and the alternative types of arrangements which are available.

**INSURANCE & ANNUITY PRODUCTS**

XI.    **INSURANCE & ANNUITY PRODUCTS**

A.  **Variable Annuities**

Variable Annuities are designed as retirement vehicles for individuals allowing for tax-deferred accumulation of earnings.  As such, they may not be appropriate for younger investors (who generally have long enough time horizons to ride out fluctuations in the market), or for the very elderly (see discussion below).  Upon withdrawal (systematic or lump sum), earnings are paid out first and are taxable as ordinary income.  Variable annuities provide the ability to choose a series of income payments that can be customized to meet a client's needs and that cannot be outlived.  Payments made in this manner are paid on a tax-advantaged basis with a portion of each payment considered a return of principal and, therefore, non-taxable.  The balance is considered earnings and subject to ordinary income taxes.

1.  *Suitability*

The following items should be considered before recommending that a client purchase a variable annuity:

a)  **Investment Objective**

The client's investment objectives should include tax-deferred accumulation for and during retirement, *unless* the variable annuity is being placed within a tax-qualified account (IRA or qualified plan).  In the latter case, there must be a rationale other than tax-deferral which establishes the suitability of the transaction.

b)  **Time Horizon**

The client should generally have a long-term investment horizon.  The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first five to ten years, depending on the contract.

c)  **Liquidity Needs**

Some contracts provide for an annual free withdrawal of 10% to 15% of premiums (or account value). Withdrawals in excess of the free amount will be subject to the stated surrender charge.  In addition to surrender charges, the client may incur a 10% tax penalty on withdrawals of earnings prior to age 59½.

d)  **Tax Considerations**

Your client's tax bracket should also be considered when making a recommendation to purchase a variable annuity.  While the tax laws and tax brackets may change, generally investors in lower tax brackets may not derive much benefit from tax deferral.  Generally, the lower the current tax bracket, the longer the time horizon should be. High tax bracket clients should also consider longer time horizons since all annuity earnings are taxed as ordinary income rather than capital gains.  Another tax consideration to keep in mind is that all withdrawals during the accumulation phase are treated as a withdrawal of earnings first and, thus, are reported as ordinary income.

e)  **The Aggregation Rule**

All annuity contracts entered into after October 21, 1988, which are issued by the same insurance company to the same policyholder during one calendar year, will be treated as one annuity contract for the purpose of determining the taxable portion of any distributions. The aggregation rule does not apply to distributions received under qualified plans or immediate annuities.  If a policyholder withdraws more than the accumulated interest from one of the (multiple) contracts the insurance company must report the distribution as the interest from all of the contracts first and the balance of the withdrawal as a return of principal.

#### f) Diversification

As with all investments, diversification is important because it can help reduce (but does not eliminate) the risk of loss of principal. Clients should limit their investment in variable annuities to a manageable percentage of their net worth and diversify their investments within the variable contract to meet their investment objectives and risk tolerance level.

#### g) Market Fluctuation

Variable annuities may be subject to fluctuation due to changing market conditions. Investors with a low tolerance for market risk may be more comfortable in assuming that risk in a variable annuity contract due to the guaranteed death benefit. However, the death benefit should not serve as a basis for an overly aggressive investing strategy.

#### h) Other Retirement Plans

Clients generally should consider the availability of other available tax-qualified accounts (401(k), 403(b), tax deductible IRA or any other employer-sponsored plan) in connection with a purchase of a variable annuity. Variable annuities, however, do offer benefits generally not available in other tax qualified accounts.

#### i) Qualified Accounts

Variable annuities can be purchased within qualified accounts. Clients, however, should be informed that there may be less expensive options than a variable annuity that provide the same tax advantages and that there are no additional tax benefits associated with purchasing a variable annuity in a qualified account. Annuities, however, do provide certain benefits not available in other types of investments including guaranteed income your client cannot outlive as well as the guaranteed death benefit feature available in many contracts. Not only should clients be made aware of the additional benefits offered by the variable annuity contract but also the additional cost of providing these benefits.

