**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LASALLE FINANCIAL SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 07 C 7116 |
| v. | ) ) | Judge Joan Humphrey Lefkow |
| DOUGLAS BRYMER, DAVID SWANSON, and RYAN KIBILOSKI, | ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) ) ) | |

**LASALLE FINANCIAL SERVICES, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>ITS MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

Stephen P. Bedell
Martin J. Bishop
Thomas K. Anderson
Anna R. Downs-Temple
FOLEY & LARDNER LLP
321 North Clark Street
Suite 2800
Chicago, IL 60610
(312) 832-4500

*Counsel for LaSalle Financial Services, Inc.*

CHIC_1675547.3

## INTRODUCTION

On December 7, 2007, former LaSalle Financial Services, Inc. ("LFS") Financial Consultants Douglas Brymer ("Brymer"), David Swanson ("Swanson"), and Ryan Kibiloski ("Kibiloski") (collectively "Defendants") abruptly, and without prior notice, resigned from their positions at LFS and assumed employment with one of LFS's direct competitors. In the wake of Defendants' resignations, an ongoing investigation by LFS has revealed that Defendants illicitly took with them confidential information about LFS's customers, and deleted electronic files and information from LFS's computers in an attempt to hide their misdeeds. LFS also has discovered that Defendants are using the information that they stole to solicit LFS's customers in blatant defiance of non-solicitation agreements that Defendants signed as a condition of employment with LFS. As a result of this misconduct, LFS filed its Verified Complaint for Injunctive Relief ("Verified Complaint" or "VC") and Motion for a Temporary Restraining Order ("Motion") seeking immediate injunctive relief to prevent Defendants from their further use, dissemination, and destruction of, and for the return of, any LFS confidential customer information in Defendants' custody, possession, or control. As set forth below, LFS is plainly entitled to the relief it seeks.

## BACKGROUND

### I.    The Parties

LFS is engaged in the business of providing financial and investment services, primarily to existing customers of LaSalle Bank National Association, an indirect parent corporation of

LFS, and its affiliated banks.  (VC, ¶ 3, attached as Ex. 1)  LFS is a licensed broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA").[1]  (*Id.*)

Defendant Brymer began his employment with LFS in March 2003, Swanson in March 2002, and Kibiloski in August 2005.  (*Id.*, ¶¶ 9-11)  All of the Defendants were employed by LFS as financial consultants.  (*Id.*)  As financial consultants, the Defendants' responsibilities included responding to customer requests for security transactions and selling brokerage services to new and existing customers of the LFS's affiliated banks (the "Banks").  (*Id.*, ¶ 12)  The Defendants worked together as a team for sales, marketing, and administrative purposes.  (*Id.*)  Kibiloski, for example, was principally responsible for networking and developing the team's client base.  (*Id.*)  Similarly, Brymer was responsible for the financial planning of the team's high net-worth clients.  (*Id.*)  Swanson was primarily responsible for administrative and sales support. (*Id.*)

On December 7, 2007, each of the Defendants, abruptly and without prior notice, resigned from LFS, and immediately began their employment with one of LFS's direct competitors in the highly competitive securities brokerage business.  (*Id.*, ¶¶ 1, 29-31)

## II.    LFS's Confidential Information and Employment Agreements

In their respective positions with LFS, each of the Defendants had daily access to some of LFS's most secret and sensitive confidential information, including the names, addresses, social security numbers, financial statements, investment objectives, investment histories, securities

---

[1] Simultaneous with the filing of LFS's Verified Complaint and Motion, LFS is filing a Statement of Claim with FINRA.  As either a FINRA member or person associated with a FINRA member, all of the parties to this dispute are obligated to arbitrate under FINRA's rules.  However, FINRA's Code of Arbitration Procedure expressly allows a party to seek temporary injunctive relief from a court of competent jurisdiction because FINRA's rules do not provide for such relief.  (*See* FINRA Rule 13804, attached as Exhibit 2)  If this Court enters a TRO in favor of LFS, then FINRA's rules require a hearing on LFS's request for permanent injunctive relief to be held at FINRA within 15 days after its entry.  (*Id.*)

2

holdings, trading histories, incomes, and net worth of LFS's customers as well as information concerning LFS's business, such as profits, margins, costs, and marketing strategies ("Confidential Information").  (*Id.*, ¶¶ 14, 23)  Customers put their trust in LFS and the Banks to maintain the secrecy of this information.  (*Id.*, ¶ 50)  LFS, in turn, trusts its employees who have access to this information on a need-to-know basis to honor LFS's strict policies and agreements not to use or disclose this information except to the extent necessary to perform their job duties.  (*Id.*, ¶ 15, 23)