#### j) Bonus Credits

Generally, it is Firm policy that bonus credit variable annuities are not permitted for sale.

#### k) Elderly Customers

Special care must be taken in making recommendations to elderly customers (age 75 and older). The following issues must be carefully considered and documented on the customer profile. RRs must ask the customer with whom they consult for their financial affairs and note the customer's response in the Notes section of the customer profile. Where there is a family member or advisor, the RR must give the customer the opportunity to discuss the investment with their advisor either in person or on the phone. In addition, notes detailing discussions about the investment objectives and suitability of the recommended product should include such topics as:

- Cash reserves and liquidity (elderly customers generally need more liquid funds on hand for medical care, nursing home costs and other health related issues or emergencies that could occur).
- The percentage of the customer's total liquid assets that is at market risk. An elderly client may not have the time horizon needed to ride out market fluctuations.
- The time horizon of the client relative to the surrender charge or CDSC period.
- Investment experience.
- Detailed notes that describe discussions with the customer regarding volatility, loss of principal, fees and costs, etc.
- All other relevant facts that explain why the investment is suitable and necessary for the customer.
- The level of an advisor's involvement or the customer's decision not to include the advisor.

**INSURANCE & ANNUITY PRODUCTS**

### I)  Summary

Variable annuity contracts are not for everyone. There are many factors that need to be considered when determining whether a variable annuity is appropriate for a client.  In addition to the factors specifically cited in this section, all of the standard suitability factors should considered.  This includes the financial information detailed in the account application (*e.g.,* annual income, liquid assets, estimated total investments/net worth, risk tolerance, and experience).

### 2.  Prospectus Delivery Requirement

When RRs present any sales literature to clients or prospects that describes a specific variable annuity, the RRs are required to provide a current prospectus for each variable annuity mentioned.  If no sales literature is presented, a current variable annuity prospectus must be provided to the client at or prior to the sale of the annuity.  A current prospectus is one that is no older than thirteen months from date of issue.  The dates of issue for variable annuity prospectuses are usually printed on the front or inside cover.  RRs are permitted to print a current variable annuity prospectus directly from the respective annuity carrier's web site.

### 3.  Replacement of Variable Annuities/1035 Exchanges

Replacing an old policy with a new one can be a legitimate part of selling annuity products. The key question, however, is whether the replacement is appropriate for the client.  Before recommending a replacement, the customer's overall financial picture should be reviewed carefully to determine if it is in the best interests of the customer (*e.g.,* what benefit will accrue to the customer as a result of the exchange).  Specific factors to review with your client in determining whether or not the replacement is appropriate must include:

- Changes in investment objectives/risk tolerance (*e.g.,* replacing an existing fixed annuity with a variable annuity or replacing a mutual fund or other security with an annuity product.)
- Surrender charges, if any, on the existing annuity.
- Client's need for liquidity.  Disclose the duration of the surrender charge period; availability or access to funds without penalty; and charges associated with partial withdrawals and surrenders.
- Tax treatment of the surrender or exchange.
- The value of death benefit lost due to transfer / 1035 exchange (if applicable)

Special attention should be given to the exchange from a variable annuity to a fixed annuity.  During times of declining markets, customers may experience a market loss in their variable annuity and may desire to exchange their existing variable annuity to a more stable, fixed annuity.  When considering this exchange, RRs must take into consideration and notify the client of the potential loss in guaranteed death benefit if the client exchanges their variable annuity at a time when the current market value is less than the guaranteed death benefit amount.  RRs should notify the client that fixed buckets, or other conservative sub-accounts, might be available within the existing variable annuity as an alternative to exchanging to a fixed annuity.  Fixed bucket(s) will allow the client to receive a stated rate of return while preserving the guaranteed death benefit.  Other conservative sub-accounts within the existing variable annuity might consist of bond funds with various quality levels and maturities.  Although these sub-accounts do not typically provide a guaranteed return, they can be used to reduce volatility.