In accord with the sensitivity, secret nature, and value of its Confidential Information, LFS goes to great lengths to protect its secrecy.  LFS keeps the Confidential Information in locked file cabinets, locks the areas where the information is kept, uses video surveillance, password protects electronic data, and limits access to the information to those employees with a need to know it.  (*Id.*, ¶ 15)

In addition, as a condition to employment, LFS requires its employees to maintain the confidentiality of its Confidential Information.  Thus, all of the Defendants agreed to maintain the secrecy of LFS's Confidential Information.  (*Id.*, ¶ 17)  Specifically, they agreed "not to, directly or indirectly, use or disclose any Confidential Information, either during or following the termination of [their] employment except to the limited extent necessary to perform [their] job duties for [LFS]."  (*Id.*, ¶ 17 & Ex. A at §4)

Along with their employment agreements, the Defendants each agreed, in writing, to adhere to the terms of LFS's Registered Representative Compliance Manual ("Compliance Manual").  (*Id.*, ¶ 18 & Ex. B)  The Compliance Manual also requires the Individual Defendants to maintain the confidentiality of LFS's Confidential Information (*id.*, ¶ 19 & Ex. B), and proscribes the destruction or deletion of any of LFS's documents or records (*id.*, ¶ 20 & Ex. B).

3

In addition to agreeing to maintain the confidentiality of LFS's Confidential Information, each of the Defendants further agreed not to solicit securities business from any customers of LFS on behalf of any other organization, or assist anyone else in doing so, during their employment by LFS, or for one year thereafter. (*Id.*, ¶ 22) Each Defendant agreed "that for a period of one (1) year after the termination of [his] employment" he would not, among other things, "solicit, canvass, or accept orders or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by, [LFS] from any Customer that [he] serviced or learned of during [his] employment." (*Id.*, ¶ 22 & Ex. A at §5)

## III.     Defendants' Wrongful Acts

Notwithstanding the Defendants' written agreements to the contrary, LFS has learned that the Defendants have illicitly taken LFS's Confidential Information and used it to solicit LFS's customers. (*Id.*, ¶¶ 33-37, 41-45) Through an ongoing investigation, LFS has determined that Defendants illicitly copied and retained highly confidential information identifying LFS customers and sensitive information about them. (Affidavit of Alison Chung ("Chung Aff."), ¶¶ 14-21, attached as Exhibit 3) In the days, hours, and minutes before their departure from LFS, Defendants were reviewing and searching LFS's client lists for the most lucrative and high net-worth accounts. (*See, e.g.*, Chung Aff., ¶¶ 23-24) In addition, Defendants illicitly and surreptitiously obtained from insurance carriers, lists of LFS customers holding annuities with those carriers. (VC, ¶ 34; *see also* Chung Aff. ¶ 26) This was information that Defendants could have accessed at LFS, but their access of it would have generated an automatic alert that would have been sent to their supervisor. (VC, ¶ 34) There was no reason for Defendants to seek this information from the insurance carriers except to subvert LFS's security measures and convert the information to their own personal use. (*Id.*)

4

Defendants' illicit taking of LFS's Confidential Information has been aggravated by their use of that information in contacting LFS customers to solicit the transfer of their accounts away from LFS to Defendants' new employer.  (VC, ¶¶ 40-41)  In one instance, the Defendants called an LFS customer, and, referencing the customer's IRA held at LFS, solicited the customer to transfer the account.  (*Id.*, ¶ 40)  Defendants also have solicited transfers by sending letters to LFS customers accompanied by paperwork to effect a change of the customer's broker-dealer.  (*Id.*, ¶ 41; *see also id.* Ex. 4)  Other LFS customers also have called LFS to complain about Defendants' uninvited contact of them.  (*Id.*, ¶ 43)

LFS's investigation of the full scope of Defendants' misconduct has been hindered by their further misconduct in destroying and deleting files and information from LFS's computers in an attempt to cover up their unauthorized taking of LFS's Confidential Information.  (Chung Aff., ¶¶ 7-13)  For example, the tech-savvy Kibiloski's LFS-issued computer was virtually wiped clean.  (*Id.*, ¶ 8)  All Defendants deliberately deleted temporary internet files from their laptops on a systematic basis.  (*Id.*, ¶ 10)  And though all Defendants visited the internet-marketing sites "constantcontact.com" and "zedo.com," there was minimal forensic information regarding their use, indicating that Defendants deliberately deleted this information to hide whatever data or information they may have transferred to these websites.  (*Id.*, ¶¶ 7, 9, 10)

In short, Defendants illicitly took LFS's Confidential Information, likely transmitted it to third-party marketing websites, deleted files and information from their LFS-issued laptop computers to try to cover their tracks, then used what they stole to solicit LFS's current customers.