If, after a thorough review of the client's financial situation, an RR determines that the replacement is appropriate, the client must complete a Customer Acknowledgment Switch Letter prior to submitting the 1035 exchange/transfer paperwork to Operations for processing.  *See* Exhibit <u>11</u>.

## INSURANCE & ANNUITY PRODUCTS

### B. Fixed Annuities

Fixed Annuities are designed as a long term retirement vehicle for individuals seeking tax deferred accumulation of earnings. Upon withdrawal (systematic or lump sum), earnings are paid out first and are taxed as ordinary income. Fixed annuities also provide the ability to choose a series of income payments that can be customized to meet client needs and that cannot be outlived. Payments made in this manner are paid on a tax-advantaged basis with a portion of each payment considered a return of principal and, therefore, non-taxable. The balance is considered earnings and subject to ordinary income taxes.

#### 1.  Suitability

The following items should be considered when making the recommendation for your client to purchase a fixed annuity:

##### a)   Investment Objective
The client's investment objective(s) should include tax-deferred accumulation of earnings for and during retirement.

##### b)   Time Horizon
The client should generally have a long-term investment horizon of at least 5 years for the benefits from tax deferral to outweigh the costs of early surrender for most annuities. The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first five to eight years, depending on the contract.

##### c)   Liquidity Needs
Some contracts provide for an annual free withdrawal of 10% or accumulated interest of the premiums (or account value). Withdrawals in excess of the free amount will be subject to the stated surrender charge. In addition to surrender charges, the client may incur a 10% tax penalty on withdrawals of earnings prior to age 59½.

##### d)   Tax Considerations
All withdrawals during the accumulation phase (prior to annuitization) are treated as a withdrawal of earnings first and are reportable as ordinary income. Your client's tax bracket should also be considered when making a recommendation to purchase a fixed annuity. High tax bracket clients should consider longer time horizons since all annuity earnings are taxed as ordinary income rather than capital gains.

##### e)   The Aggregation Rule
All annuity contracts entered into after October 21, 1988, which are issued by the SAME insurance company to the SAME policyholder during one calendar year, will be treated as ONE annuity contract for the purpose of determining the taxable portion of any distributions. The aggregation rule does not apply to distributions received under qualified plans or immediate annuities. If a policyholder withdraws more than the accumulated interest from one of the (multiple) contracts the insurance company must report the distribution as the interest from all of the contracts first and the balance of the withdrawal as a return of principal.

##### f)   Other Retirement Plans
Clients generally should consider the availability of other available tax-qualified accounts (401(k), 403(b), tax deductible IRA or any other employer-sponsored plan) before purchasing an annuity. Annuities, however, do offer benefits generally not available in other tax qualified accounts.

##### g)   Qualified Accounts
Fixed annuities can be purchased within qualified accounts and many of them are transferred from another IRA. Your customer needs to know that a fixed annuity in an IRA or qualified plan does not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified plan the customer is transferring the money from, regardless of whether it is a qualified CD, mutual fund, or another fixed annuity. On the other hand, there are valid reasons (which need to be

documented) for transferring the money (*e.g.,* guaranteed returns, safety of principal, or the guaranteed lifetime income option that the customer cannot outlive).

### 2. Insurance Licenses and Appointments

All salespeople must be licensed with the Department of Insurance in states where they intend to do business before engaging in any insurance sales-related activities. Generally, insurance regulations require the agent to be appropriately licensed in the state where the product sale occurs (*i.e.,* where the customer signs the application).

### 3. Replacement of Fixed Annuities/1035 Exchanges

Replacing an old policy with a new one can be a legitimate part of selling fixed annuity products. The key question, however, is whether the replacement is appropriate for the client. Before recommending a replacement, the customer's overall financial picture should be reviewed carefully (by means of the Customer Profile form) to determine if it is in the customer's best interests. Specific factors to review with your client in determining whether or not the replacement is appropriate may include:

- Changes in investment objectives/risk tolerance (*e.g.,* replacing an existing variable annuity with a fixed annuity or replacing a mutual fund with an annuity product.)
- Surrender charges, if any, on the existing annuity.
- Client's need for liquidity. Disclose the duration of the surrender charge period; availability or access to funds without penalty; and charges associated with partial withdrawals and surrenders.
- Tax treatment of the surrender or exchange.