## ARGUMENT

A party seeking a TRO must show that: (1) it is reasonably likely to succeed on the merits of its claims; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm which, absent the injunction, outweighs the irreparable harm the respondent will suffer if an injunction is granted; and (4) the injunction will not harm the public interest. *Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672, 675 (N.D. Ill. 2006). Significantly, each of the Defendants agreed in their employment agreements that LFS has a right to injunctive relief under the circumstances present here. (Employment Agreements, § 6); *see, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 727-28 (10th Cir. 1988) (holding that employer was entitled to injunctive relief under the terms of its employment contract with employee). To show a reasonable likelihood of success, LFS need only show "'some likelihood of success' and that its 'chances are better than negligible.'" *Int'l Profit Assocs.,* 461 F. Supp. 2d at 676 (internal citations omitted).

## I.    LFS Will Succeed On The Merits Of Its Contract Claims

### A.    The Unauthorized Use And Dissemination of LFS's Confidential Information Is A Breach of LFS's Employment Agreement

In their employment agreements with LFS, Defendants agreed to maintain the confidentiality of LFS's Confidential Information including information regarding LFS's customers. Specifically, Defendants acknowledged and agreed:

> During your employment with [LFS], you have had or will have access to confidential information concerning [LFS's] business and its customers, including but not limited to information concerning the identities, addresses, telephone numbers, account numbers, personal information, financial information, and transactions of customers . . . .
>
> You further agree not to, directly or indirectly, use or disclose any Confidential Information, either during or following the termination of your employment, except to the limited extent

6

> necessary to perform your job duties for [LFS], including only disclosing Confidential Information to other [LFS] employees who have a "need to know" this information. These restrictions apply regardless of whether the Confidential Information is in printed, written, or electronic form, retained within your memory, or is compiled or created by you and regardless of when or how you learned the Confidential Information.

(VC Ex. A, § 4 (emphasis supplied))   In addition, all of Defendants agreed to abide by the confidentiality provisions of LFS's Registered Representative Compliance Manual which provides that:

> In the normal course of business, employees may be given or may acquire information about the business of the Firm, its customers, or its affiliates that is not available to the general public. This information is deemed to be confidential . . . . All employees are responsible for respecting and maintaining the confidential nature of information that concerns the business of the Firm, its customers, and its affiliates.
>
> Whether orally or in writing, confidential information may only be disclosed within the Firm or to employees of the Firm's affiliates who need to know the information to perform their job functions.

(VC, ¶ 19 & Ex. B at p. 10 (emphasis supplied); *see also* VC, ¶ 21 & Ex. C)   All of the Defendants have breached these provisions.

As noted, LFS has been conducting ongoing forensic analysis of Defendants' LFS-issued laptops. That forensic analysis has shown that Defendants have accessed and likely copied files containing LFS's Confidential Information.   (Chung Aff., ¶¶ 19-21)   The analysis also has revealed that Defendants repeatedly connected portable electronic storage devices (such as Apple iPods and USB flash drives) to their LFS computers even though there was no legitimate reason for them to do so in carrying out their duties and responsibilities as LFS financial consultants. (VC, ¶ 36)   Rather, Defendants' used the electronic storage devices to illicitly copy and retain LFS's Confidential Information.   (*Id.*)   In addition, in an attempt to subvert LFS's security measures (which would have alerted Defendants' supervisor to their suspicious activity),

7

Defendants requested and obtained from insurance carriers lists of LFS customers holding annuities with those carriers, even though this was information that was available at LFS if Defendants had any legitimate reason for accessing it. (*Id.*, ¶ 34)

Simply put, there can be no real dispute that the Defendants' taking and blatant disregard for the safekeeping of LFS's information constitutes a breach of the confidentiality provisions of their employment agreements.