If, after thorough review of the client's financial situation, the salesperson determines that the replacement is appropriate, properly complete the insurance carrier transfer paperwork, the Customer Acknowledgment Switch Letter, and document the rationale of the switch recommendation on the customer profile. Consideration also should be given when a RR recommends a 1035 exchange/IRA transfer between fixed annuities. Customers typically will consider this transaction when their existing fixed annuity is out of surrender and another fixed annuity carrier offers a higher rate on new policies. Prior to submitting paperwork for this exchange, RRs should thoroughly discuss the new contingent deferred sales charge (CDSC) schedule with the customer to determine if the new rate justifies the lack of liquidity on the new fixed annuity. For example, if the new rate available on the new contract is only slightly better than the existing rate the customer is receiving, a new five or six year CDSC schedule may not be worth the increase in return.

RRs are reminded that Licensed Bank Employee's (LBE) may not discuss, or make recommendations regarding the replacement of a customer's securities holdings. As such, RRs may not encourage LBEs to engage in this type of discussion with customers.

### C. Variable Universal Life

Variable life insurance policies are designed primarily as insurance products. Variable life insurance products are subject to both insurance and securities laws (unless otherwise indicated, references to variable life insurance include both scheduled premium variable life insurance and flexible premium variable universal life insurance). These products allow the cash value of the policy to be invested in stock, bond, or money market portfolios (sub-accounts). Investors can elect to move from one portfolio to another or can rely on the company's professional money managers to make such decisions for them. As in whole life insurance, the annual premium is fixed, but part of it is earmarked for the investment portfolio. The policy owner bears the risk of securities investments, while the insurance company usually guarantees a minimum death benefit unaffected by any portfolio losses as long as the established premium is paid on schedule. When portfolio investments rise substantially, a

## INSURANCE & ANNUITY PRODUCTS

portion of the increased cash value is put into additional insurance coverage. The death benefit and cash value of this type of policy may vary to reflect the performance of the product's variable sub-accounts or the fixed account, depending on how premium payments and cash values are invested and the choice of asset allocations. A drop in the investment results of the separate account will cause a decrease in the death benefit from the value in the previous year, but not below the guaranteed minimum.

As with usual whole life policies, borrowings can be made against the accumulated cash value, or the policy can be cashed in. Also, as with an IRA, earnings from variable life policies are tax deferred until distributed. Income is taxed only to the extent that it exceeds the total premiums paid into the policy. Death benefits are not subject to income taxes, but they may be subject to estate taxes.

Variable life insurance is different from universal life insurance. Universal Life Insurance allows policyholders to increase or decrease premiums and change the death benefit. It also accrues interest at market-related rates on premiums over and above insurance charges and expenses.

Variable universal life combines many of the features of variable life and universal life. Variable universal life incorporates the flexibility of universal life, the investment features of variable life, and the tax advantages of all life insurance products. It also is regulated as a security.

### 1. Suitability

In making a recommendation about the purchase of a variable life product, the RR is required to make reasonable efforts to obtain information concerning the customer's financial and tax status, the customer's financial objectives, and such other information used or considered to be reasonable in making recommendations to the customer. Certain situations or statements made by a customer may make the purchase of a variable life policy unsuitable. These include, but are not limited to: (i) a representation by a customer that his or her life insurance needs were already adequately met; (ii) the customer's express preference for an investment other than an insurance product; (iii) the customer's inability to fully appreciate how much of the purchase payment or premium is allocated to cover insurance or other costs, and a customer's ability to understand the complexity of variable products generally; (iv) the customer's inability or willingness to invest a set amount on a yearly basis; (v) the customer's need for liquidity and short-term investment; (vi) the customer's immediate need for retirement income; and (vii) the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

The following items should be considered when making a recommendation to a client to purchase a variable life insurance product:

#### a) Investment Objective
The client's investment objectives should include passing money on to beneficiaries, as well as tax-deferred savings.