### B.     Defendants' Solicitation Of LFS's Customers Using LFS's Confidential Information Is A Breach of LFS's Employment Agreements

Similarly, there is no question that Defendants have solicited LFS's customers in breach of their employment agreements by which Defendants promised, for a period of one year following termination of employment with LFS, not to "solicit, canvass, or accept orders or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by, [LFS] from any Customer that [he] serviced or learned of during [his] employment." (VC, ¶ 22 & Ex. A at §5). Defendants have directly called LFS customers soliciting a transfer of their accounts (*id.* at ¶¶ 41, 43) and have sent LFS customers letters and transfer paperwork to encourage a transfer (*id.*, ¶ 42, Ex. 4).

This conduct constitutes solicitation in Illinois, which has "lenient rules regarding what constitutes solicitation." *YCA v. Berry*, No. 03-C-3116, 2004 WL 1093385, at *10-11 (N.D. Ill. May 7, 2004) ("[I]f a recipient would have understood a particular contact as a solicitation for business, that suffices to show solicitation."); *see also Henry v. O'Keefe*, No. 01 C 8698, 2002 WL 31324049, at *5 (N.D. Ill. October 18, 2002) ("[I]f a recipient would have understood a particular contact as a solicitation for business, that suffices to show solicitation even absent direct evidence of the party's intent and even in the face of a denial of an intent to solicit.");

CHIC_1675547.3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *2 (N.D. Ill. March 13, 1998) (sending of change-of-account paperwork to former customers is solicitation).

**C.     Defendants' Non-Solicitation Clauses Are Enforceable**.

Defendants obtained LFS's Confidential Information regarding LFS's customers while they were employees of LFS, and now have attempted to use that information by soliciting LFS customers.  None of the Defendants had any customers to speak of prior to joining LFS.  (VC, ¶ 44)  Thus, any customers that they had at the time they left LFS were a result of relationships developed while they were employed by LFS.  The formation of these relationships was facilitated by LFS and its goodwill, and they were for LFS's benefit – not for the benefit of Defendants.  *See IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 419 (N.D. Ill. 1994) ("That many of Smithson's clients are friends and were acquired through hard work and long hours is of no significance.  The hard work and long hours were engaged in for the benefit of IDS and were an essential part of his agreement with IDS.").  Under such circumstances, courts enforce restrictive covenants as protecting a legitimate business interest.  *See Outsource Int'l Inc. v. Barton*, 192 F.3d 662, 668 (7th Cir. 1999) (protecting employer's client information as confidential and holding that legitimate interest meriting protection exists where "the employee learned trade secrets or other confidential information while in [the] plaintiff's employ and subsequently attempted to use it for his or her own benefit") (internal citations omitted); *see also Credit Suisse First Boston, LLC v. Vender*, No. 04 C 7631, 2004 WL 2806191, at *2 (N.D. Ill. December 2, 2004).

Courts also enforce restrictive covenants where employers have a near-permanent relationship with their customers and but for an employee's employment, the employee would not have had contact with them.  *See Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill. App. 3d 631, 636 (3d Dist. 1993) (holding that legitimate business interest meriting protection exists where

9

"the employer has a 'near permanent' relationship with its customers and but for the employment, the employee would not have had contact with the customers"); *see also Vender*, 2004 WL 2806191, at *2.  In the highly competitive securities brokerage industry, it has taken LFS years to develop the trust and goodwill necessary to attract and maintain its customers. (VC, ¶ 16)  LFS engages in research to determine what its customers want from LFS in terms of products, brokerage features, and customer service.  (*Id.*)  As a result, LFS's customers tend to be long-term customers and value the continuity of their long-term relationship with LFS and theBanks.  (*Id.*)  These considerations highlight the near-permanence of LFS's relationship with its customers.  *See Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1032 (1st Dist. 1988) (outlining factors to consider).  Moreover, LFS is a provider of professional financial services to its customers, and as such, has a near-permanent relationship with those customers.  *See Vender*, 2004 WL 2806191, at *2 (finding that CFSB, a financial services provider similar to LFS, would likely be able to show a near-permanent relationship with its customers because such a relationship is inherent in the provision of professional services).  In short, consideration of both the professional nature of LFS's business and other factors identified by the courts establishes the near-permanence of LFS's customer relationships.

It also is indisputable that "but for" their employment with LFS, the Individual Defendants would not have had contact with LFS's customers, who were primarily referred to the Individual Defendants as LFS representatives by employees of the Bank.  (VC, ¶ 44)  There is no publicly available list or directory of LFS's customers or of individuals who generally have a need for financial services.