#### b) Time Horizon
The client generally should have a long-term investment horizon. The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first seven to ten years, depending on the contract.

#### c) Liquidity Needs
The policy owner has access to the cash values either through a policy loan or a cash withdrawal. A policy loan will result not only in interest being charged, but the amount of cash value representing collateral for the loan is transferred out of the separate account and into the company's general account where it will earn a lower rate of interest. The total cost of the loan then would be the interest rate plus the separate account earnings lost minus the interest credited from the general account. Money can also be withdrawn from the policy without incurring interest consequences of a policy loan. The death benefit is usually reduced by the amount of the withdrawal. There may also be a processing fee. Most contracts provide for an annual free withdrawal of 10% or the increase in the contract value.

## INSURANCE & ANNUITY PRODUCTS

Withdrawals in excess of the free amount will be subject to the stated surrender charge. In addition to surrender charges, the client may incur a 10% federal income tax penalty on withdrawals prior to age 59½.

### d)  Diversification

As with all investments, diversification is important because it helps reduce (but does not eliminate) the risk of loss of principal. Clients should limit their investment in variable life insurance to a manageable percentage of their net worth and diversify their investments within the variable contract to meet their investment objectives and risk tolerance level.

### e)  Market Fluctuation

Variable universal life policies may be subject to fluctuation due to changing market conditions. Investors with a low tolerance for equity volatility risk may be more comfortable in a traditional life product.

### f)  Elderly Customers

Special care must be taken in making recommendations to our elderly customers (75 and older). The following issues must be carefully considered and documented on the customer profile:

- Representatives must ask the customer with whom they consult for their financial affairs and note the customer's response in the notes section of the profile. Where there is a family member or advisor, the representative must give the customer the opportunity to discuss the investment with their advisor or discuss the investment with the representative either in person or on the phone.
- Notes detailing discussions with family members about the investment objectives and suitability of the recommended product.
- Cash reserves and liquidity.
- The percentage of the customer's total liquid assets that is at market risk. The elderly client may not have the time horizon needed to ride out market fluctuations.
- The time horizon of the client relative to the surrender charge or CDSC period.
- Investment experience.
- Detailed notes that describe discussions with the customer regarding volatility, loss of principal, fees and costs, etc.
- All other relevant facts which explain why the investment is suitable and necessary for the customer.

### g)  Summary

Variable life policies are not for everyone. There are many factors that need to be considered when determining whether a variable life product is appropriate for a client. In addition to the factors specifically cited in this section, all of the standard suitability factors should be considered. This includes the financial information detailed in the account application (*e.g.,* annual income, liquid assets, estimated total investments/net worth, risk tolerance, and experience). Also, RRs must ensure customers understand and execute a Variable Insurance Product Acknowledgment form. A hyperlink to this form is attached as Exhibit 2.

## XII.    INVESTMENT ADVISORY SERVICES

### A.    Registration

LFS is a Registered Investment Adviser (RIA), registered with the U.S. Securities and Exchange Commission under the Investment Advisers Act ("Advisers Act") of 1940. Its principal office and place of business is in Chicago, Illinois. As such, LFS complies with the regulations promulgated under the Advisers Act

As an RIA, LFS has a fiduciary duty of loyalty and good faith to its advisory clients. In carrying out this fiduciary duty, LFS shall protect the interests of its advisory clients and shall place their interests first and foremost. LFS shall provide full and fair disclosure of all relevant facts and any potential conflicts of interest to its advisory clients, shall provide recommendations that are suitable, and shall seek best execution of all client transactions.

Registration requirements for Investment Advisory Representatives (IARs) are governed by the respective states. IARs of LFS who solicit business or provide investment advice within a given state must meet that state's requirements and must ensure that the Firm also is authorized to do business in that state. IARs must generally pass a qualifying examination, either the Series 65 or Series 66 examination. The Series 66 examination is available only to a person who holds the Series 7 license. Series 6 licensed individuals must pass the Series 65 examination. .