The non-solicitation clauses that the Defendants agreed to are for a reasonable one-year period, *see, e.g.*, *Malone v. Cort Furniture Corp.*, No. 02-C-1729, 2002 WL 1874818, at *1

(N.D. Ill. Aug. 13, 2002) (granting a TRO to enforce 18-month restrictive covenant against defendant, and recognizing that "restrictive covenants with similar or broader restrictions have been enforced"); *CUNA Mut. Life Ins. Co. v. Kuperman*, No. 97 C 6228, 1998 WL 409880, at *6 (N.D. Ill. July 7, 1998) (holding that a 24-month non-solicitation provision in a financial consultant's employment agreement was reasonable), and contain no restrictions forbidding the FC Defendants from continuing to earn a living as financial consultants. They should, therefore, be enforced.

## II.    LFS Will Succeed On Its Claim For Violation Of The Computer Fraud And Abuse Act.

In a transparent attempt to cover up their illicit taking and transmission of LFS's Confidential Information, the Defendants deleted and destroyed files and information from their LFS-issued laptop computers. (Chung Aff., ¶¶ 7-13) Specifically, all of the Defendants deleted their temporary internet files and other files relating to their access of the internet-marketing sites "constantcontact.com" and "zedo.com." (*Id.*, ¶¶ 7, 9) In addition, a software application was employed to deliberately wipe and overwrite data and information on Kibiloski's LFS-issued laptop computer. (*Id.*, ¶ 11)

By these unauthorized deletions, Defendants violated the terms of the Computer Fraud and Abuse Act ("CFAA"). 18 U.S.C. § 1030(a)(5); *see also, Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418, 419 (7th Cir. 2006) (reversing district court dismissal of CFAA claim against former employee who deleted information and files from employer-issued laptop); *Hub Int'l of California Ins. Servs., Inc. v. Kilzer*, No. C-06-5227, 2007 WL 1674355 (N.D. Cal. June 8, 2007) (granting relief under CFAA where former-employee deleted files prior to resignation); *ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1100 (N.D. Cal. 2006) (granting summary judgment to plaintiff for CFAA claim where defendant deleted information from his ViChip-issued computer

the day before he was terminated); *Pacific Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196-97 (E.D. Wash. 2003) (granting preliminary injunction to employer and recognizing that "[e]mployers [] are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"). *Citrin* is particularly instructive. In that case, a soon-to-be-former-employee deleted files from his employer-issued laptop in an attempt to destroy information that would have revealed his pre-resignation misconduct. *Citrin*, 440 F.3d at 420. The Seventh Circuit held that this activity fell squarely within the range of conduct that the CFAA proscribes. *Id.* Like the former employee in *Citrin*, therefore, Defendants' deletion-activity here subjects them to liability under the CFAA.

Defendants' unauthorized access to and copying of LFS's Confidential Information (as described in part I.A above) also subjects them to liability under the CFAA. 18 U.S.C § 1030(a)(2)(A); *KEG Technologies, Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1380-81 (N.D. Ga. 2006) (finding that former employee's unauthorized copying and transmission of employer's data violated CFAA); *PharMerica, Inc. v. Arledge*, No. 8:07-cv-486, 2007 WL 865510 at *7 (M.D. Fla. March 21, 2007) (same). Under the circumstances presented here, the CFAA expressly authorizes injunctive relief. 18 U.S.C. § 1030(g); *Laimer*, 436 F. Supp. 2d at 1380-81 (finding issuance of injunctive relief appropriate and ordering defendants to destroy illicitly-obtained computer files); *see also*, *Yournetdating, LLC v. Mitchell*, 88 F. Supp. 2d 870, 871-72 (N.D. Ill. 2000) (granting TRO prohibiting a former employee from accessing or interfering with any computer, program, or service of plaintiff); *see also Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 937-38 (9th Cir. 2004) (upholding injunction under the CFAA against former employee and former employee's new employer).

CHIC_1675547.3

**III.    LFS Will Succeed On Its Claim For Violation Of The Illinois Trade Secrets Act.**

LFS is likely to succeed on its claim against the Defendants for their violations of the Illinois Trade Secrets Act ("ITSA," codified at 765 ILCS 1065 *et seq*.). Courts applying ITSA recognize that a financial services firm's customer lists, like LFS's customer lists here, fall squarely within ITSA's definition of a trade secret. *See, e.g.*, *Smithson*, 843 F. Supp. at 418 (holding that "§ 2(d) of the Illinois Trade Secrets Act, 765 ILCS 1065/2(d), protects IDS's interest in confidential information such as customer identity, addresses, and financial data" and that IDS's employee confidentiality agreements were reasonable steps to protect its confidential information as trade secret); *Cross*, 1998 WL 122780, at *2 ("Customer lists are entitled to trade secret protection under Illinois law."). Defendants have misappropriated LFS's trade-secret protected customer lists and information and used it to solicit LFS's customers. Under the circumstances, LFS is entitled to injunctive relief enjoining Defendants' from further use of LFS's Confidential Information and ordering Defendants to return it.