### B.    Wrap Accounts

LFS offers two distinctive wrap account programs. In all cases, the IAR and the Firm must ensure that the program is consistent with the client's stated risk tolerance, investment objectives, and financial goals. In addition, the IAR and the Firm must ensure that any wrap program account is managed based on the individualized investment needs of the client.

LFS sponsors a wrap fee program known as Portfolio Manager I (Program Option I on the advisory contract), managed by Fundquest, Inc., an independent registered investment advisor. Fundquest will create a portfolio consisting exclusively of various mutual funds.

LFS also acts as sponsor and manager of its own wrap fee program, known as Portfolio Manager II (or Program Option 2). Accounts within Portfolio Manager II are managed by LFS on a discretionary basis, based on the goals and objectives of the client. Fundquest will provide administrative support for Portfolio Manager II accounts.

### C.    Disclosure Document

The Advisers Act requires that LFS provide all clients and prospective clients with a written disclosure document. This document consists of Part II of the Firm's Form ADV. Wrap fee clients must in certain instances receive a separate wrap fee disclosure document (brochure). The disclosure document informs clients of the firm's services, fees, business practices, possible conflicts of interest and material affiliations.

The disclosure document shall be delivered to the client or prospective client either:

- not less than 48 hours prior to entering into any written or oral investment advisory contract, or
- at the time of entering into any such contract if the advisory client has a right to terminate the contract without penalty within five business days after entering into the contract.

A copy of the disclosure document must be maintained in the client's file.

LFS must also deliver or offer in writing to deliver the current disclosure document to each of its advisory clients, without charge, on an annual basis.

It is LFS' policy that the separate disclosure document (brochure) shall be given to an investment advisory client, in addition to Part II of Form ADV, in situations involving investment advisory contracts where Program Option 2 is selected. If Program Option 1 is selected, Fundquest acts as investment manager and the IAR must then also give to the client Fundquest's Form ADV Part II.

### D. Advisory Contract

LFS' policy with respect to wrap account customers is that written investment advisory contracts with clients are required. Among other things, the Agreement contains an acknowledgment that the client has received the requisite disclosure document(s). The Agreement also incorporates the applicable fee schedule.

IARs also must complete the normal brokerage customer new account documentation and establish the customer's account with NFS. The customer's investment objectives and other suitability matters are addressed on the Customer Profile and on a wrap account questionnaire rather than on the Advisory Contract.

The Advisory Contract may be terminated by any party upon 30 days written notice. Any unearned prepaid fees will be returned to the client.

### E. Other Advisory Services

LFS also provides other investment advisory services to clients not involving a wrap fee program. Such services are provided on an advisory fee basis. For example, LFS offers financial planning services and will provide clients with a written financial plan. IARs are reminded that they are required to comply with the disclosure document rule in such cases as discussed above.

For a more detailed discussion of LFS' investment advisory program, refer to the separate Investment Advisory Compliance Manual. For a hyperlink to this manual, refer to Exhibit 19.

**EXHIBITS**

XIII.    **EXHIBITS**

1.  *Mutual Fund/Unit Investment Trust Acknowledgment form*

2.  *Variable Insurance Product Acknowledgment form*

3.  *Fixed Annuity/Insurance Policy Acknowledgment form*

4.  *Unsolicited Customer Acknowledgment form*

5.  *Noncooperative Countries Regarding Anti-Money Laundering*

6.  *Photo Identification Matrix*

7.  *Anti-Money Laundering Handbook*

8.  *Option Account Agreement*

9.  *Margin Application and Disclosure Agreement*

10. *Statistical Market Information Disclosure*

11. *Customer Acknowledgment Switch Letter*

12. *NASD's Expense Analyzer*

13. *B Share Customer Acknowledgment form*

14. *Approved Product List*

15. *Outside Business Activity Notification form*

16. *Gift form*

17. *407 Letter*

18. *Code of Ethics*

19. *Investment Advisory Compliance Manual*