**IV.    Absent Injunctive Relief, LFS Will Suffer Irreparable Injury And Will Be Left With No Adequate Remedy At Law**

Irreparable harm is presumed where a former employee solicits the customers of its former employer on behalf of a new employer. *See Vender*, 2004 WL 2806191, at *3 (finding irreparable harm was established, where defendants were soliciting their former employer's clients, by plaintiff's allegations that it would be irreparably harmed by "loss of [plaintiff's] goodwill, competitive position and continuity of its business relationships, . . . and that such harm cannot be readily calculated and cured by a subsequent award of monetary damages"); *Kuperman*, 1998 WL 409880, at *9 (noting that "[i]rreparable harm is presumed when terminated employees solicit former clients on behalf of a new employer"); *Cross*, 1998 WL

13

122780, at *2 (finding irreparable harm where former employee contacted employer's customers using confidential information).

Similarly, where, as here, "trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable." *Smithson*, 843 F. Supp. at 418. Absent an injunction, LFS's protectable interests in its Confidential Information, trade secrets, and customers will go unprotected.

Likewise, LFS has no adequate remedy at law to compensate it for the injuries it has suffered and will continue to suffer as a result of the Defendants' conduct. *See Vender*, 2004 WL 2806191, at *3 (rejecting a claim that an adequate remedy at law existed because solicitation of a discrete identifiable number of clients in the securities industry is susceptible to quantification); *Kuperman*, 1998 WL 409880, at *9 (finding that plaintiff did not have an adequate remedy at law "even assuming [lost] commissions could be tracked" where "[t]he value of the [employer's] relationship with its customers and with [its banking entity] may be damaged if the preliminary injunction is not issued."). Indeed, each of the Defendants agreed to as much in his employment agreement with LFS. (VC, ¶ 58 & Ex. A § 6) Accordingly, LFS has demonstrated that it is entitled to injunctive relief.

## V.    The Balance Of The Harms And The Public Interest Support The Issuance Of The TRO

Courts routinely hold under circumstances identical to those here, that the harm to the former employees enjoined from soliciting customers of their former employer is outweighed by the harm to the employer resulting from the employee's use of its confidential information and the irreparable injury to the employer resulting from the former employee's solicitation of the employer's customers. *See Kuperman*, 1998 WL 409880, at *9-10 (holding that the balance of harms "clearly favor[ed]" former employer in enjoining financial advisor from soliciting former

14

employer's customers and using its confidential information); *Smithson*, 843 F. Supp. at 419 (finding that the balance of harms favored former employer in enjoining financial planner from servicing former employer's clients). This Court should do the same.

Likewise, the public interest will be served by protecting LFS's trade secrets and confidential information, because "[t]he public has an interest in protecting business from theft of confidential information." *PharMerica, Inc.*, No. 8:07-cv-486, 2007 WL 865510 at \*9. The public interest also will be served by issuing a TRO to enforce LFS's contract rights. *Farr Fin., Inc. v. Sentinel Mgmt. Group, Inc.*, No. 07 C 4614, 2007 WL 2410379, at \*2 (N.D. Ill. August 17, 2007) (finding public interest served by granting the TRO and noting that "Courts in this District have recognized that the public interest is served by enforcing valid contracts." (quoting *Brown & Brown, inc. v. Ali*, No. 07 C 2893, 2007 WL 1953374, at \*9 (N.D. Ill. June 25, 2007))).

<u>CONCLUSION</u>

WHEREFORE, Plaintiff LFS respectfully requests that this Court: (a) grant LFS's Motion in its entirety; (b) temporarily enjoin the Defendants consistent with the draft order attached to LFS's Motion; and (c) grant LFS any further relief that this Court deems just and appropriate.

Dated: December 19, 2007                    By:    /s/ Martin J. Bishop
                                                   Stephen P. Bedell
                                                   Martin J. Bishop
                                                   Thomas K. Anderson
                                                   Anna R. Downs-Temple
                                                   Foley & Lardner LLP
                                                   321 North Clark Street, Suite 2800
                                                   Chicago, IL 60610
                                                   (312) 832-4500

CHIC_1675547.3