# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LASALLE FINANCIAL SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| DOUGLAS BRYMER, DAVID SWANSON, and RYAN KIBILOSKI, | ) ) ) | |
| Defendants. | ) ) ) | |

## LASALLE FINANCIAL SERVICES, INC'S
## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff LaSalle Financial Services, Inc. ("LFS") hereby brings the following Verified Complaint for injunctive relief against Defendants Ryan Kibiloski ("Kibiloski"), Douglas Brymer ("Brymer"), and David Swanson ("Swanson") (collectively, "Defendants") alleging: (i) violations of the computer fraud and abuse act; (ii) breach of contract; (iii) misappropriation of trade secrets; (iv) breach of fiduciary duties; (v) tortious interference with business and contractual relations; (vi) tortious interference with prospective business relations; (vii) conspiracy; (viii) conversion; and (ix) unfair competition. In support of its Complaint, LFS alleges as follows:

## NATURE OF THIS ACTION

1.     Defendants Brymer, Swanson, and Kibiloski are former LFS financial consultants who resigned from LFS on the same day to pursue jobs as financial consultants at one of LFS's competitors. Prior to resigning from LFS, however, the Defendants stole confidential information about LFS's customers and then attempted to hide their actions by destroying and

deleting files and other information belonging to LFS from LFS's computers. Each of the Defendants is bound by legal and professional duties – including certain express agreements and applicable state and federal law – not to disclose or use confidential information and trade secrets belonging to LFS, and not to solicit LFS's customers after the Defendants' departed from LFS. In blatant defiance of these duties, however, Defendants surreptitiously removed customer information – including downloading LFS's confidential computer files and trade secrets which included LFS customer lists and account data – and have subsequently used that data to, among other things, solicit existing LFS customers to move their accounts over to Defendants' new employer. In an attempt to cover their tracks, and in contravention of the Computer Fraud and Abuse Act, Defendants employed software computer applications to "wipe" or delete and overwrite data on LFS's computers.

2.      Through this lawsuit, LFS seeks to immediately enjoin the Defendants, and anyone acting in concert with them, from: (1) further deletions or destruction of any of LFS's confidential information that Defendants have illicitly taken; (2) from the continued use and disclosure of that confidential information; and (3) from the continued solicitation of LFS's customers and diversion of LFS's customers' business away from LFS. Once the injunction has issued and the status quo preserved, this matter may be stayed against all defendants pending the outcome of an arbitration under the auspices of the Financial Industry Regulatory Authority ("FINRA"), which LFS is filing contemporaneously with this action.

## PARTIES

3.      LFS is a corporation organized under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. LFS is engaged in the business of providing

financial and investment services, primarily to existing customers of LaSalle Bank National Association, an indirect parent corporation of LFS, and its affiliated banks, including, but not limited to, LaSalle Bank Midwest (the "Bank"). LFS is a broker-dealer registered with FINRA.

4.    Defendant Brymer resides at 1305 S. Michigan Avenue, #910, Chicago, Illinois 60605, and is a resident of the State of Illinois. Brymer is registered with FINRA.

5.    Defendant Swanson resides at 8 W. 57th Street, Westmont, Illinois 60559, and is a resident of the State of Illinois. Swanson is registered with FINRA.

6.    Defendant Kibiloski resides at 205 N. West Street, Naperville, Illinois 60540 and is a resident of the State of Illinois. Kibiloski is registered with FINRA.

## JURISDICTION

7.    Jurisdiction over LFS's claim against Defendants under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count 1) is conferred upon this Court by 28 U.S.C. § 1331. Supplemental jurisdiction over LFS's remaining claims (Counts 2-9) is conferred upon this Court by 28 U.S.C. § 1367.

## VENUE

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because each of the Defendants resides in the Northern District of Illinois and because the events giving rise to LFS's claims occurred in the Northern District of Illinois.

## GENERAL ALLEGATIONS

**A.    Defendants Were Employed by LFS and**
**Were Bound By Confidentiality and Non-Solicitation Obligations**

9.    Defendant Brymer was employed by LFS from March 31, 2003 to December 7, 2007 as a Financial Consultant, servicing LFS clients out of LFS's Naperville office in Naperville, Illinois.

10.    Defendant Swanson was employed by LFS from March 18, 2002 to December 7, 2007 as a Financial Consultant, servicing LFS clients out of LFS's Naperville Office in Naperville, Illinois.

11.    Defendant Kibiloski was employed by LFS from August 1, 2005 to December 7, 2007 as a Financial Consultant, servicing LFS clients out of LFS's Naperville office in Naperville, Illinois.

12.    As Financial Consultants, Defendants' responsibilities included responding to customer requests for security transactions, and selling brokerage services to new and existing customers of the Bank.  The Defendants worked together as a team for sales, marketing, and administrative purposes.  Kibiloski, for example, was principally responsible for networking and developing the team's client base.  Similarly, Brymer was responsible for the financial planning of the team's high net-worth clients.  Swanson was primarily responsible for administrative and sales support.

13.    Defendants each are registered representatives, registered with FINRA, and are subject to its rules and regulations.

14.    In conducting its business, LFS relies upon highly confidential information concerning its business operations and its customers, including, but not limited to, the names, addresses, social security numbers, phone numbers, financial statements, investment objectives, investment history, securities holdings, trading histories, incomes, and net worth of LFS's customers, and information concerning LFS's business, such as profits, margins, costs, and marketing strategies (collectively, "Confidential Information").

15.    LFS has implemented procedures to maintain the secrecy of its Confidential Information including, but not limited to, keeping the information in locked file cabinets, locking the areas where the information is kept, using video surveillance, password protecting electronic data, and limiting dissemination of the information to those LFS employees with a need to know the information.

16.    LFS's Confidential Information pertaining to its customers is particularly valuable.  It has taken LFS years to develop the trust and goodwill necessary to attract and retain its customers.  LFS engages in research to determine what its customers want from LFS in terms of products, brokerage features, and customer service.  LFS also engages in efforts to determine what features, activities, and efforts increase the probability that LFS's brokerage customers will keep their accounts with LFS.  Because of these and other efforts, LFS customers tend to be long-term customers who value the continuity of their relationship with LFS and the Bank.

17.    When hired by LFS, each of the Defendants signed a Financial Consultant Agreement, in which he agreed, among other things, that:

4.    Confidentiality

(a)    During your employment with AAFS[1], you have had or will have access to confidential information concerning AAFS's business and its customers, including but not limited to information concerning the identities, addresses, telephone numbers, account numbers, personal information, financial information, and transactions of customers, as well as AAFS's marketing strategies and plans, goals, business methods, business prospects, computer software, research techniques and results, and other information that would be of value to competitors if they obtained this information (collectively, "Confidential Information"). You agree that AAFS has undertaken reasonable measures to maintain the secrecy of its Confidential Information and that during and after your employment you will take all reasonable steps necessary to maintain the information's secrecy, including ensuring that the Confidential Information is not disclosed and is maintained in a secure environment where it is protected from theft or inadvertent disclosure.

(b)    You further agree not to, directly or indirectly, use or disclose any Confidential Information, either during or following the termination of your employment, except to the limited extent necessary to perform your job duties for AAFS, including only disclosing Confidential Information to other AAFS employees who have a "need to know" this information. These restrictions apply regardless of whether the Confidential Information is in printed, written, or electronic form, retained within your memory, or is compiled or created by you and regardless of when or how you learned the Confidential Information. These restrictions also apply to any use or disclosure, whether it is by verbal, written, electronic, or other means. You also agree that you will immediately inform your supervisor and your State Sales Manager of any unauthorized access, use or disclosure of AAFS' Confidential Information.

(c)    Upon demand or the termination of this Agreement, you shall return all Confidential Information in whatever form is [sic] may exist, as well as any documents and data created or compiled by you containing[,] that contains, is based upon, or derived from any Confidential Information, regardless of the source, location, or media on which this

---

[1] ABN AMRO Financial Services, Inc., or "AAFS," is the predecessor-in-interest to LFS.

> information is kept. In addition, you agree to not create
> any documents or data that contains, is derived from, or
> based upon Confidential Information after the termination
> of this Agreement.

(Financial Consultant Agreement at § 4, an example of which is attached as Exhibit A)

18.    In addition, the employment of all of LFS's employees is governed by the LFS

Registered Representative Compliance Manual (attached as Exhibit B), which requires

employees to, among other things, maintain the confidentiality of LFS's Confidential

Information. The agreement of LFS's employees to abide by these terms of confidentiality is a

condition of employment.

19.    The LFS Registered Representative Compliance Manual provides:

> It is the policy of the Firm that all proprietary, customer, trading,
> and account information acquired by the Firm or any of its
> employees is to be maintained in strictest confidence.
>
> *   *   *   *
>
> A.    Confidential Information
>
> In the normal course of business, employees may be given or may
> acquire information about the business of the Firm, its customers,
> or its affiliates that is not available to the general public. This
> information is deemed to be confidential and may include trading
> and investment details and customer income or financial data. All
> employees are responsible for respecting and maintaining the
> confidential nature of information that concerns the business of the
> Firm, its customers, and its affiliates.
>
> Whether orally or in writing, confidential information may only be
> disclosed within the Firm or to employees of the Firm's affiliates
> who need to know the information to perform their job functions.
> In particular, specific customer transactions or orders are not to be
> discussed with bankers or other employees of the Firm's affiliates
> unless there is a legitimate business need to do so.
>
> All employees are to exercise reasonable care in how and where
> they discuss, document, and store the confidential information that
> relates to the business activities of the Firm and its customers.

> Confidential business and customer information should not be disclosed outside of the Firm and its affiliates except for legitimate and legal business reasons or as required by law. Employees should be discreet about discussing or exposing written confidential information in public areas such as elevators, halls, and restaurants. Documentation and files of a confidential nature, such as order tickets, customer account opening forms, monthly statements, and memoranda are to be maintained in a secure place where their confidentiality will not be compromised by people unaffiliated with the Firm.

(Exhibit B at p. 10)

20.    The Compliance Manual also prohibited the Defendants from deleting or destroying any of LFS's records or documents:

> Employees are specifically prohibited from the following:
>
> - Forging signatures of customers or others; or altering, falsifying or destroying customer or Firm records or documents.

(Exhibit B at p. 25)

21.    Defendants also agreed to abide by LFS's Standards of Conduct, which provide in relevant part:

> IV. CONFIDENTIAL INFORMATION AND CHINESE WALLS
>
> In the normal course of business, employees may be given or may acquire information about the business of the Company, its subsidiaries, affiliates, customers, or employees that is not available to the general public. This information is confidential and may include, but is not limited to: financial data, business plans, strategies concerning specific lending or trading decisions, computer software programs or code, employee, and client information including social securities numbers, restricted list information, investment decisions, or research opinions. All employees are responsible for respecting and maintaining the confidential nature of such information. Clients conduct business with the Company with the expectation that the Company will maintain in absolute confidence all information provided to it regarding them and their business. The Company and its

employees must meet their responsibility for confidentiality throughout the relationship with the client and even after a transaction or relationship has ended.

The duty to protect the confidence of the Company, its subsidiaries, affiliates, customers, and employees includes avoiding intentional disclosures, as well as taking care to avoid accidental disclosures. All employees are to exercise extreme care in how and where they discuss, document and store the confidential information that relates to the business activities of the Company, its customers and its employees.

Whether orally or in writing, confidential customer, Company or employee information only may be disclosed within the Company to those who need to know the information to perform their job functions. Confidential business, customer and employee information is not to be disclosed outside of the Company except for legitimate business reasons or as required by law. Heightened awareness of identity theft/fraud should be a concern to all employees.

* * *

XV. PROHIBITION OF THE USE OF INFORMATION AFTER LEAVING THE COMPANY

If you leave the Company for any reason, you may not take and must return all Company property received by you in the course of your employment. This includes but is not limited to computer, printer, fax machine, pager or telephone, and all paper and electronic Company documents and data including memoranda, customer information, financial reports, personnel information, and all copies thereof. All such items, documents and data are property of the Company. In addition, you may not divulge any confidential information obtained by you during your employment regarding the Company's business to a new or prospective employer. This includes, but is not limited to, any proprietary information or trade secrets such as customer lists, financial information, business plans, personnel information, and any other information not publicly available.

(Exhibit C at pp. 4-5, 11)

22.     In addition to agreeing to maintain the confidentiality of LFS's Confidential

Information, trade secrets, and other customer information, the Defendants further agreed in each

of their respective Agreements, that they would not solicit securities business from any customers of LFS on behalf of any other organization, or assist anyone else in doing so, during their employment by LFS, or for one year thereafter.  Specifically, Defendants agreed as follows:

5.    Nonsolicitation.

(a)    As part of your AAFS job duties, you have been or will be responsible for obtaining, maintaining, and developing business relationships in a professional and business-like manner with actual and prospective AAFS customers, including but not limited to brokerage customers, annuity customers serviced through insurance companies, and customers of AAFS affiliated banks that you learn of as a result of your employment (collectively, "Customers"). You agree that your relationships with Customers are undertaken solely as an agent of AAFS, on whose behalf the relationships are maintained.  AAFS at all times retains the right, exercised at its sole discretion, to reassign any account or customer to any employee.

(b)    Accordingly, you agree that for a period of one (1) year after the termination of your employment, regardless of the reason for termination, you will not, directly or indirectly, and whether as an employee, agent, representative, owner, contractor, partner, sole-proprietor, investor, consultant, or in any other capacity, do any of the following: (i) solicit, canvass, or accept orders or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by, AAFS from any Customer that you serviced or learned of during your employment; (ii) induce or attempt to induce any Customer to patronize any business that is competitive with AAFS; (iii) request or advise any Customer to withdraw, curtail, or cancel the Customer's actual or prospective business with AAFS; or (iv) otherwise initiate any securities or insurance related business contact, written or verbal, with any Customer.  These restrictions shall not apply to those Customers agreed to by you and your State Sales Manager (provided that the names of these Customers are set forth in a writing signed by the State Sales Manager that directly refers to this agreement) or to Customers that are directly related to you, provided that you do not use any Confidential Information in servicing these Customers after the termination of your employment.  You further agree

that it is critical to AAFS's continued business and a reasonable restriction on your future employment that you not interfere with AAFS's Customer relationships upon the termination of your employment.

(Exhibit A at § 5)

23.    During their employment and for the limited purpose of performing their job duties as Financial Consultants, Defendants were provided access to Confidential Information relating to the customers and accounts that they managed for LFS, as well as limited Confidential Information relating to other LFS customers and Confidential Information concerning LFS's business.  This Confidential Information was provided to the Defendants with the trust and confidence that they would abide by their duties under LFS's written policies, their written agreements, and the law, to keep this information confidential and that they would not use or disclose any of this Confidential Information, except to the limited extent necessary to perform their job duties.

24.    To assist in the performance of their job duties, Defendants were also allowed access to paper documents containing highly confidential customer and financial information.

25.    In consideration for the work performed by Brymer and his obligation to maintain the secrecy of LFS Confidential Information, among other obligations, LFS paid Brymer generous compensation, including commissions, amounting to $163,139.66 for the year 2005, $168,296.16 for the year 2006, and $196,714.49 in 2007 through his termination at LFS.

26.    In consideration for the work performed by Swanson and his obligation to maintain the secrecy of LFS Confidential Information, among other obligations, LFS paid Swanson generous compensation, including commissions, amounting to $44,918.30 for the year 2005, $59,067.10 for the year 2006, and $69,705.44 in 2007 through his termination at LFS.

27.     In consideration for the work performed by Kibiloski and his obligation to maintain the secrecy of LFS Confidential Information, among other obligations, LFS paid Kibiloski generous compensation, including commissions, amounting to $26,500.00 for the fraction the year 2005 for which Kibiloski was employed by LFS, $97,356.94 for the year 2006, and $146,801.49 in 2007 through his termination at LFS.

28.     In addition to commissions and bonuses, LFS provided Defendants with operational and sales systems, computer resources, sales assistance, and other support.  LFS also provided Defendants with customers and customer leads, referrals, assignments, and sales advantages resulting from LFS's and LaSalle Bank's goodwill, reputation, and name recognition in the securities and banking industries.

29.     On December 7, 2007, without any prior notice, Brymer announced his resignation.

30.     On December 7, 2007, without any prior notice, Swanson announced his resignation.

31.     On December 7, 2007, without any prior notice, Kibiloski announced his resignation.

32.     On information and belief, all of Defendants immediately commenced their employment with their new broker-dealer.

**B.**    **The Defendants Breached Their Confidentiality and Non-Solicitation Obligations, and Deleted Electronic Information From LFS's Computers in an Attempt to Cover-Up Their Misdeeds**

33.    Notwithstanding their clear contractual, professional, ethical, legal, and other duties, the Defendants have taken Confidential Information from LFS.    They did so in a systematic fashion in the months, weeks, and days leading up to their departure from LFS.

34.    During that time, Defendants copied numerous electronic files containing LFS's Confidential Information.    In addition, during that time, the Defendants requested and obtained from various insurance carriers, lists of the LFS customers who purchased and held annuities issued by those carriers.    This was information that the Defendants could have accessed from LFS; however, their access of this information would have been recorded by LFS's computer systems and generated an automatic alert that would have been sent to the Defendants' supervisor.    Defendants knew about this security feature and attempted to subvert it by accessing the information from the insurance carriers instead of directly from the LFS computer system. Defendants also were aware that their access to this information would be denied after they resigned from LFS because they knew that, in accord with LFS's policies, the passwords that permitted them access to this information from insurance carriers would be immediately deactivated upon their resignation.

35.    In the days leading up to Defendants' departure from LFS, and indeed on the afternoon of their final day at LFS, Defendants repeatedly accessed and reviewed LFS's confidential customer lists.

36.    On numerous occasions during the weeks leading up to their departure from LFS, Defendants connected portable electronic media storage devices, such as flash drives and Apple

iPods, to their computers at LFS.  The Defendants had no reason related to their duties as LFS financial consultants to connect such devices to their LFS computers and likely did so solely as a means to download and store LFS's confidential information.

37.    Defendants also illicitly copied LFS's Confidential Information onto CD ROMs. For example, on November 20, 2007 – the day after Kibiloski was offered his position at his new employer – he installed the Roxio CD-burning application onto his LFS computer.  There is no legitimate reason why Kibiloski, the most tech savvy of the three Defendants, would have needed such software to carry out his duties and responsibilities as a Financial Consultant at LFS.    Rather he installed it for the purpose of copying and taking LFS's Confidential Information.

38.    LFS has demanded the immediate return of its Confidential Information from Defendants, but none of the Defendants have responded to LFS's demand.  (*See* LFS Letters to Defendants attached as Group Exhibit D)

39.    The Defendants also have used LFS's Confidential Information for marketing purposes.    For example, Defendants accessed internet-based marketing organizations constantcontact.com and zedo.com on numerous occasions in the days and weeks leading up to their departure from LFS.

40.    Through their numerous contacts, it is likely that Defendants provided LFS's confidential customer information to constantcontact.com and zedo.com to facilitate a mass-mailing solicitation or other advertising and marketing campaign directed to LFS's customers. There is no legitimate reason why Defendants would have accessed these sites in carrying out their duties and responsibilities as Financial Consultants for LFS.

41.    Defendants also are actively soliciting LFS's customers to move their accounts away from LFS to Defendants' new employer, a direct competitor of LFS.  For example, LFS received a telephone call from an LFS customer who was concerned because he received a telephone call from Defendants in which they referenced his IRA account held at LFS and solicited him to transfer that account to Defendants' new broker-dealer.  Defendants' access to that customer's account information could only have come from LFS's Confidential Information, which Defendants illicitly retained upon their departure from LFS.

42.    Defendants also sent a letter soliciting customers to change their broker-dealer of record from LFS to Defendants' new employer with respect to annuities held by the customers. Defendants included with the letter a form for customers to fill out and sign to accomplish the change.  If a customer fills out and submits such a form and thereby switches broker-dealers from LFS to Defendants' new employer, then the commission trails paid by the annuity company would be paid to Defendants and their new employer and not to LFS.  Defendants could not have made this solicitation to LFS's annuity customers without using LFS's Confidential Information that they illicitly took when they left LFS.

43.    LFS also has received telephone calls from other customers reporting that they had been contacted by the Defendants.

44.    None of the Defendants had a significant number of customers when they began their employment with LFS.  Defendants' customers at LFS were primarily referred to them by the Bank.

45.    Using LFS's Confidential Information that they illicitly retained upon their resignation from LFS, Defendants have solicited, and absent injunctive relief from the Court,

upon information and belief, will continue to solicit, other LFS customers that Defendants may or may not have serviced while they were employed by LFS.

46.     Thus, rather than abide by their contractual agreements and other applicable duties, and despite federal and state laws protecting the privacy of financial information, Defendants engaged in a scheme to reproduce and use the Confidential Information to steal LFS's customers for their own benefit and the benefit of their new employer.

47.     LFS's efforts to determine the full scope of Defendants' misconduct have been hindered by Defendants' unauthorized and intentional destruction and deletion of files and information from LFS's computers.  Indeed, LFS's forensic investigation has determined that Defendants went so far as to use a computer application to "wipe" or overwrite data on LFS's computers in order to hide their actions.  Defendants' deletions and overwriting of data was a deliberate attempt by Defendants to hide their unauthorized copying and misappropriation of LFS's Confidential Information.

**C.     The Defendants' Conduct Has Caused and
Continues to Cause LFS Irreparable Injury**

48.     The securities brokerage industry is a highly competitive industry, and Defendants' new employer is a direct competitor of LFS.

49.     Tellers, personal bankers, commercial banking officers, and trust personnel referred customers to Defendants with the understanding that Defendants would enhance and protect the Bank's relationships with those customers and the confidentiality of the information provided to it.

50.     Maintaining the confidentiality and secrecy of LFS's trade secret and confidential customer information is crucial if LFS and the Bank are to maintain the trust and confidence of their customers. These customers fully expect that all private financial and personal information provided to LFS and the Bank will be kept strictly confidential and will not be unnecessarily disclosed to any other person or entity, and LFS and the Bank provide their customers with assurances to that effect. The disclosure of this information will destroy the confidence and trust LFS and the Bank and their customers that they have built over time, to LFS's and the Bank's grave and irreparable harm.

51.     LFS also diligently maintains the secrecy and confidentiality of its trade secret and Confidential Information in order to maintain its competitive advantage over competitors who do not have this information. If this information becomes known to a competitor, it would allow a competitor to target LFS's most lucrative and productive accounts and provide the competitor with an unfair competitive advantage without the investment of years of effort and resources made by LFS in obtaining and retaining the customer.

52.     Defendants' actions in converting the Confidential Information detailed above create immediate and irreparable harm not only to LFS, but to the Bank as well.

53.     Defendants' conduct was, and is, in furtherance of a scheme to obtain and convert to their own use and gain the Confidential Information of LFS, including the names, addresses and other customer information and records used to conduct business at LFS, the client lists and contacts of LFS, the trade secrets of LFS, and the goodwill generated, directly and indirectly, by the Defendants' association with LFS.

54.     Unless Defendants are restrained from using any of the information they have taken from LFS, LFS will suffer immediate and irreparable harm.  Defendants' unlawful acquisition of LFS's confidential customer information will destroy the benefits of all of the resources that LFS has devoted in developing this information and its customer trust and goodwill, including years of marketing and nurturing customer relationships.  No price tag could ever be placed on the destruction of these benefits that will take place if Defendants are not restrained from using the misappropriated information.

55.     Specifically, LFS will suffer irreparable harm through the disclosure of its trade secrets, customer lists, and customer account information, as well as the loss of confidentiality of clients' records and financial dealings.  LFS will also be irreparably harmed by the loss of trust and confidence of its customers, loss of goodwill, and loss of business reputation.  The resultant present and future economic loss to LFS and the Bank is and will always be impossible to fully ascertain in monetary terms.

56.     Defendants' conduct has caused, and will continue to cause, irreparable harm to LFS as follows:

    A)    Deletion of LFS's Confidential Information in the Defendants' possession, custody, or control;

    B)    Disclosure of LFS's trade secrets to third parties and potentially unlimited distribution of those trade secrets through electronic copying and transfer of the information;

    C)    Loss of confidentiality of customer's records and financial dealings, loss of confidence and trust of clients, and loss of customer goodwill;

D)    Present economic loss which is unascertainable at this time, and future

economic loss, which is incalculable; and

Injunctive relief is necessary to ensure LFS's ability to comply with its affirmative and

continuing obligation to respect the privacy of its customers and to protect the security and

confidentiality of those customers' nonpublic information as required by 15 U.S.C. §6801 *et seq.*

and Regulation S-P promulgated thereunder (17 C.F.R. pt. 248).

57.    LFS has no adequate remedy at law for these injuries.    Injunctive relief is

necessary to forestall continuing injury and to insure LFS's ability to comply with its affirmative

and continuing obligation to respect the privacy of its customers and to protect the security and

confidentiality of those customers' nonpublic information as required by 15 U.S.C. § 6801 *et*

*seq.* and Regulation S-P promulgated there under (17 C.F.R. pt. 248).

58.    Defendants have acknowledged LFS's irreparable injury and right to an injunction

upon breach of the confidentiality and non-solicitation clauses of their agreements.    Specifically,

Defendants each agreed, as follows:

> 6.    Injunctive Relief.    You acknowledge that should you
> violate any provisions of Section 4 [confidentiality] or Section 5
> [non-solicitation], AAFS will suffer substantial harm and not have
> adequate remedy at law. Accordingly, you agree that:  (a) AAFS
> may seek injunctive relief to restrain any such violation, whether
> threatened or actual;  (b) such equitable relief may be sought in any
> court of competent jurisdiction, regardless of whether other issues
> (e.g., damages) are subject to arbitration;  (c) any requirement for
> AAFS to post a bond in seeking such equitable relief is waived.
> This equitable remedy is cumulative and in addition to any other
> remedies available to AAFS under the law, including the right to
> obtain damages.

(Exhibit A at § 6)

59.     Defendants also each agreed to pay for LFS's attorney fees associated with enforcing the terms of the Financial Consultant Agreements:

> 7.     <u>Attorneys Fees & Costs</u>.  In the event AAFS brings suit to enforce the terms of this Agreement, you agree to pay any fees or costs (including any reasonable attorneys' fees and arbitration forum fees) AAFS incurs in enforcing the terms of the Agreement.

(Exhibit A at § 7)

## COUNT I
## <u>VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT</u>
### (Against All Defendants)

60.     LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

61.     Without LFS's authorization, the Defendants intentionally accessed a computer used for interstate commerce in order to take LFS's confidential information, including its customer lists.  Defendants transferred that confidential information to small, portable electronic storage devices such as iPods and flash or thumb drives.  Defendants also transferred that information to CD ROMs and possibly other media for storing electronic information.

62.     In an attempt to hide their unauthorized copying and retention of LFS's confidential information, Defendants also intentionally deleted files and records maintained on LFS's computers prior to their resignation from LFS.

63.     As a result of the Defendants' unauthorized access and deletions, LFS has suffered losses of at least $5,000 in value within a one year period, including the cost of investigating the offense, the cost of responding to the offense, and lost revenues.

64.     Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), LFS is entitled to injunctive relief enjoining the Defendants, and anyone to whom they have divulged LFS's information, from making any use of LFS's information and ordering Defendants, and anyone to whom they have divulged LFS's information, to return to LFS all documents and things containing or embodying the information.  LFS also is entitled to enjoin Defendants from further deletions of LFS's confidential information in Defendants' custody, possession, or control.

65.     Also pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, LFS is further entitled to recover monetary damages against the Defendants for the losses LFS has sustained, and the unjust enrichment obtained by the Defendants, in an amount to be determined in arbitration.

**COUNT II**

**<u>BREACH OF CONTRACT</u>**

**(Against All Defendants)**

66.     LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

67.     The obligations to not engage in the unauthorized use and/or disclosure of LFS's Confidential Information, as set forth in LFS's Registered Representative Compliance Manual, together with Defendants agreements described above are part of Defendants' contract for employment with LFS.

68.     The prohibition against soliciting clients of LFS as set forth in the agreements described above is part of the Defendants' contract for employment with LFS.

69.    The Defendants have breached their contractual obligations to maintain the confidentiality of LFS's Confidential Information by engaging in the unauthorized reproduction, use and disclosure of LFS's Confidential Information to their new employer or other unknown third parties.

70.    The Defendants have breached their contractual obligations to refrain from soliciting customers of LFS by contacting those customers and encouraging/assisting them to transfer their accounts from LFS to Defendants' new employer and LFS's competitor.

71.    LFS has complied with its obligations under the agreements.

72.    As a result of the Defendants' breach of their contractual duties, LFS has suffered and will continue to suffer irreparable injury, as well as damages.

## COUNT III

### VIOLATIONS OF ILLINOIS' UNIFORM TRADE SECRETS ACT

#### (Against All Defendants)

73.    LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

74.    The Defendants were only provided access to LFS's Confidential Information in the trust and confidence that they would maintain the secrecy of that information and abide by LFS's policies and procedures, and federal and state law, to maintain the secrecy of that information.

75.    The Defendants are using LFS's Confidential Information to LFS's detriment and irreparable harm.

Case 1:07-cv-07116     Document 9-2     Filed 12/19/2007     Page 24 of 116

76.     LFS's Confidential Information derives actual or potential economic value from not being generally known to and not being readily ascertainable by proper means to other persons and entities who can obtain economic value from its disclosure and use.

77.     LFS takes reasonable steps to protect the secrecy and confidentiality of its Confidential Information, including without limitation, maintaining the information in locked files and locked buildings, using video surveillance, using computer passwords, limiting dissemination to those employees with a need to know the information, promulgating employment policies mandating the confidentiality and secrecy of the information and entering into agreements with its employees to maintain the secrecy of this information.

78.     The Defendants have misappropriated LFS's Confidential Information for their business by wrongfully obtaining the information in violation of the law and their contractual duties owed to LFS.

79.     The Defendants acted with actual knowledge that LFS's Confidential Information was being misappropriated by improper means and in violation of their duties owed to LFS.

80.     The misappropriation of LFS's Confidential Information was willful and malicious.

81.     Pursuant to 765 ILCS 1065/3(a), this Court may enjoin the actual or threatened misappropriation of LFS's Confidential Information by the Defendants.

82.     LFS has no adequate remedy at law for Defendants' actions since the damages LFS has suffered and will continue to suffer as a result of the use and divulgence of its Confidential Information are incapable of exact proof.

83.    Unless the Defendants and those acting in concert with them are preliminarily and permanently enjoined from misappropriating LFS's Confidential Information, the Defendants will continue their use and misappropriation of LFS's Confidential Information and will continue to cause LFS irreparable harm. Accordingly, a preliminary and permanent injunction enjoining Defendants and those acting in concert with them is a necessary remedy if LFS is to obtain meaningful relief.

**COUNT IV**

**<u>BREACH OF FIDUCIARY DUTIES</u>**

**(Against All Defendants)**

84.    LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

85.    Because the Defendants were Financial Consultants employed by LFS, they owed the following fiduciary duties to LFS:

A)    A duty not to utilize or disclose LFS's Confidential Information for their own benefit or to the detriment of LFS;

B)    A duty not to harm LFS's business by using and/or disclosing LFS's Confidential Information;

C)    A duty not to compete with LFS prior to the termination of their employment;

D)    A duty not to misuse confidential customer information except for the express purpose for which the information was provided to LFS; and

E)    A duty of good faith and loyalty to LFS.

86.    The Defendants have breached each and every one of the foregoing duties:

A)    By using and disclosing LFS's Confidential Information for their own benefit and the benefit of Defendants' new employer and to the detriment of LFS;

B)    By breaching their duties to LFS and the trust in which customers and LFS placed in them by engaging in the unauthorized disclosure and use of the Confidential Information;

C)    By using LFS's Confidential Information to compete and/or prepare to compete with LFS prior to the termination of their employment with LFS; and

D)    By transmitting LFS's Confidential Information for the express purpose of harming LFS.

87.    As a result of the Defendants' breach of their fiduciary duties owed to LFS, LFS has suffered and will continue to suffer irreparable injury and damages.

**COUNT V**

**TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS**

**(Against All Defendants)**

88.    LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

89.    There now exist, and at all relevant times have existed, actual business relations between LFS and its customers.

90.     The Defendants have been, at all relevant times, aware of the existing business relations between LFS and its customers.

91.     The Defendants' actions in soliciting LFS's customers through the use of Confidential Information misappropriated by the Defendants are intentional and unjustified attempts to get LFS customers to breach their agreements with LFS.

92.     As a proximate result of Defendants' interference, LFS has been damaged in an amount it cannot yet ascertain, and which includes irreparable harm.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (Against All Defendants)

93.     LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

94.     There now exist, and at all relevant times have existed, prospective business relations between LFS and its customers.

95.     The Defendants, at all relevant times, knew of the prospective business relations between LFS and its customers.

96.     The Defendants' actions to solicit LFS's customers by the misappropriation and use of LFS's customer information constitutes intentional and unjustifiable interference with LFS's prospective business relations, causing a breach and termination of the expectancy of those prospective business relations.

97.     As a proximate result of the Defendants' interference, LFS has incurred damages in an amount it cannot yet ascertain, and which includes irreparable harm.

**COUNT VII**

**CONSPIRACY**

**(Against All Defendants)**

98.     LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

99.     On information and belief, Defendants agreed to misappropriate and use LFS's Confidential Information.

100.     This concerted action was intended to, among other things, gain a competitive advantage, and to otherwise improperly and unfairly compete with LFS.

101.     The Defendants furthered this conspiracy by using the misappropriated Confidential Information to solicit LFS's customers.

102.     As a consequence of the Defendants' conduct, LFS has suffered damages and will continue to suffer irreparable harm and loss.

**COUNT VIII**

**CONVERSION**

**(Against All Defendants)**

103.     LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

104.     The Defendants have documents and information that belong to LFS.

105.    LFS has an absolute and unconditional right to immediate possession of these documents and information.

106.    The Defendants have wrongfully and without LFS's authorization, assumed control, dominion and ownership over these documents and information.

107.    Upon learning that the Defendants had possession of these documents and information, LFS made an immediate demand for their return.

108.    The value of the documents or information converted by Defendants is not possible to ascertain with any reasonable degree of certainty, and LFS is entitled to the immediate return of those documents and all compilations and derivations of the information contained in those documents.

109.    As a direct and proximate result of the Defendants' conversion of LFS's property, LFS has suffered, and will continue to suffer, immediate and irreparable injury.

110.    Injunctive relief is necessary to insure LFS's ability to comply with its affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic information as required by 15 U.S.C. §6801 *et seq.* and Regulation S-P promulgated thereunder (17 C.F.R. pt. 248).

## COUNT IX
## UNFAIR COMPETITION
### (Against All Defendants)

111.    LFS incorporates by reference the allegations contained in paragraphs 1 through 59 of the Complaint, as if fully set forth herein.

112.     The foregoing conduct of the Defendants and those acting in concert with them constitutes an unfair method of competition.

113.     As a consequence of the Defendants' conduct, LFS has suffered damages and will continue to suffer irreparable harm and loss.

## REQUEST FOR RELIEF

WHEREFORE, LaSalle Financial Services, Inc. respectfully prays for the entry of judgment in its favor and against each of the Defendants:

1)     permanently restraining and enjoining the Defendants and all persons acting in concert with them:

(a)     From directly or indirectly, and in any manner, using or disclosing any Confidential Information belonging to or originating from LFS, including but not limited to using the Confidential Information to  solicit LFS's customers and accounts.

(b)     From directly, or indirectly through their employer, soliciting business from or diverting the business of any LFS customer.

(c)     From clearing any transfers of customer accounts for LFS customers solicited by Defendants, or by any of them, in whole or in part through defendants' use of LFS's Confidential Information.

(d)     From destroying, altering, modifying or concealing any data relevant to this action or LFS's Confidential Information stored on any computer media.

2)      awarding LFS attorneys' fees, costs, and expenses incurred in connection

with this action;

3)      awarding LFS such other relief as the Court deems just and equitable.

Dated:  December 19, 2007                    Respectfully submitted,

By: _____
      Stephen P. Bedell
      Martin J. Bishop
      Thomas K. Anderson
      Anna Downs-Temple
      Foley & Lardner LLP
      321 North Clark Street
      Suite 2800
      Chicago, IL 60610

## **VERIFICATION**

I, Amy Hughes, on oath and under penalties of perjury as provided in 28 U.S.C. § 1746, state that I am a Senior Vice President at LaSalle Financial Services, Inc.; that I am authorized to make this Verification on behalf of LaSalle Financial Services, Inc.; that I have read the foregoing Verified Complaint and am familiar with its contents; and that the statements contained in the foregoing Verified Complaint are true and correct to the best of my knowledge and belief.

Executed on: 12/18/07

Amy Hughes
Senior Vice President
LaSalle Financial Services, Inc.

# EXHIBIT A

# ABN AMRO FINANCIAL SERVICES, INC.

## Financial Consultant Agreement

Douglas F Bryher
_____
**Financial Consultant Name**

# FINANCIAL CONSULTANT AGREEMENT

This agreement between you and ABN AMRO Financial Services, Inc., a Delaware corporation ("**AAFS**") sets forth the capacity in which you will serve AAFS and the terms and conditions that apply to your employment with AAFS ("**Agreement**").

1. Scope.

   (a) In return for your diligent performance under this Agreement, and subject to the terms of this Agreement, AAFS agrees to employ you in your capacity as an NASD-licensed and/or annuities-licensed financial consultant ("**Financial Consultant**"). Your duties are:

   (i) To execute purchases and sales of authorized investment products, including shares or units of certain registered open-end management companies and unit investment trusts, for customers of AAFS;

   (ii) In accordance with guidelines established by AAFS, to provide investment advice and recommendations with respect to investment products that are suitable for AAFS's customers and are in accordance with their investment goals, financial status, tax status or any other criteria used or considered to be reasonable by AAFS; and

   (iii) To render such other services as may be assigned to you from time to time by AAFS.

   (b) To the extent that you are appropriately licensed and authorized by AAFS to sell insurance products as agent, this Agreement will apply to such sales activity and your employment by AAFS as a licensed insurance specialist. In that case, to illustrate (but not limit) the general applicability of this Agreement to your insurance-related activities, references herein to investment products, sales, commissions, policies, Rules and licenses shall be deemed to also refer to insurance products, sales, commissions, policies, Rules and licenses.

   (c) Except for customers' orders in the ordinary course of business, you have no right to make any contracts or commitments for, or on behalf of, AAFS without first obtaining the written consent of AAFS.

   (d) AAFS has the sole and exclusive right to advise, instruct, supervise, direct and control you with respect to your employment as Financial Consultant under this Agreement and the services and duties to be performed by you as a Financial Consultant under this Agreement.

2. Compliance.

   (a) You agree that you will strictly adhere to all of the policies and procedures established by AAFS for the conduct of its Financial Consultants, which includes those set forth in AAFS's Registered Representative Compliance Manual. YOU ACKNOWLEDGE RECEIPT OF SUCH MANUAL. If for any reason you require a replacement copy of the Manual, contact AAFS, and a copy will be furnished to you. AAFS may ask for the return of your present copy.

   (b) You agree that you will strictly adhere to all applicable state and federal laws, rules, regulations, and guidelines, as well as those of any applicable self-regulatory organization (collectively, the "**Rules**"). You will at all times faithfully, industriously, and to the best of your ability perform all of the duties that may be required of you pursuant to this Agreement and you will use your best efforts to become, and/or remain a qualified Financial Consultant during the term of this Agreement. You will immediately notify your supervisory principal and the AAFS Compliance Officer of any customer complaint, whether written or verbal, and you will provide all relevant details concerning any such complaint.

   (c) You agree that you will strictly adhere to the Interagency Statement on Retail Sales of Nondeposit Investment Products, as amended (the "**Interagency Statement**"), as well as the policies and procedures of AAFS's affiliated banks implementing the Interagency Statement, copies of which AAFS will make available to you.

(d) You acknowledge that failure to strictly adhere to AAFS's policies, procedures, and rules (which includes those set forth in the Manual), the Rules, and the Interagency Statement ... be subject you to disciplinary action (including termination) by AAFS.

(e) You agree, during the term of this Agreement, not to solicit or sell any securities or other investment products on behalf of any other unaffiliated broker-dealer or insurance agency; not to sell any products other than those approved for sale by AAFS and for which you are properly licensed; and not to sell products outside the jurisdiction(s) in which you and AAFS are properly licensed. You further agree to obtain and maintain in good standing all federal, state, and self-regulatory organization licenses and registrations required for your activities as a Financial Consultant and to complete all applicable continuing education requirements on a timely basis.

3. Compensation.

(a) In full payment for your services under this Agreement, you will be compensated by the payment of commissions at a rate determined by AAFS from time to time, as further defined in this Agreement. A copy of the commission structure currently in effect is attached hereto as Exhibit A. AAFS reserves the right to unilaterally change the commission rates and/or system of compensation at any time in its sole discretion. Benefits will be provided to you in accordance with your eligibility under the ABN AMRO North America, Inc. benefit plans in effect from time to time. AAFS and/or ABN AMRO North America, Inc. reserves its right to unilaterally modify, amend, or cancel any of these benefit plans, with or without prior notice to you.

(b) You may be paid refundable, recoverable bi-monthly draws as advances against commissions earned in such amount and to the extent set forth in the AAFS commission structure then in effect. "Commissions earned" that are to be paid to you are defined as commissions on eligible sales, including trailers (if any), at the rate and on the products set forth in the commission structure then in effect, minus any draws previously paid to you that have not yet been recovered, minus all charge backs then outstanding. If you work on a sale with another Financial Consultant, AAFS reserves its right, exercised at its sole discretion, to allocate any commissions paid on that sale. While you are a current employee, commissions earned will be due in the month following the sale to the customer or when the commission is listed in the monthly commission report, whichever is later. Upon the termination of your employment, commissions earned that have not yet been paid shall be due to you ninety days after the date of termination of employment. You agree to pay AAFS for any draws that have not yet been recovered and any outstanding charge backs following the final payment of commissions earned. This payment shall be made by you within sixty (60) days of notification by AAFS that such amounts are due and owing.

(c) You will be provided with monthly commission reports. You are responsible for auditing these reports and to immediately notify AAFS of any errors therein. If you fail to notify AAFS in writing of any errors within thirty (30) days of the date that the report is mailed or otherwise provided to you, you will be deemed to have agreed with the accuracy of those reports and no further adjustments will be made based on any errors you may later assert. All notifications regarding commission disputes and monthly commission reports must be made in writing, with supporting documentation, to AAFS's headquarters in Chicago. Nothing contained herein in any way limits AAFS's right to correct errors and/or to account for charge backs at any time in determining commissions earned, whether or not these are correctly or otherwise set forth in a monthly commission report.

(d) AAFS will deduct all outstanding charge backs in calculating commissions earned by you. Charge backs will include, but will not necessarily be limited to, the loss to AAFS, including any related expenses and costs, when a customer incurs a loss or is otherwise damaged due to your act or omission that was negligent, in violation of AAFS's instructions or guidelines, or inconsistent with the terms of this Agreement, and AAFS, in its sole discretion, reimburses the customer for that loss. Charge backs shall also include, but will not necessarily be limited to, the amount of any previously paid commission when the commission was paid on a transaction that is later canceled, including but not limited to a transaction that is canceled because the product allows a specified time for reversal or the customer later challenges the suitability of the product, to the extent that AAFS has returned the compensation it

2

received in connection with the transaction. Charge backs shall also be made for any prior errors by AAFS in calculating commissions earned.

(e) You may not share any investment product sales compensation with others, including employees of AAFS's affiliated banks. Without advance written approval by AAFS, you may not compensate (whether by gift or otherwise) others for referrals or otherwise in connection with your investment product sales activities.

4. Confidentiality.

(a) During your employment with AAFS, you have had or will have access to confidential information concerning AAFS's business and its customers, including but not limited to information concerning the identities, addresses, telephone numbers, account numbers, personal information, financial information, and transactions of customers, as well as AAFS's marketing strategies and plans, goals, business methods, business prospects, computer software, research techniques and results, and other information that would be of value to competitors if they obtained this information (collectively, "Confidential Information"). You agree that AAFS has undertaken reasonable measures to maintain the secrecy of its Confidential Information and that during and after your employment you will take all reasonable steps necessary to maintain the information's secrecy, including ensuring that the Confidential Information is not disclosed and is maintained in a secure environment where it is protected from theft or inadvertent disclosure.

(b) You further agree not to, directly or indirectly, use or disclose any Confidential Information, either during or following the termination of your employment, except to the limited extent necessary to perform your job duties for AAFS, including only disclosing Confidential Information to other AAFS employees who have a "need to know" this information. These restrictions apply regardless of whether the Confidential Information is in printed, written, or electronic form, retained within your memory, or is compiled or created by you and regardless of when or how you learned the Confidential Information. These restrictions also apply to any use or disclosure, whether it is by verbal, written, electronic, or other means. You also agree that you will immediately inform your supervisor and your State Sales Manager of any unauthorized access, use or disclosure of AAFS' Confidential Information.

(c) Upon demand or the termination of this Agreement, you shall return all Confidential Information in whatever form is may exist, as well as any documents and data created or compiled by you containing that contains, is based upon, or derived from any Confidential Information, regardless of the source, location, or media on which this information is kept. In addition, you agree to not create any documents or data that contains, is derived from, or based upon Confidential Information after the termination of this Agreement.

5. Nonsolicitation.

(a) As part of your AAFS job duties, you have been or will be responsible for obtaining, maintaining, and developing business relationships in a professional and business-like manner with actual and prospective AAFS customers, including but not limited to brokerage customers, annuity customers serviced through insurance companies, and customers of AAFS affiliated banks that you learn of as a result of your employment (collectively, "Customers"). You agree that your relationships with Customers are undertaken solely as an agent of AAFS, on whose behalf the relationships are maintained. AAFS at all times retains the right, exercised at its sole discretion, to reassign any account or customer to any employee.

(b) Accordingly, you agree that for a period of one (1) year after the termination of your employment, regardless of the reason for termination, you will not, directly or indirectly, and whether as an employee, agent, representative, owner, contractor, partner, sole-proprietor, investor, consultant, or in any other capacity, do any of the following: (i) solicit, canvass, or accept orders or business of any kind relating to the products and/or services sold by, or that are substantially similar to those sold by, AAFS from any Customer that you serviced or learned of during your employment; (ii) induce or attempt to induce any Customer to patronize any business that is competitive with AAFS; (iii) request or advise any Customer to withdraw, curtail, or cancel the Customer's actual or prospective business

3

with AAFS; or (iv) otherwise initiate any securities or insurance related business contact, written or verbal, with any Customer. These restrictions shall not apply to those Customers agreed to by you and your State Sales Manager (provided that the names of these Customers are set forth in a writing signed by the State Sales Manager that directly refers to this agreement) or to Customers that are directly related to you, provided that you do not use any Confidential Information in servicing these Customers after the termination of your employment. You further agree that it is critical to AAFS's continued business and a reasonable restriction on your future employment that you not interfere with AAFS's Customer relationships upon the termination of your employment.

6. <u>Injunctive Relief.</u> You acknowledge that should you violate any of the provisions of Section 4 or Section 5, AAFS will suffer substantial harm and not have adequate remedy at law. Accordingly, you agree that: (a) AAFS may seek injunctive relief to restrain any such violation, whether threatened or actual; (b) such equitable relief may be sought in any court of competent jurisdiction, regardless of whether other issues (*e.g.*, damages) are subject to arbitration; (c) any requirement for AAFS to post a bond in seeking such equitable relief is waived. This equitable remedy is cumulative and in addition to any other remedies available to AAFS under the law, including the right to obtain damages.

7. <u>Attorney's Fees & Costs.</u> In the event AAFS brings suit to enforce the terms of this Agreement, you agree to pay any fees or costs (including reasonable attorneys' fees and arbitration forum fees) AAFS incurs in enforcing the terms of this Agreement.

8. <u>Indemnification.</u> AAFS will indemnify, defend and hold you harmless from and against any loss, liability, damage, cost or expense (including any amounts paid in settlement, provided that AAFS will have approved such settlement), resulting from a demand, claim, lawsuit, action or proceeding relating to your employment as an Financial Consultant of AAFS under this Agreement, provided, that your conduct which was the subject of the demand, claim, lawsuit, action or proceeding did not constitute a breach of this Agreement and was not violative of any of the policies, procedures, Rules or reporting requirements specified in this Agreement; and provided further, that AAFS receives prompt written notice from you of any such demand, claim, lawsuit, action, or proceeding and complete authority and information required for the defense thereof. If any such action is brought against you, and you notify AAFS of the commencement thereof, as provided in this Section 8, AAFS will assume the defense of such action. AAFS will not be responsible for any legal costs or expenses incurred by you without AAFS's prior written consent, unless AAFS has failed to act timely in defense of such demand, claim, lawsuit, action or proceeding after prompt written notification by you.

9. <u>Waiver and Modification.</u> No waiver or modification of this Agreement will be valid unless in writing and duly executed by the party against whom enforcement is sought. Waiver by either party hereto of any breach or default by the other party of any of the terms and provisions of this Agreement will not operate as a waiver of any other breach or default, whether similar to or different from the breach or default waived.

10. <u>Severability.</u> All provisions and covenants contained herein are severable, and in the event that any one or more of them is held to be invalid, illegal or unenforceable in any respect by any court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions and covenants contained herein will not in any way be affected thereby, and such provision or term shall be construed to effectuate its purposes to the fullest extent enforceable under applicable law.

11. <u>Entire Agreement.</u> This agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and no other representations, promises, agreements, or understandings regarding the subject matter hereof shall be of any force or effect unless in writing, executed by the party to be bound, and dated on or subsequent to the date hereof.

12. **<u>Arbitration.</u> The parties agree that all claims and controversies between them, including, but not limited to, claims of discrimination or sexual harassment; those involving any transaction; or the construction, performance, or breach of this of this Agreement, whether entered into prior, on, or subsequent to the date of this Agreement, shall be determined by arbitration. Any arbitration under this Agreement shall be conducted pursuant to the federal arbitration act and the laws of the State of Illinois, before the arbitration facilities provided by the National**

4

Association of Securities Dealers, Inc. In agreeing to arbitrate all claims and controversies, it is important that you understand the following:

- You are agreeing to arbitrate any dispute, claim or controversy that may arise between you and your firm, or a customer, or any other person, that is required to be arbitrated under the rules of the self-regulatory organizations with which you are registering. This means you are giving up the right to sue a member, customer, or another associated person in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

- A claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated under NASD rules. Such a claim may be arbitrated at the NASD only if the parties have agreed to arbitrate it, either before or after the dispute arose. The rules of other arbitration forums may be different.

- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

- The arbitrators do not have to explain the reason(s) for their award.

- The panel of arbitrators may include arbitrators who were or are affiliated with the securities industry, or public arbitrators, as provided by the rules of the arbitration forum in which a claim is filed.

- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

Forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein. Moreover, nothing in this section shall be deemed a waiver of AAFS's rights to injunctive relief as provided for in Section 6 of this Agreement.

13. Termination.

    (a) You understand that your employment with AAFS is at will, and may be terminated by either you or AAFS at any time and for any reason, with or without prior notice.

    (b) The provisions of Section 3, Section 4, Section 5, and Section 12 of this Agreement will survive the term of this Agreement and be binding upon the parties thereafter to the extent specified.

14. Governing Law. This Agreement shall be deemed to have been made in the United States in the State of Illinois and shall be construed and enforced in accordance with, and the validity and performance hereof, shall be governed by the laws of the State of Illinois, without regard to the conflicts of laws principles thereof. You consent to the jurisdiction of the state and federal courts located in or for the State of Illinois in connection with any action or proceeding instituted relating to this agreement.

15. Headings. The headings used in this Agreement are for convenience only, shall not be deemed to constitute a part hereof, and shall not be deemed to limit, characterize, or in any way affect the provisions of this Agreement.

**YOU UNDERSTAND THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE, WHICH IS LOCATED ON PAGE 4, IN SECTION 12. YOU SHOULD READ THAT CLAUSE NOW AND UNDERSTAND IT BEFORE SIGNING THIS AGREEMENT.**

ACKNOWLEDGED AND AGREED TO this _3RD_ day of _APRIL_, 20_03_ :

_____       ABN AMRO Financial Services, Inc.
  (Signature)

5

Social Security No.

REDACTED

Telephone No.

By: Douglas F Bryher

Title: Financial Consultant

Financial Consultant's Name and Address

Douglas Bryher

(Please Print)

655 W. Irving Park Rd #1105

Chicago, IL 60613

6

Exhibit A

# ABN-AMRO FINANCIAL SERVICES

## FINANCIAL CONSULTANTS COMPENSATION PLAN

- 100% of mutual funds and variable annuity revenues to grid (preferred vendors. VA's maximum to 6.5%)
- 100% of security and annuity trailers to grid
- 100% of insurance revenue to grid
- 100% Portfolio Manager I and II annual fee to grid. trailers begin in 5th quarter
- 100% of UIT revenue to grid (VK and Nuveen)
- 100% of equity and fixed income to grid
- Non-preferred vendors maximum: 3% unless commission is less than 3%. then 1% reduction
- 1035X revenue applied to grid when funds received by AAFS
- Fixed annuity commissions maximum of 4%
- Direct-to-Fund business permitted only on trades less than $1,000 unless 529 plan. Reps are paid when funds received by AAFS

- **ANNUAL GRID LEVELS: ***
  - 0 TO 125,000 — 22.5%
  - 125,001 TO 200,000 — 25%
  - 200,001 TO 300,000 — 28%
  - 300,001 TO 400,000 — 31%
  - 400,001 TO 500,000 — 33%
  - 500,001 & OVER — 35%

*Retroactive to first dollar

- **ANNUAL BONUS SCHEDULE:**

| PRODUCTION LEVEL | BONUS AMT. |
|---|---|
| 400,000 | 10,000 |
| 500,000 | 20,000 |
| 625,000 | 32,500 |
| 750,000 | 50,000 |
| 875,000 | 65,000 |
| 1,000,000 | 100,000 |

Exhibit A

Financial Consultant must be employed with AAFS through 2/28 of the following year to be eligible to receive the annual bonus.

OR

The annual bonus will be paid on the second pay period of February (i.e. February 28th or 29th if leap year). You must be employed by AAFS on this payday to receive the annual bonus.

- **SALES ASSISTANT PROGRAM:**
  *Available to President's Council Members in Full Standing*

**Annual Revenue\* $300,000 - $500,000**      AAFS pays 50% of the salary and 100% of the bonus
               **$500,000+**             AAFS pays 100% salary and bonus

- **Unlicensed Sales Associate**      **Salary $27,500**
  *Not eligible for bonus*

- **Fully Licensed Sales Associate**      **Salary $32,500**
  *Eligible for 1% bonus if FC revenue (Gross Commissions plus Trailers) is $33,000 or greater/month. Maximum Monthly Bonus is $1,000*
  *(LBE Revenue NOT included)*

\*Based on prior year's revenue

# EXHIBIT B



# LaSalle
## ABN AMRO

# REGISTERED REPRESENTATIVE
# COMPLIANCE MANUAL

**LaSalle Financial Services, Inc.**
135 S. LaSalle Street
Chicago, Illinois  60603

# TABLE OF CONTENTS

**SECTION**                                                                 **PAGE**

I.    INTRODUCTION ..................................................................................................1

II.   DEPARTMENT REFERENCES .........................................................................2

III.  COMMUNICATIONS WITH THE PUBLIC ......................................................3

A.   Sales Area .........................................................................................................3

B.   Disclosures .......................................................................................................3
     1. Oral Disclosures ..........................................................................................3
     2. Written Disclosures .....................................................................................3

C.   Sales Literature ...............................................................................................4
     1. Approvals .....................................................................................................4
     2. Content and Disclaimers .............................................................................4

D.   Advertising Materials .....................................................................................4

E.   Correspondence ...............................................................................................5
     1. Outgoing ......................................................................................................5
     2. Incoming ......................................................................................................6

F.   Electronic Communications (E-Mail, Web Sites, Chat Rooms) .................6

G.   Telemarketing – Do-Not-Call List ................................................................6

H.   Agreements and Other Documents ................................................................7

I.   Customer Complaints ......................................................................................7
     1. Written Complaints .....................................................................................7
     2. Oral Complaints ..........................................................................................8

J.   Communications with Regulators and Attorneys .........................................8

K.   Service of Process, Requests for Information, Subpoenas ...........................8

L.   Guest Speaking Engagements .........................................................................8

IV.  CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION ..........10

A.   Confidential Information .................................................................................10

B.   Material, Nonpublic Information ....................................................................10

C.   Rumors ..............................................................................................................11

## TABLE OF CONTENTS

D.    Privacy Statement ..................................................................................................11

V.    CURRENCY TRANSACTIONS ................................................................................12

A.    Accepting Cash and Currency ...............................................................................12

B.    Record Keeping and Reporting Obligations ..........................................................12

VI.   CUSTOMER ACCOUNTS ......................................................................................13

A.    Suitability ...............................................................................................................13

B.    Recommendations and Solicitations ......................................................................13

C.    Risk Assessment ...................................................................................................13

D.    Account Documentation .........................................................................................14
      1. New Accounts ...................................................................................................14
      2. Circumstances Regarded as Increased Risk to the Firm ..................................14
         a)  Customer's Background .............................................................................14
         b)  Customer's Business/Activities .................................................................14
         c)  Customer's Product and Service Needs ....................................................15
         d)  Customer's Source of Funds .....................................................................15
      3. Required Information .........................................................................................15

E.    Accounts for Minors ...............................................................................................16

F.    Court Appointment Accounts .................................................................................17

G.    Accounts for Securities Industry Personnel ...........................................................17

H.    Changes in Account Information .............................................................................17
      1. Retail Customer Account Changes ...................................................................18
      2. Death of a Customer .........................................................................................18

I.    Customer Checks, Securities, and Holding Mail .....................................................18

J.    Wire Transfers ........................................................................................................19

K.    Options Accounts ...................................................................................................19

L.    Margin Accounts .....................................................................................................19

VII.  MUTUAL FUNDS ...................................................................................................20

A. Communications with the Public ...............................................................................20

B. Sales Literature Relating to Mutual Funds ...............................................................20

C. Prospectus Delivery Requirements ...................................................................................21

D. Mutual Fund/Unit Investment Trust Sales Practices and Documentation ...............21
    a)   Switching........................................................................................................21
    b)   Breakpoint Sales............................................................................................22
    c)   Sales of Multiple Class Mutual Funds.........................................................23
    d)   Selling Dividends..........................................................................................24
    e)   529 Plans ......................................................................................................24
    f)   NAV Entry Privilege ....................................................................................24

E. Mutual Fund Due Diligence ...............................................................................................24

**VIII.    PROFESSIONAL CONDUCT** ...........................................................**25**

A.    Prohibited Practices ..................................................................................................25

B.    Private Securities Transactions ...............................................................................25

C.    Selling Away..............................................................................................................26

D.    Outside Business Activities .......................................................................................26

E.    Gifts and Gratuities ...................................................................................................26

F.    Reportable Matters ...................................................................................................27

G.    Fraudulent Schemes ..................................................................................................27

H.    Continuing Education ...............................................................................................28
    1.  Regulatory Element........................................................................................28
    2.  Firm Element .................................................................................................28

I.    Annual Compliance Meeting ...................................................................................28

J.    Annual Employee Questionnaire .............................................................................29

**IX.    REGISTRATIONS** ...........................................................................**30**

A.    Individual Registrations...........................................................................................30
    1.  Regulatory Filings..........................................................................................30
    2.  Activities of Registered Personnel ...............................................................30
    3.  Activities of Unregistered Personnel.............................................................31

B.    Employee and Employee-Related Brokerage Accounts...........................................31

C.    Surveillance of Employee Accounts .........................................................................32

**X.    SALES AND TRADING PRACTICES** ..........................................**33**

A.    **Prohibited Activities** ................................................................... **33**

B.    **Suitability** ................................................................................. **34**
1. General ........................................................................................ 34
2. Senior Citizens/Elderly Customers ............................................ 34
3. Selling to Non-English Speaking Customers .............................. 34

C.    **Discretion** ................................................................................. **34**

D.    **Bond Transactions** .................................................................... **35**

E.    **Refusing Transactions** .............................................................. **35**

F.    **Errors** ....................................................................................... **35**

G.    **Markups and Commissions** ........................................................ **36**

H.    **Restricted Securities and Beneficial Ownership Rules** ................ **36**

I.    **Penny Stock Transactions** ......................................................... **36**

J.    **Initial Public Offerings/Freeriding & Withholding** ..................... **36**

K.    **Retail Options Sales** ................................................................. **37**

L.    **Fee-Based Accounts** ................................................................. **37**

XI.    **INSURANCE & ANNUITY PRODUCTS** ...................... **38**

A.    **Variable Annuities** .................................................................... **38**
1. Suitability .................................................................................. 38
   a)   Investment Objective .......................................................... 38
   b)   Time Horizon ...................................................................... 38
   c)   Liquidity Needs .................................................................. 38
   d)   Tax Considerations ............................................................ 38
   e)   The Aggregation Rule ........................................................ 38
   f)   Diversification .................................................................... 39
   g)   Market Fluctuation ............................................................ 39
   h)   Other Retirement Plans ..................................................... 39
   i)   Qualified Accounts ............................................................. 39
   j)   Bonus Credits .................................................................... 39
   k)   Elderly Customers ............................................................. 39
   l)   Summary ............................................................................ 40
2. Prospectus Delivery Requirement .............................................. 40
3. Replacement of Variable Annuities/1035 Exchanges .................. 40

B.    **Fixed Annuities** ........................................................................ **41**
1. Suitability .................................................................................. 41
   a)   Investment Objective .......................................................... 41
   b)   Time Horizon ...................................................................... 41

c)    Liquidity Needs ................................................................................ 41
d)    Tax Considerations ........................................................................... 41
e)    The Aggregation Rule ....................................................................... 41
f)    Other Retirement Plans ..................................................................... 41
g)    Qualified Accounts ........................................................................... 41
2.  Insurance Licenses and Appointments ......................................................... 42
3.  Replacement of Fixed Annuities/1035 Exchanges ...................................... 42

C.    **Variable Universal Life** ...................................................................... 42
1.  Suitability ...................................................................................................... 43
a)    Investment Objective ......................................................................... 43
b)    Time Horizon ...................................................................................... 43
c)    Liquidity Needs ................................................................................... 43
d)    Diversification ..................................................................................... 43
e)    Market Fluctuation ............................................................................. 44
f)    Elderly Customers .............................................................................. 44
g)    Summary .............................................................................................. 44

XII.    **INVESTMENT ADVISORY SERVICES** ..................................... **45**

A.    **Registration** ........................................................................................... 45

B.    **Wrap Accounts** ...................................................................................... 45

C.    **Disclosure Document** ............................................................................ 45

D.    **Advisory Contract** ................................................................................. 46

E.    **Other Advisory Services** ....................................................................... 46

XIII.    **EXHIBITS** ............................................................................................ **47**
1.    Mutual Fund/Unit Investment Trust Acknowledgment form ...................... 47
2.    Variable Insurance Product Acknowledgment form .................................... 47
3.    Fixed Annuity/Insurance Policy Acknowledgment form ............................ 47
4.    Unsolicited Customer Acknowledgment form ............................................. 47
5.    Noncooperative Countries Regarding Anti-Money Laundering ................... 47
6.    Photo Identification Matrix .......................................................................... 47
7.    Anti-Money Laundering Handbook .............................................................. 47
8.    Option Account Agreement .......................................................................... 47
9.    Margin Application and Disclosure Agreement ........................................... 47
10.    Statistical Market Information Disclosure ................................................... 47
11.    Customer Acknowledgment Switch Letter ................................................... 47
12.    NASD's Expense Analyzer ........................................................................... 47
13.    B Share Customer Acknowledgment form .................................................. 47
14.    Approved Product List .................................................................................. 47
15.    Outside Business Activity Notification form ............................................... 47
16.    Gift form ........................................................................................................ 47
17.    Annual Compliance Questionnaire .............................. **Error! Bookmark not defined.**
18.    407 Letter ...................................................................................................... 47
19.    Code of Ethics ............................................................................................... 47

# TABLE OF CONTENTS

20.     Investment Advisory Compliance Manual ....................................................................................47

## I.    INTRODUCTION

This LaSalle Financial Services, Inc. ("LFS" or the "Firm") Registered Representative Compliance Manual (the "Manual") has been prepared to set forth the policies and procedures relating to the securities and investment advisory activities of the Firm.

LFS is a broker/dealer and registered investment adviser, registered with the Securities and Exchange Commission "("SEC"), is a member of the National Association of Securities Dealers, Inc. ("NASD"), and the Municipal Securities Rulemaking Board ("MSRB"). As such, the Firm is subject to the rules and regulations of those regulatory bodies. The Firm also is registered as a broker/dealer in all fifty states and the District of Columbia and, therefore, is subject to the securities laws of those jurisdictions.   As a bank affiliated broker/dealer offering non-deposit investment products to the customers of its affiliated banks, the Firm is subject to the terms of the Interagency Statement as well. The Firm is also a licensed insurance agency in certain states, and is subject to the insurance laws and regulations of those states.

LFS is a wholly-owned subsidiary of LaSalle Bank N.A. and is an affiliate of several bank and trust companies, including ABN AMRO Bank, N.V., and Standard Federal Bank N.A. The Firm also is affiliated through common ownership with other registered broker/dealers. The Firm operates from its primary offices as well as through Offices of Supervisory Jurisdiction located in Chicago, Illinois and Boca Raton, Florida. The Firm utilizes the clearing, custody, and securities processing services of National Financial Services for its retail activities and the services of its affiliate, ABN AMRO Incorporated, for its institutional activities.

The Manual is intended to be used in conjunction with, to supplement, and to supersede all other previously issued policy and procedures manuals applying to the business activities, operations, and employees of the Firm. The policies and procedures set forth herein apply to all individuals who are employees of the Firm and registered with the Firm. The Manual is not intended to be a complete text of the laws and rules governing securities activities. Rather, it is meant to provide guidelines for daily operations and to set forth the necessary procedures for persons carrying out the Firm's securities activities.  Situations may arise which require clarification or a more detailed explanation of the applicable rules or laws concerning a particular transaction or course of business conduct.  Such inquiries should be directed to the employee's supervisory principal or the Compliance Department.

The securities laws and rules under which the Firm operates are constantly changing.  As changes affecting securities activities occur, amendments or supplements will be added to the Manual.  These amendments or supplements will become a part of the Manual and must be complied with by all employees of the Firm.  Any employee or registered person who fails to comply with any provision of the Manual, with any applicable state or federal rule, regulation or statute, the rules of the SEC, NASD and MSRB, or who causes or permits such a failure may be subject to disciplinary action, including dismissal for cause, suspension, fine, or change in job assignment or responsibilities.

The Manual is the property of the Firm and may not be reproduced, in whole or in part, or distributed outside the Firm without the knowledge and approval of the Director of Compliance.

The Manual does not create or constitute any guarantee of employment.

II.      DEPARTMENT REFERENCES

Chairman of the Board and Chief Executive Officer ................................................... Thomas P. Zidar
President and Director ................................................................................................. Terry McCaffrey
Chief Administrative Officer ......................................................................................... Deborah T. Stotts
Chief Compliance Officer ............................................................................................. Anthony P. Pecora
National Director of Retail Sales and Marketing ................................................... Louis C. Mastropietro
Retail Operations Manager ........................................................................................... Pamela Staton
Financial Operations Principal ..................................................................................... Thomas M. Paulus
Midwest Sales Manager ................................................................................................ Robert E. Klein
LaSalle Broker Dealer Services Division Manager ........................................................ Patrick J. Kelly
Municipal Securities Division Manager ......................................................................... Michael J. Smale
Standard Insurance Services Division Manager ........................................................... Anthony A. Curti
Wealth Management Division Manager ......................................................................... D. Lynn Boucher
Corporate Finance Division Manager ............................................................................. Michael Bastian
ABN AMRO Mortgage Capital Markets ......................................................................... Maria Fregosi
Capital Markets Business Unit Manager ....................................................................... Jennifer Falconer
FX/Derivatives Business Unit Manager ......................................................................... Camille E. Rudge
Corporate Capital Business Unit Manager .................................................................... Jeffrey A. Sirota
Senior Registered Options Principal ............................................................................. Thomas J. Boland
Compliance Registered Options Principal ..................................................................... Peter J. VanHouten
Anti-Money Laundering Compliance Officer .................................................................. Michael Grossman

III.    **COMMUNICATIONS WITH THE PUBLIC**

It is the policy of the Firm that all communications with the public, whether oral or written, be based on the principles of fair dealing and good faith, be truthful, in good taste and not exaggerated, unwarranted or misleading, conform to regulatory requirements, and be handled consistent with the provisions of this policy statement. In addition, all communications relating to products and services are to be designed to provide their recipients with a sound basis for evaluating the facts presented and the risks associated with the products.

Communications with the public that contain or are related to proprietary material or nonpublic information are subject to particular policies governing their use. See CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION, p. 10.

A.  **Sales Area**

Banks must market non-deposit products in a manner that does not mislead or confuse the customers as to the nature of the products or the risks associated with them. To help establish in the customer's mind that these are not insured, bank-sponsored products, the sales process must be conducted in a location separate from the area where business involving insured deposits is conducted. At a minimum, this is achieved through the use of signage which prominently displays the name of the Firm offering these products.

In no case should tellers and other employees located in the routine deposit area (teller line and teller window) make general or specific investment recommendations regarding non-deposit investment products or qualify a customer as being eligible to purchase such products, or accept orders for such products, even if unsolicited. Tellers and other employees who are not authorized to sell non-deposit investment products may refer customers to individuals whom the Firm has specifically designated, licensed and trained to assist customers interested in such products.

B.  **Disclosures**

1.  *Oral Disclosures*

When advertising or otherwise marketing securities to customers or prospective customers, Registered Representatives (RRs) are to ensure that customers are fully apprised of the nature of the investments in accordance with securities and banking regulations. Each RR is to make oral disclosures to a customer at the beginning of the RR's presentation that the products offered:

- Are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

The content of the presentation should also be structured to eliminate the possibility of customer confusion regarding who is offering the products and the Firm's relationship to its affiliate banks. Failing to orally disclose potential risks and associated fees or misrepresenting the investment would be a violation of regulatory rules and could lead to disciplinary action against the Firm and RR.

2.  *Written Disclosures*

RRs will provide the client with the appropriate acknowledgment form upon the sale of any mutual fund, unit investment trust, variable annuity, variable life, other life insurance or fixed annuity product. The RR will go over each of the applicable bullet points listed on the acknowledgment form and ask the customer to initial (where applicable) and sign the form. The RR must also sign and date the acknowledgment form. The White copy is sent to the OSJ, the Pink copy is kept by the RR and the

Canary (Yellow) copy is given to the customer. Exhibits 1, 2 and 3 provide hyperlinks to the current acknowledgment forms.

It is the RR's responsibility to obtain a signed acknowledgment form for each sale of a mutual fund, unit investment trust, variable annuity, variable life, fixed annuity, or life insurance product. If a client is adding to an existing position and has signed an acknowledgment form which is current (not older than one year), or if the addition is less than $1,000, an additional acknowledgment form is not required. It is the RR's responsibility to ensure that a current acknowledgment form is sent to the OSJ.

### C.  Sales Literature

#### 1.  Approvals

All sales literature is to be reviewed by Compliance prior to use, and approved by a principal in the business unit utilizing the material. Sales literature for purposes of this policy includes any written communication (other than advertising), distributed or made generally available to customers or the public. Sales literature includes circulars, research reports, market letters, performance reports or summaries, form letters, seminar texts and reprints or excerpts from any other advertisement, or published articles.

Pre-approved form letters are maintained in the Marketing Department in Chicago. As with any mailing, a copy of the form letter must be maintained together with a copy of the mailing list and date of mailing in the outgoing correspondence file at the branch.

#### 2.  Content and Disclaimers

All sales literature is to contain the following prominently displayed in generally readable type size:

- the name of the Firm;
- the name of the person or entity preparing the sales literature;
- the date the material was originally published; and
- any statements sufficient to make the information not misleading, including attention to the fact that information may not be current.

Sales literature which references employees, services, or products of affiliates of the Firm are to include statements that identify the relationship between the Firm and its affiliates. Services and products of the Firm are to be clearly identified as such in a way that makes it clear they are not offered by the Firm's affiliates or insured by federal agencies insuring affiliates' deposits.

Any employee offering an opinion, orally or in writing, on a particular product or service, is to have a reasonable basis for it.

Material that relates to options must include a description of the general nature of options or options strategies. If the literature includes a description of options strategies, it also needs to explain clearly and with equal emphasis the risks and rewards of such strategies and that options are not suitable for all investors. All advertising and/or sales literature relating to options must be approved in advance by a Compliance Registered Options Principal ("CROP"). When discussing options, it is also a good practice to mention that an Options Clearing Corporation ("OCC") disclosure document is available and will be provided on request.

### D.  Advertising Materials

All advertising materials are to be reviewed by the Compliance Department and approved by the responsible principal in the business unit prior to their being made available or distributed to customers, potential customers, or other non-employees. "Advertising materials" as used in this

policy means material published or designed for use in a newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape displays, signs or billboards, movies, telephone directories (unless it is a listing of the Firm's name, address and telephone number only), or other public media.

The Compliance Department is responsible for ensuring all necessary regulatory approvals have been obtained, for making any changes requested by regulators prior to the use of such materials, and for maintaining a central file of all advertising materials. All such advertising and sales literature shall conspicuously disclose that such non-deposit investments:

- are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

Such disclosure shall also be featured conspicuously in:

- all written or oral sales presentations by employees; and
- periodic customer statements that include information on both deposit products and non-deposit investments.

Under no circumstances may material marked "For Broker/Dealer Use Only" or "Agent Use Only" be sent or shown to clients or other members of the public.

Because of the special regulatory consideration given to advertising relative to registered investment companies (including mutual funds, variable contracts, and unit investment trusts) any employee that wants to prepare or disseminate advertising materials concerning these products is encouraged to seek the guidance of the Compliance Department prior to drafting the materials. See also MUTUAL FUNDS at page 20.

### E.  Correspondence

#### 1.  Outgoing

All letters must be on Firm letterhead and in good business form, be free of extravagant statements, reflect caution in speaking of future markets or earnings, and should carefully avoid definite forecasts unless an identified source for the forecast is included.  Outgoing written correspondence of RRs must be reviewed and approved by a Principal prior to mailing if it pertains to any of the following:.

- A recommendation to purchase or sell a security or information pertaining to a security to ensure that the re commendation is based on facts.

- A security which is subject to a current effective registration statement (this always applies to shares of open-end investment companies and Direct Access Notes or DANS) to ensure that a copy of a prospectus is enclosed; that such enclosure is indicated in the letter; and that any statements made in the letter are based on the facts indicated in the prospectus.

- Correspondence that includes a portfolio review.

The RR must keep a copy of the correspondence in the outgoing correspondence file at their hub branch, and send a copy to the OSJ.

Following are important points to consider in the preparation of correspondence:

- If a prospectus is required, the letter must include a statement that one is enclosed.
- All statements must be reasonable and accurate.

## COMMUNICATIONS WITH THE PUBLIC

- Correspondence must comply with the NASD's sales literature rules.

### 2. Incoming

Incoming written correspondence to any of the OSJs will be opened by sales assistants or administrative personnel who are supervised by the Department/Branch Manager. Special attention must be paid to incoming checks and securities, which must be brought to the Cashier/Operations Department upon receipt.

Originals of incoming written correspondence received in the branch offices must be forwarded to the OSJ. The RR is required to keep a copy in the hub branch incoming correspondence file.

### F. Electronic Communications (E-Mail, Web Sites, Chat Rooms)

The following types of electronic communications require the review and approval by a supervising principal, Regional Sales Manager (RSM) and, when necessary, Compliance Department, prior to use:

- Bulletin board postings – Advertising
- Chat rooms – Speaking Engagements
- Group electronic mail – Sales Literature
- Web sites – Advertising

Pursuant to NASD Rule 3010, registered employees having contact with the public are required to have the electronic correspondence they may receive and send be monitored by a supervising Principal. The supervising Principal will review all electronic correspondence that has been quarantined by the Firm's electronic correspondence monitoring system, and may also review a portion of both incoming and outgoing electronic correspondence that is not quarantined. The electronic mail account (ABNAMRO.com) given by the Firm to its' employees represents Firm property, and should not be abused or misused. All employees are prohibited from soliciting or communicating with customers, sending mass mailings, advertising, or conducting any other types of business related activity on the Internet from a personal e-mail account.

No outgoing e-mail correspondence from an employee may contain: (a) any untrue statement or omission of a material fact or otherwise false or misleading information; (b) promises of specific results or exaggerated or unwarranted claims; (c) opinions for which there are no reasonable basis; (d) projections or forecasts of future events which are not clearly labeled as forecasts; or (e) nonpublic (inside) information or proprietary information.

### G. Telemarketing – Do-Not-Call List

The Firm and its representatives are subject to NASD Rule 2211 relating to outbound calls and the maintenance of a "Do-Not-Call" list. Telemarketing scripts must be approved by a Principal, reviewed by Compliance and maintained in the OSJ advertising files. In telemarketing, RRs shall not:

- make outbound telephone calls to the residence of any person for the purpose of soliciting the purchase of securities or related services at any time other than between 8 a.m. and 9 p.m. local time at the called person's location, without the prior consent of the person; or
- make an outbound telephone call to any person for the purpose of soliciting the purchase of securities or related services without disclosing promptly and in a clear and conspicuous manner to the called person the following information: (1) the identity of the caller and the Firm's name; (2) the address or phone number of the branch office or OSJ in which the caller may be contacted; and (3) that the purpose of the call is to solicit interest in a security.

- These restrictions and requirements, however, do not apply to telephone calls by an RR for the purpose of maintaining and servicing the accounts of existing, active customers of the Firm which are assigned to the RR.

In the event a person states that they do not wish to receive telephone solicitations from the Firm or its registered representatives, the RR must promptly notify the Director of Compliance to ensure the person's name is added to the Do-Not-Call list.

In addition, the U.S. Federal Communications Commisssion's ("FCC") Telemarketing Rule, in effect as of October 1, 2003 allows consumers to "opt out" of unwanted telemarketing calls. Existing customers of LFS and of LFS' affiliates are exempt from the national "Do-Not-Call" regulations. However, calls based upon referrals from existing clients are not exempt. Therefore, prior to calling a potential customer whose phone number was provided by an existing customer, associated persons must check to see if that telephone number is maintained on the national "Do-Not-Call" list, and must refrain from calling the potential customer if their number does appear on that list. Violators may be subject to fines of up to $11,000 per violation. Telephone numbers may be checked against the "Do-Not-Call" list on the Firm's Datamart site.

## H.  Agreements and Other Documents

Employees are not permitted to execute any document, contract, or letter agreement on behalf of the Firm without the prior approval of a supervisory principal. Contracts, letters, including form letters, or other documents that request any employee's signature or the signature of an officer or another on behalf of the Firm, are subject to this pre-approval policy. Employees are not authorized to act on behalf of the Firm in connection with any agreements, settlements, or other matters which would create an obligation of the Firm to a third party.

## I.  Customer Complaints

Monitoring customer complaints is a required and critical part of any compliance program. Complaints can jeopardize the Firm's and employees' reputations and can have legal and regulatory implications. A customer complaint is any communication from a customer that makes claims against the Firm or any of its employees.

The two types of customer complaints that the Firm and its employees may have to address are written and oral complaints. Both are described below, as well as the procedures an RR must follow when presented with either type of complaint.

Under no circumstances should an employee attempt to settle a claim or allegation made against the employee or the Firm and relating to the employee's job responsibilities or activities on behalf of the Firm without the approval of their supervisor.

### 1.  Written Complaints

If an RR receives a customer complaint, whether received via e-mail or in written form, the RR must immediately forward the original complaint to Compliance and a copy to their supervising principal or RSM . Concealing a customer complaint is a serious offense and can be grounds for immediate dismissal. The RR also must keep a copy of the complaint in their hub branch office customer complaint file.

Upon receipt of the written complaint, a compliance officer will investigate the matter and prepare a written response to the customer, if applicable. To aid the compliance officer in the investigation and response, the RR will be required to provide a written statement addressing each allegation raised in the customer complaint letter. The RR may also be required to provide Compliance copies of additional documentation, notes, memos, etc.

The Compliance Department will maintain a customer complaint file containing all of the relevant information and a record of the resolution of the complaint.

### 2. Oral Complaints

If an RR receives an oral customer complaint that is merely operational in nature, the RR may first attempt to resolve the issue at the branch level. If the RR is unsuccessful, the RR's RSM will attempt to resolve the issue. If the complaint is eventually submitted in written form, the procedures for handling written customer complaints must be followed. However, an RR must immediately report any oral complaint alleging sales practice violations to the RR's supervising Principal or RSM and to Compliance.

## J.   Communications with Regulators and Attorneys

Communications and filings relative to the securities activities and business of the Firm made with regulatory agencies or representatives of self-regulatory organizations to which the Firm is subject or of which it is a member, are to be made by or through the Chief Executive Officer, President, the Financial and Operations Principal, the Director of Compliance, or their designees. Further, employees of the Firm are not to speak to regulators (e.g., SEC, NASD, OCC, state securities or insurance regulators) or attorneys or provide materials to them relating to the business of the Firm without the prior knowledge and approval of the Chief Executive Officer, President, the Financial and Operations Principal, the Director of Compliance, or the Firm's legal counsel. In addition, the Director of Compliance is to be notified promptly whenever a representative of a regulatory agency or self-regulatory organization or an attorney contacts any of the Firm's employees in any manner for any purpose whatsoever. This policy helps ensure accurate information is provided.

## K.   Service of Process, Requests for Information, Subpoenas

Messengers seeking to serve the Firm or any of its employees with subpoenas or other legal documents are to be directed to the Firm's legal counsel. If legal papers are inadvertently received by Firm personnel, they should promptly be referred to the Firm's legal counsel, with a copy as appropriate to the Director of Compliance. A notation should be made by the recipient of the document recording the place of service and the name of the individual effecting service. In connection with the service of process, no document should be signed by any employee which would indicate that service was timely or otherwise proper.

On occasion, employees may receive telephone calls requesting information about the Firm, a customer, or an account. Employees should be discrete and prudent in identifying the caller and providing only general, public information (such as the Firm's address, the name of an individual to whom materials can be sent, etc.). As a general rule, requests for information should be referred to a Principal, and under no circumstances is any information concerning a customer, any account, or any transaction to be given to any party until the party's identity and entitlement to the information has been confirmed.

From time to time, financial institutions may seek to obtain voluntary liens on the Firm's accounts for customers. Such requests are to be referred to Compliance. Under no circumstances should an employee agree to accept such a lien or notice of such an impediment on an account.

## L.   Guest Speaking Engagements

Employees who are invited to make appearances or to speak publicly about the business, products, services, or other activities of the Firm are to obtain the written approval of a Principal and Compliance prior to accepting any such invitation. In requesting such approval, the employee must provide the following information in writing:

## COMMUNICATIONS WITH THE PUBLIC

- the name of the sponsoring group, the presiding officer or program chairman, and the entity's mailing address;
- the subject to be discussed and the outline or text to be used;
- the date of the engagement;
- the approximate number and type of attendees; and
- other speakers' names.

In deciding to grant or deny approval, consideration should be given to the qualifications of the employee to address the subject and the nature of the audience.  Employees' opinions in such a context or otherwise are always to be clearly distinguished as their own and as not necessarily representing the official position of the Firm.

# CONFIDENTIALITY AND MATERIAL NONPUBLIC INFORMATION

## IV.    CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION

This policy and the policies on <u>Employee and Employee-Related Brokerage Accounts</u> (*see* p. <u>31</u>), <u>SALES AND TRADING PRACTICES</u> (*see* p. <u>33</u>) and the LaSalle Bank Corporation Standards of Conduct are collectively designed to prevent the misuse of material, nonpublic information by the Firm and its employees.

It is the policy of the Firm that all proprietary, customer, trading, and account information acquired by the Firm or any of its employees is to be maintained in strictest confidence.  Additionally, material, nonpublic information, as defined in this policy, may not form the basis of any improper proprietary, customer, or employee transaction.

Employees are to be particularly cognizant of the legal, regulatory, and ethical issues surrounding confidential and material, nonpublic information and the impact of its internal communication, use, and disclosure on the business activities of the Firm and its affiliates.

Failure to comply with this and related policies may subject employees to disciplinary action, including dismissal, and may result in civil or criminal liabilities to employees, the Firm, or its management.

### A.   Confidential Information

In the normal course of business, employees may be given or may acquire information about the business of the Firm, its customers, or its affiliates that is not available to the general public.  This information is deemed to be confidential and may include trading and investment details and customer income or financial data.  All employees are responsible for respecting and maintaining the confidential nature of information that concerns the business of the Firm, its customers, and its affiliates.

Whether orally or in writing, confidential information may only be disclosed within the Firm or to employees of the Firm's affiliates who need to know the information to perform their job functions.  In particular, specific customer transactions or orders are not to be discussed with bankers or other employees of the Firm's affiliates unless there is a legitimate business need to do so.

All employees are to exercise reasonable care in how and where they discuss, document, and store the confidential information that relates to the business activities of the Firm and its customers.  Confidential business and customer information should not be disclosed outside of the Firm and its affiliates except for legitimate and legal business reasons or as required by law.  Employees should be discreet about discussing or exposing written confidential information in public areas such as elevators, halls, and restaurants.  Documentation and files of a confidential nature, such as order tickets, customer account opening forms, monthly statements, and memoranda are to be maintained in a secure place where their confidentiality will not be compromised by people unaffiliated with the Firm.

Any instance in which the security or confidentiality of the Firm's files or data may have been compromised is to be promptly brought to the attention of the President, the Director of Compliance, or a Principal, who is to report such instance, as appropriate, to law enforcement or corporate authorities.

### B.  Material, Nonpublic Information

Some confidential information is also material, nonpublic information and, therefore, subject to the restrictions of federal and state securities laws and other governmental regulations as to its communication and use.

Information is material if a reasonable investor would be likely to consider the information important when deciding to buy or sell a security.  Material information may include earnings estimates, dividend

## CONFIDENTIALITY AND MATERIAL NONPUBLIC INFORMATION

projections, merger, acquisition, disposition or tender offer plans, previously undisclosed or contingent liabilities, business plans, and product innovations.

Nonpublic information refers to information about the internal affairs of a corporate issuer of securities that is not publicly available to other investors through disclosures in public filings, corporate releases, or by dissemination through publications or news services with general distribution. Material information should be treated as nonpublic until it is clear the information can be deemed otherwise.

Employees may not trade in their own account, or direct others to trade on their behalf or for their benefit, while in possession of or after exposure to material, nonpublic information relating to the securities that are the subject of the trade. Employees who possess material, nonpublic information are also prohibited from "tipping" others either by sharing the material, nonpublic information wrongfully or offering trading recommendations or strategies based on the information.

Employees who have reason to believe customers may be seeking to place a trade while in possession of material, nonpublic information are to bring the matter immediately to the attention of a supervising principal, RSM, or Compliance and are to decline to take the order.

### C.  Rumors

Rumors are detrimental to the marketplace and may be of particular harm to specific industries or businesses. Also, rumors may have originated from material, nonpublic information and may subject those who circulate or act upon them to civil or criminal liabilities. Accordingly, employees should not circulate, trade, or cause another to trade or act upon unsubstantiated rumors.

### D.  Privacy Statement

At account opening, RRs must give a current copy of the Firm's privacy policy to any new customer if that customer does not have a pre-existing relationship with another ABN AMRO affiliate.

## V.    CURRENCY TRANSACTIONS

It is the policy of the Firm to comply with all regulatory requirements relating to the handling, record keeping and reporting of cash and currency.  No employee may assist any person in making a deposit or structuring a transaction such as to evade this policy or the currency reporting requirements, nor may an employee act or fail to act in such a way that would cause the Firm to be in noncompliance with currency reporting requirements.

Currency, as used and referred to in this policy statement, means the coin and paper money of the United States or of any other country that circulates in and is customarily used and accepted as money in the country in which issued.  Currency includes U.S. silver certificates, U.S. notes and Federal Reserve notes, but does not include bank checks or other negotiable instruments not customarily accepted as money.  Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in any foreign country.

### A.  Accepting Cash and Currency

It is against Firm policy to accept cash or money orders from customers.  Instances in which a customer seeks to deposit a series of checks, which are each under $10,000 but which exceed $10,000 in the aggregate are to be brought to the attention of  the Anti-Money Laundering ("AML") Compliance Officer.

### B.  Record Keeping and Reporting Obligations

If, for some reason, an exception to the general policy prohibiting the acceptance of cash or money orders is granted by the AML Compliance Officer, all deposits of currency are to be separately designated as such on the Firm's deposit slips and are also to be noted as such in the cash receipts blotter.  The customer is also to be advised that further deposits aggregating to $10,000 or more will be reported as required by federal laws and regulations. The AML Compliance Officer is responsible for reviewing the account and any affiliated accounts of a customer paying cash for potential multiple, same day currency transactions.

The AML Compliance Officer is responsible for ensuring that all appropriate regulatory filings as may be required are made in timely fashion relative to currency transactions.

## VI.    CUSTOMER ACCOUNTS

It is the policy of the Firm to use diligence in knowing the essential facts relative to each of its customers and to have records documenting a customer's identity, investment objectives, investment experience, financial resources, and authority to trade.

### A.    Suitability

Prior to opening a new account, it is the responsibility of the RR to use due diligence in learning the facts about each prospective customer sufficient to "know the customer" and to determine whether it is appropriate for the Firm to do business with such customer. Additionally, in recommending to a customer the purchase, sale, or exchange of any security, each RR shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts disclosed by such customer as to his or her financial situation and needs.

Further, the RR is responsible for taking reasonable steps to ensure the customer is aware of the Firm's suitability determination. Further, if a customer demands to make an inappropriate investment, the RR should counsel the customer against such a course of action. *See* SALES AND TRADING PRACTICES, p. 33. Customers should always be encouraged to be accurate and complete in supplying information on which the Firm relies.

### B.    Recommendations and Solicitations

RRs recommending the purchase or sale of any security are to have a reasonable basis at the time of each recommendation that the purchase or sale is suitable for the customer based upon the customer's financial resources, tax status, investment objectives, trading experience and history, and any other relevant information as recorded on the Firm's documentation and as known to the RR.

RRs who are Financial Consultants in LFS' retail divisions (LaSalle Financial Services and Standard Financial Services) are prohibited from recommending or otherwise soliciting transactions in individual equities for their customers' accounts.

Customers wishing to trade individual stocks on an unsolicited basis in their brokerage accounts must complete the Unsolicited Customer Acknowledgment form. See Exhibit 4. This document must be renewed on an annual basis. These transactions must also be marked "unsolicited" at the order entry stage (Streetscape® users must select the "unsolicited" option on the order entry screen). This ensures that "unsolicited" appears on the customer's confirmation.

No recommendations to customers may be made when the RR is in possession of or has been exposed to material, nonpublic information. *See* CONFIDENTIALITY AND MATERIAL, NONPUBLIC INFORMATION, p. 10.

### C.    Risk Assessment

Prior to establishing a relationship with a customer, RRs are required to perform a risk assessment of the customer and potential relationship. RRs must complete a Customer Profile form for each new account and, when applicable, additional account documentation to use as an aid in determining potential risks. At a minimum, the following information must be ascertained and documented on the Customer Profile form regarding each customer:

- customer's background
- customer's business/activities
- customer's product and service needs
- the source and nature of the customer's funds or assets

## CUSTOMER ACCOUNTS

Although the risk assessment is a subjective process, RRs are to consult with their supervising principal, RSM, or Compliance if they have any concerns or if they want additional guidance. Moreover, all instances in which a customer's behavior is suspicious in nature when providing, or refusing to provide, the above information must be brought to the attention of the Compliance Department.

### D.  Account Documentation

#### 1.  New Accounts

RRs may accept new customers only after a Customer Profile is completed.  The RR must give the customer a copy of the profile, including the customer agreement portion containing the arbitration agreement and a copy of a summary of the Firm's Business Continuity Plan.  RRs must, however, obtain Customer Profiles for all new accounts, including direct business (e.g., 529 plans and other mutual fund accounts maintained with the mutual fund vendor, variable annuities, variable life, fixed annuities, and insurance) as well as accounts introduced to LFS' clearing firm, National Financial Services, LLC ("NFS").  All information required by applicable laws, rules, regulations and company policies must be obtained prior to the sale of any investment product.  In order for the new business to be accepted and approved by a Principal, the completed Customer Profile and any additional account documents must be submitted to the Back Office.  For certain types of accounts (e.g., guardianships, conservatorships, B/D/A IRAs), the RR must submit the profile to the back office and cannot enter orders until the account has been approved and entered into the NFS system. In addition, it is the policy of the Firm that all direct vendor business (529s and other mutual funds held direct, variable annuities, variable life, fixed annuities, and other insurance products) accepted by an RR must be processed through the Back Office rather than mailed in by the RR to the direct vendor.

#### 2.  Circumstances Regarded as Increased Risk to the Firm

The following identifies increased risk areas that warrant additional due diligence and approval from the Business Unit Manager or supervisory Principal.  In addition, all accounts that exhibit one or more of these risk areas must be reviewed by the AML Compliance Officer before the account may be accepted:

##### a)  Customer's Background

- Persons holding high public offices (e.g., government officials, senior executives of a government owned company, politicians, important political party officials and their family or company relations, especially in those countries that are known to be vulnerable to corruption and fraud).
- Customers having a permanent address in a high money-laundering risk country (e.g., countries indicated by the Financial Action Task Force as being noncooperative in combating money laundering).  A list of such countries is available on the Compliance intranet site.
- Customers having a permanent address in a country under economic or other sanctions by recognized national or international bodies (e.g., Dutch National Bank, European Commission, United Nations, Office of Foreign Assets Control, including those regarded as involved in or supporting terrorist activities).
- Foreign government accounts (embassies, consulates, etc.)

##### b)  Customer's Business/Activities

- Business/activities that are known to be vulnerable to illegal or criminal activities.
- Business/activities that are subject to strong negative public opinion.
- Where it appears that the legal entity is not carrying out any trading or economic activities, or is not actively participating in the economy of the country in which their office is registered.

### c) Customer's Product and Service Needs

- Products and services that are known to be especially vulnerable to illegal or criminal activities.
- Products involving financial transactions and constructions that are unusual to a client or a client's business, taking into account all relevant circumstances.

### d) Customer's Source of Funds

- After assessing the source and nature of funds, there is a reasonable doubt as to whether or not the money or monetary instrument offered or passed to the Firm is the proceeds of crime, or the credit facilities offered by the Firm might be used for criminal purposes.

### 3.  Required Information

As a general rule, accounts will not be opened for customers who refuse to sign or provide account documentation or who make material changes to the documentation's standard language. Instances in which customers refuse to sign the Firm's account forms or in which they will only agree to sign if standard language is changed or deleted are to be referred to Compliance. At a minimum, the following information is required prior to establishing an account for a client:

*Name:*  In all cases, the customer's account should read in the customer's legal name or, in the case of institutional accounts, in the name of the legal entity responsible for the account. Opening an account under a fictitious name is strictly prohibited. Customers wishing to change the name on an existing account are to establish by court order or otherwise their legal entitlement to use of a different name.

*Address:*  In all cases, a customer's account opening documentation is to reflect the customer's legal address where the customer is domiciled. Unless an exception is approved by Compliance, new accounts may only be opened for persons who reside within the United States and who provide their legal domestic address. Customers who open accounts while residing in the U.S. but who later relocate to another country will be reviewed by Compliance on an annual basis. Customers may use a post office box for mailing purposes only; and this must be approved by Compliance. Account documentation can be provided to a customer in care of a third party only if the customer has completed a limited power of attorney or otherwise provided a written directive to the Firm authorizing the third party to accept service or account trading documentation on the customer's behalf. Customer documentation may not be sent in care of an employee. In all cases, the customer's legal domestic address must also be maintained on file.

*Social Security or Tax Number:*  A social security number (for individuals) or tax identification number (for entities such as corporations, trusts, pensions and other institutional accounts) is necessary in order to comply with the regulations of the Internal Revenue Service and with other federal agencies and regulatory bodies. Custodial Accounts require the social security number of the minor. Conservatorships and guardianships require the social security number of the ward. Trust accounts require the appropriate tax identification number as provided by the trustee(s). Joint accounts require the social security numbers of all named individuals on the account. Authorized individuals of a bank, estate, fiduciary account, investment club, non-incorporated organization or association, partnership, pension plan and profit sharing trust, or trust accounts are to certify the tax identification numbers of these types of accounts.

*Signature:*  Under no circumstances are RRs or other employees to sign a customer's name to account documentation, including, but not limited to, customer agreements, trading authorizations, stock powers, letters of authorization to transfer funds or securities, or address change requests. RRs and other employees are also prohibited from signing any name other than their own and from altering, falsifying or destroying customer or Firm documents or records.

*Customer Identification:*  All RRs are required to verify the identity of the clients they establish an account relationship with according to the Firm's current Customer Identification Program ("CIP"), generally by obtaining a copy of, or documenting, the information from a valid photo ID from each

person who has an ownership interest in any investment account. For minor accounts and guardianships/conservatorships, the required CIP information must be obtained from the adult custodian/guardian/conservator. An RR may document that a customer has a pre-existing relationship with an affiliate bank in lieu of obtaining an ID. A valid photo ID is generally limited to the following: state-issued driver's license, state-issued identification card, military ID, passport, Matricula or resident alien card. Further, if the RR obtains a photocopy of the ID, they are responsible for forwarding the photocopy, which must include the RR's original signature and date the photocopy was made, to the OSJ. Verification of the customer's identity may not be required if the customer has a pre-existing account relationship with LFS. For a description of account registrations and required identification procedures, refer to Exhibit 6, Photo ID Matrix.

A fuller description of the Firm's CIP may be found in the Anti-Money Laundering Policies and Procedures Manual ("AML Handbook"). For a hyperlink to the AML Handbook, refer to Exhibit 7.

*Financial Status:* In order to have a better understanding of their clients' current financial status, each RR will obtain, at a minimum, the following financial information: current income, liquid net worth, net worth (excluding value of the equity and liability portions of their primary residence), tax status, investment objectives, and other information that would be considered material. It is against the policy of LFS to recommend that customers borrow against their home equity in order to fund an investment product.

*Institutional Accounts:* Documentation for institutional accounts must specify the nature of the entity (corporation, profit-sharing trust, etc.), a street address (not post office box), a description of the business, the names and phone numbers of persons authorized to transact business for the account, and settlement instructions. In the case of a trust, the "Trustee Certification of Investment Powers" must be completed and signed by all current trustees.

All questions regarding account titling and required documentation in support thereof should be referred to Operations.

### E.   Accounts for Minors

An account opened for an individual below the age of majority (usually 18 or 21 depending upon the age of competency in the person's state of residence) may only be opened consistent with the Uniform Gifts/Transfers to Minors Act. Generally, under state law, assets may be retained in a minor's account until the minor reaches the age of majority, or as provided by the respective state statute (*e.g.*, In Illinois, a minor reaches age of majority at 18, but they may not take possession of the custodial assets until they reach age 21). Accounts should designate the name of the custodian who is responsible for the account for the benefit of the minor.

If the custodian of a minor's account is unable to continue acting in that capacity, the minor may be able to appoint the custodian's replacement, depending upon the age of the minor and the law of the state where the minor child resides.

Custodial accounts for minors may not trade on margin.

Firm policy prohibits a person who is a minor in their state of domicile from opening a securities account in their own name.

For CIP purposes, the adult custodian is considered "owner" of the account and must be identified according to the Firm's CIP policies and procedures.

Questions concerning the specific administration of accounts for minors should be referred to the Compliance Department.

### F.  Court Appointment Accounts

Certain types of "fiduciary" accounts involve appointment of an individual by a court order which vests that person to act as fiduciary on behalf of another person or a deceased person's estate. Examples are executors, administrators, personal representatives, guardians, conservators, etc. When such persons seek to open accounts and conduct business with LFS, special care must be taken by the RR to ensure that the account ownership is established correctly. In general, the account should be opened in the name of the fiduciary and with the social security number or taxpayer identification number of estate or protected natural person (*e.g.,* the minor or adult protected person).

The RR also must obtain a copy of the court order (dated within 60 days) that evidences the authority of that person to act as fiduciary. In some cases, the court order may limit the fiduciary's investment authority to certain types of financial products. For example, in the case of a guardianship or conservatorship, the court order may restrict the fiduciary to insured bank products and may prohibit other investment products. Any such limitations must be strictly adhered to. Before opening a new conservatorship or guardianship account, an RR must receive approval from both Compliance and the Midwest Sales Manager or National Sales Manager. Any questions in this regard should be directed to Compliance.

In some cases, a probate or other court overseeing a fiduciary account may seek an account inventory from the RR assigned to the account. RRs should never sign court documents without first consulting with their supervisor and, as necessary, the Legal Department.

### G.  Accounts for Securities Industry Personnel

Special rules apply when opening an account for persons associated with an NASD, NYSE member firm or for employees of any domestic securities exchange. This includes accounts in which such persons have a financial interest or over which they may exercise discretionary authority (for example, through that employee's spouse, children, trust, or partnership).

Accounts as described above may only be opened:

- with the written approval of the other member firm or securities exchange (by an individual other than the person opening the account); and
- after the other member firm or securities exchange has designated an individual to receive duplicate confirmations and statements on the account.

Also, the customer should be advised that written permission from the other member firm or securities exchange, generically referred to as a 407 Letter, must be received and that duplicate confirmations and statements will be provided on the account.

After the account is opened, RRs are to use reasonable diligence to determine that transactions for the accounts of such securities industry customers do not adversely affect the interests of the other member firm or securities exchange.

### H.  Changes in Account Information

RRs are responsible for periodically reviewing the information pertaining to their customers for accuracy, completeness, and currency. In particular, information subject to change, such as employer, salary, trading experience, and investment objectives, is to be specifically reviewed with each customer on a regular basis and appropriate changes made to the Firm's customer records. RRs are required to update customer information on the customer profile every three years for active accounts. An account is considered active if a transaction (*e.g.,* deposit, withdrawal, purchase, liquidation, or incoming transfer) has occurred within the past three years.

## CUSTOMER ACCOUNTS

### 1.  Retail Customer Account Changes

All changes to retail customer account instructions are to be made via the customer's written authorization.  These include, but are not limited to, changes of:

- mailing address*
- payment instructions
- dividend/interest payment instructions
- security delivery instructions

*Address changes may be accepted directly by the Operations Department with written instructions from the customer sent via facsimile or regular mail.  Upon receiving an address change request, National Financial Services, LLC., our clearing firm, will send a written notice to both the old and new addresses.

Instances of a customer desiring to change the account's address to a post office box number, to the address of another customer, or to the same address as an employee (unless it is an employee-related account) should be specifically brought to the attention of Compliance for review.

### 2.  Death of a Customer

Immediately upon becoming aware that a customer has passed away, the RR is to notify Operations. Operations is then responsible for notifying the Trade Desk and clearing firm as appropriate.

All open orders for a deceased customer's account or accounts are to be immediately canceled by the Trade Desk once notified by an Operations Principal, and no additional transactions may be executed or orders accepted until the necessary legal documents have been received and approved by an Operations Manager.

### I.  Customer Checks, Securities, and Holding Mail

LFS does not accept third-party checks for deposit to a customer account.

If securities to be deposited into an account are registered in the names of persons not listed on the account, such persons must sign an authorization relinquishing their ownership of such securities.

As a general rule, a customer's checks and securities will be delivered to the customer's account address or to an address provided by the customer in writing with instructions to that effect. Checks and securities may not be provided to the RR for delivery to a customer. A check may be made payable to a payee other than a customer only with the customer's written authorization.  Journals (transfers) of assets or securities from one account to another may only be accepted upon written authorization from the customer(s) who own the transferring account.  A Letter of Instruction ("LOI") with only one signature is acceptable if the journal is to a like registration.  If the journal is to a different account registration, the signatures of all account owners are required on the LOI.  A signature guarantee is additionally required in cases involving a journal to a third-party account (involving a completely new registration with no common owners from the transferring account).

RRs and/or Sales Assistants receiving securities or checks directly from customers must keep records of receipt and promptly transmit such securities or checks to the Cashier, no later than by noon of  the next business day.

LFS does not hold customer mail as a matter of policy.

**CUSTOMER ACCOUNTS**

### J.  Wire Transfers

LFS requires customers wishing to engage in wire transfer activity to sign an Electronic Funds Transfer Agreement and a Wire Transfer User Authorization Form prior to initiating any wire transfer request.  The RR or LFS' Operations area will authenticate the setup for new users.  After the customer is set up to request wire transfers, they may do so by phone, fax, letter or in person.  After the client initiates a wire transfer request, the RR or Operations will authenticate the request.  In the case of a written request, a Letter of Instruction-Fed Wire request is submitted, signed by the client. Clients who place wire requests by telephone will be required to provide a Security Code chosen by them previously.  LFS' Operations area will perform callbacks and verify client signatures on file.  The Operations Department reviews a daily wire transfer report generated by NFS and investigates all wires of $500,000 and greater.  Wires are also subject to the anti-money laundering screening tool employed by NFS and any suspicious transactions are reported to LFS for investigation by the Compliance Department.  Finally, NFS' Margin department must approve disbursements greater than $100,000.

### K.  Options Accounts

Prior to accepting an order from a customer to purchase or write an option contract (even if the customer currently has an existing cash or margin account), the customer must submit a completed Option Account Agreement; the Senior Registered Options Principal specifically must approve in writing the customer for options trading and the level of trading approved; and the customer must have been furnished the appropriate options disclosure document(s).  By signing the Option Account Agreement,  the customer is (1) verifying the background and financial information upon which the account has been approved for options trading; (2) indicating that they are aware of and agree to be bound by the rules of the NASD applicable to the trading of option contracts (including the position and exercise limits); (3) confirming that they have received a copy of the current disclosure document(s); and (4) acknowledging that they are aware of and agree to be bound by the rules of The Options Clearing Corporation.  If, for some reason, a customer has failed to provide a signed Option Account Agreement within 15 days of opening the account, no opening transactions will be allowed in the account.

Additionally, the RR is under a continuing obligation to send the customer a revised Option Account Application for verification within 15 days after the RR becomes aware of any material change in the customer's financial situation. *See* Exhibit 8 for a hyperlink to the current Option Account Agreement.

### L.  Margin Accounts

Individual customers and certain legal entities may want margin privileges, but not all accounts are eligible for margin.  Specifically, accounts that require a fiduciary generally are not eligible for margin privileges (*e.g.,* UTMA, conservator, transfer on death (TOD), estate, IRA, and guardianship).  Those accounts that are eligible (*e.g.,* individual, joint, trust, corporate, etc.) must complete the Margin Account Application, which includes the Truth in Lending Statement, and be provided a copy of the Margin Disclosure Statement.  Upon completion of the Firm's Customer Profile and the Margin Account Application, a Principal must approve the account before any non-cash (margined) transaction is executed.  A hyperlink to Margin Application and Disclosure Statement is provided as Exhibit 9.

RRs are responsible for knowing, and enforcing, what kinds of securities may be purchased on margin.  Questions about whether a security purchase is marginable are to be referred to the Trade Desk.

The Margin Department of the Firm's clearing agent (currently NFS) will notify the RR of Regulation T and maintenance margin calls as set by the clearing firm.  The Credit Officer of the clearing firm is responsible for periodically reviewing the accounts trading on margin and for adjusting those accounts' margin requirements.

### VII.    MUTUAL FUNDS

All mutual fund transactions executed or taken for execution by an RR of the Firm for any of its customers must conform to all applicable state and federal securities and banking laws, the rules and regulations of self-regulatory organizations of which the Firm is a member, and the Firm's policies as contained in this Manual (including as supplemented, modified, clarified or explained by the Firm's Compliance Bulletins).  As with the sales of other investment products to customers, RRs are to handle mutual fund transactions in accordance with the policy statements on COMMUNICATIONS WITH THE PUBLIC (p. 3); PROFESSIONAL CONDUCT(p.25); and SALES AND TRADING PRACTICES (p. 33).

#### A.  Communications with the Public

Communications, including sales literature, research, or advertising relating to mutual funds are to be truthful, in good taste and not misleading, conform to all regulatory requirements, and be approved consistent with the policies contained in this manual.

#### B. Sales Literature Relating to Mutual Funds

As described above, sales literature relating to mutual funds is to be reviewed by Compliance and approved by a Principal of the business unit utilizing that material prior to its use.  If the sales literature includes a specific rating, it also must include a description of the criteria used to arrive at that rating.

Because of the special regulatory consideration given to sales literature relating to registered investment companies (including mutual funds, variable contracts, and unit investment trusts), any employee that wants to prepare or disseminate sales literature relative to these products is required to seek the guidance of Compliance prior to their drafting.  Customers who are sent or given publications of mutual fund independent rating services are also to be provided a current fund prospectus at or prior to providing any such literature.

Materials regarding mutual funds that deviate in any way from those previously reviewed by Compliance and approved by a business unit Principal are subject to re-approval.  If any such materials include a specific rating, they are also to include a description of the criteria used to arrive at that rating.

When advertising or otherwise marketing mutual funds to customers or prospective customers, RRs are to ensure that customers are fully apprised of the nature of these investments in accordance with securities and banking regulations.  One of the following product disclosures must appear conspicuously on account opening documentation, customer correspondence, and any other form of communication to customers:

> Products offered through* LaSalle Financial Services, Inc., member NASD/SIPC, and a licensed insurance agency, are not insured by the FDIC or any government agency; are not deposits or other obligations of, or guaranteed by, the bank or its affiliates; and are subject to investment risks, including possible loss of the principal amount invested.

OR

---

**NOT A DEPOSIT**
**NOT INSURED BY FDIC OR ANY GOVERNMENT AGENCY  -  NO BANK**
**GUARANTEE  -  MAY LOSE VALUE**

---

## MUTUAL FUNDS

Products offered through LaSalle Financial Services, Inc.,(LFS),, member NASD/SIPC and a licensed insurance agency.

*A divisional name can be inserted here (*e.g.,* LaSalle Financial Services, a division of LaSalle Financial Services, Inc., etc.)

Generic market and product brochures of an informational nature may be provided to appropriate customers with the prior review by Compliance and approval from a business unit Principal. Statistical tables, charts, graphs or other illustrations are to disclose the source of the information if not prepared internally. Statistical market information is to contain the disclaimer that appears at Exhibit <u>10</u>. Statistical Market Information Disclosure.

### C. Prospectus Delivery Requirements

When RRs present any sales literature to clients or prospects that describes a specific mutual fund, the RRs are required to provide a current prospectus for each mutual fund mentioned. If no sales literature is presented, a current mutual fund prospectus must be provided to the client at or prior to the sale of the fund(s). A current prospectus is one that is no older than than thirteen months from date of issue. The dates of issue for mutual fund prospectuses are usually printed on the front or inside cover. RRs are permitted to print a current mutual fund prospectus directly from the respective fund company's web site.

### D. Mutual Fund/Unit Investment Trust Sales Practices and Documentation

Principal sales of investment company shares and unit investment trusts are to be executed at the next-quoted public offering price after the order is received and in accordance with the Firm's sales agreement with the underwriter. Firm policy prohibits "late trading," and thus, orders accepted after the trading deadline will be executed on the next business day. If available, quantity discounts on single purchases, letters of intent, and rights of accumulation should be discussed with customers. RRs must indicate to the Trade Desk if an order is subject to a Letter of Intent or related accounts that would qualify for Rights of Accumulation.

In addition to the policies on sales practices described in this policy statement and elsewhere, RRs may not in connection with mutual fund or investment company sales:

- state or indicate that the product is appropriate for short term investing
- favor or disfavor a particular fund or fund family on the basis of the commission structure
- fail to fully disclose any and all charges or fees relating to the transaction
- demand or require commissions or fees from any source as a condition to the sale or distribution of the product
- offer or promise commissions or fees to any source as a condition to the sale or distribution of the product

#### a)  Switching

RRs may not recommend unsuitable mutual fund "switching." Unsuitable switching is a prohibited sales practice whereby an RR changes or recommends that a customer change their investments from one mutual fund to another, <u>without a basis for believing that such a switch is appropriate in light of changes to a customer's financial resources or investment objectives</u>.

If a customer's investment objectives or financial resources have changed such that a mutual fund or unit investment trust with a different investment objective has become more suitable to the customer's needs then:

- sufficient information needs to be documented to show that the customer's investment objective can be better served because it is not the policy of the Firm to suggest switching to a different fund family absent such evidence; and

- the customer needs to be advised that they may be forgoing future reductions in sales charges by investing outside the fund family or may be paying an additional sales charge (or becoming subject to a new contingent deferred sales charge) on the purchase of a new fund, as opposed to the nominal fee that may be charged for exchanging within the same fund family.

If it is agreed that it is in the best interest of the customer to change investments, the customer must complete the Customer Acknowledgment Switch Letter. Any contingent deferred sales charges (CDSCs) must be discussed with the customer and documented on the Switch Letter. The Switch Letter must also document a material benefit to be realized by the customer which justifies the switch. A hyperlink to the most current version of the Customer Acknowledgment Switch Letter is included as Exhibit 11.

Changes in investments other than exchanges of mutual funds may also be considered a switch, e.g. annuity 1035 exchanges (variable to variable, fixed to variable, fixed to fixed, or variable to fixed), or switches between annuities (variable or fixed) and mutual funds. A switch letter must also be completed in such cases, and a material benefit justifying the switch must be documented. Full disclosure must be made of any death benefit loss and any CDSCs on the surrendered product, as well as any new CDSC on the product purchased. An RR should not recommend any switch unless it is in the customer's best interests.

### b)  Breakpoint Sales

RRs must not engage in the practice of mutual fund "breakpoint sales." A breakpoint sale is a prohibited sales practice whereby a recommendation is made to customers that they make mutual fund investments in amounts selected because they are just below the pre-established points at which the sales charges are reduced. Mutual fund breakpoints are determined by fund families and may not be individually negotiated.

RRs are required to advise customers of the savings available in purchasing amounts above the breakpoint, whether such savings could be achieved through letters of intent or rights of accumulation. RRs should assure themselves that purchases of mutual funds in amounts just below the sales charge "breakpoint" are appropriate and suitable based upon the customer's financial resources and investment objectives and that full disclosure regarding letters of intent and rights of accumulation has been made. Most fund families will allow a letter of intent to be backdated over a certain period of time, and an investment will qualify for a breakpoint so long as the customer agrees to invest at or over a breakpoint threshold over a definite future period of time. RRs should consult a fund's prospectus or Statement of Additional Information for detailed information regarding their rules governing letters of intent or rights of accumulation.

RRs must be sensitive to breakpoint sales for multiple as well as individual transactions, whether those transactions occur on the same day or over time. Larger class B share purchases may be considered violations of the breakpoint sales rules where a customer could instead invest in the fund company's A shares at reduced cost (see discussion below). Sales of mutual funds in more than one fund family in total amounts that would qualify for a breakpoint if they were all invested in one fund family's A shares should generally be avoided, unless the customer cannot realize their investment objectives by investing in one fund family. Under the rights of accumulation privileges at most fund families, holdings in the same fund family maintained in accounts held at other firms, holdings in shares classes other than class A, holdings by other family members in the same household (including multiple accounts by the same owner), as well as additions to pre-existing positions or new purchases of other A share funds in the same family generally will serve to qualify a customer for a breakpoint discount. RRs must be familiar with the breakpoint rules of the mutual fund families they recommend so as to ensure that their customers receive the appropriate breakpoint discounts to which they are entitled.

### c) Sales of Multiple Class Mutual Funds

Some mutual fund companies offer multiple fund share classes, with differing fee schedules within the specific fund to achieve the different classes of shares. For example, funds with A shares come with up-front sales charges and B shares have contingent deferred sales charges. Generally, the expenses or management fees for B shares are raised, temporarily or permanently, to offset the commissions paid to brokers and representatives. Generally, at some later point in time (subsequent to the expiration of the surrender period), B shares convert to A shares, with their attendant lower operating costs. C shares have no upfront sales charges but typically come with a short surrender period (e.g., one year) and with higher operating costs similar to B shares. However, C shares usually never convert to A shares and thus are generally the most expensive class of shares to own over longer time periods. As such, C shares are generally suitable investments only for customers with shorter investment time horizons and who invest in mutual funds which are consistent with a shorter time horizon.

RRs are responsible for being familiar with the costs and benefits of each type of shares, for carefully explaining to customers the benefits and financial implications of each type, and for ensuring that the particular type of share offered is consistent with the customer's needs and investment objectives. In assessing which share class is best, RRs should consider the size of the initial investment and the possibility of future contributions to the customer's account. The RR should inform the customer that they may benefit from investing in A shares because of the ability to receive discounts on sales charges of large purchases and the lower ongoing fees and expenses of the A shares. Large individual or multiple purchases of B shares, either within one mutual fund family or within more than one family, may constitute a violation of the breakpoint sales rules when such investments can be made within one family's A shares at a substantially reduced cost.

Many mutual fund companies set dollar amounts at which they no longer accept trades for B or C shares. Generally the fund's prospectus or statement of additional information (SAI) will outline the requirements for a particular fund and will provide a brief cost analysis comparing the purchase of B or C shares versus A shares. RRs should only present B or C shares as a possible option when it is beneficial for the customer. In order to make this determination, an RR must include in their sales discussions with the customer a comparison of the 12b-1 fees, front-end sales charges, and the impact of time on these costs and charges. RRs should utilize the mutual fund expense analyzer tool found on the NASD's website in order to facilitate this comparison. A hyperlink to the NASD's expense analyzer is attached as Exhibit 12.

In order to ensure that customers have been provided adequate information and are making an informed decision in connection with their purchase of multiple share mutual funds, customers who purchase B share transactions in an amount of $100,000 or more must sign the B Share Customer Acknowledgment form. A hyperlink to this form is included as Exhibit 13. An order for B shares in amounts of $100,000 or more will not be processed by the trade desk without the signed acknowledgment. The Acknowledgment must be signed for individual B share trades of $100,000 or more and for multiple B share trades within one or more mutual fund families that in the aggregate total $100,000 or more. An RR also must have such trades pre-approved by the National Sales Manager.

Purchases of B shares in an amount of $250,000 or greater are not permitted, either as individual B share trades or for multiple B share trades within one or more mutual fund families that in the aggregate total $250,000 or more, whether those trades are placed the same day or over a short period of time.

Some mutual fund families may offer other share classes as well, but the same principles discussed above should govern RRs' recommendations of such other shares classes. Namely, the RR must conduct a comparative analysis of the respective costs, advantages and disadvantages of each share class, the impact of time on these costs and charges, and the likelihood of additional future investments. The RR must then disclose these facts to the customer. Generally, RRs should

## MUTUAL FUNDS

recommend only the share class that is most cost advantageous for the customer in light of these various factors.

### d)  Selling Dividends

No RR shall, in recommending the purchase of a mutual fund, state or imply that the purchase, shortly before an ex-dividend date, is advantageous to the purchaser, unless there are specific, clearly described tax or other advantages to the purchaser. In addition, no RR shall represent that distributions of long-term capital gains by an investment company are or should be viewed as part of the income yield from an investment in such company's securities.

### e)  529 Plans

RRs who recommend and sell mutual funds through 529 college savings plans must ensure that their customers are aware that they may be able to purchase in-state 529 plans that may afford them preferential state income tax treatment, and that may also be purchased at costs lower than those charged by 529 plans made available though mutual fund vendors with whom the Firm maintains a selling agreement. Such disclosures must be documented in the Notes section of the Customer Profile. These considerations should also govern RRs recommendations regarding 529 plans to their customers.

### f)  NAV Entry Privilege

From time to time, certain mutual fund vendors with whom the Firm maintains a selling agreement may offer, in limited circumstances, an NAV entry privilege to customers who transfer funds from another mutual fund family (e.g., who transfer funds from a class A, B or C mutual fund at another mutual fund complex). RRs must enable their customers to avail themselves of this opportunity, where applicable, and generally may not recommend purchases in the new fund family which entail an upfront sales load or CDSC.

### E. Mutual Fund Due Diligence

The Firm's product selection committee meets at least annually to select the fund families that will be included in the Firm's Preferred Provider Program. The committee conducts due diligence on various fund families and selects only those that meet its criteria. The Preferred Provider Program generally includes a select group of some of the largest and most well-known mutual fund families that offer a broad spectrum of investment products. A hyperlink to the Approved Product List is included as Exhibit 14.

RRs, however, may solicit orders for mutual funds not in the Preferred Provider Program, and are encouraged to do so when it is in the best interests of the customer (e.g., a customer has a position in a fund and wishes to add to that position, or may obtain a breakpoint discount by investing in a fund family outside of the Preferred Provider Program). RRs that recommend non-preferred mutual funds may be required to conduct due diligence to establish that the non-preferred fund is superior to similar mutual funds offered through preferred providers.

## VIII.    PROFESSIONAL CONDUCT

It is the policy of the Firm that all employees conduct themselves in accordance with industry regulations, provisions of applicable state and federal laws, and the highest standards of good business practices.

Employees are to remain in good standing with all self-regulatory organizations and in all jurisdictions where they conduct the Firm's business in order to continue to remain qualified to receive compensation. In particular, an employee generally becomes unqualified to receive compensation upon a finding that the employee has violated the rules of any governmental or regulatory authority to which the employee is subject or upon a felony conviction.

In addition to complying with the policies and approval requirements as contained in this policy statement, employees are also to comply in full with the provisions of LaSalle Bank Corporation's Standards of Conduct Policy, including specifically adhering to the proscriptions and obtaining approvals as required by that document in addition to those required by this Manual.

### A.    Prohibited Practices

Employees are specifically prohibited from the following:

- using their positions with the Firm or knowledge or expertise gained in the course of their association with the Firm, whether actually or by appearance, for private gain, for the benefit of any enterprise which is or could be in direct or indirect competition with the Firm, or to obtain favors or benefits personally, for a family member or for another person;
- misappropriating for themselves any corporate opportunity which the Firm is financially, strategically, or legally able to undertake;
- making or receiving any payment on behalf of or for the benefit of the Firm, either domestically, or abroad, for the purpose of acquiring or retaining business, obtaining business concessions or attempting to influence a governmental decision or activity;
- borrowing or lending money or securities to any customer of the Firm unless such customer is a family member of the employee and the borrowing or lending is unrelated to any transaction or business activity conducted at or through the Firm;
- suggesting or allowing the Firm's name to be used or listed in any prospectus or offering circular in connection with a transaction in which the Firm is not directly involved and which has not been properly approved by management;
- suggesting, directly or indirectly, that they, the Firm, or any of the Firm's affiliates will guarantee a customer against loss;
- misrepresenting the Firm's name, logo or their status with the Firm. Employees are not permitted to execute any document, contract or letter agreement on behalf of the Firm;
- Employees are not authorized to act on behalf of the Firm in connection with any agreements, settlements or other matters which would create an obligation of the Firm to a third party; and
- forging signatures of customers or others; or altering, falsifying or destroying customer or Firm records or documents.

*See also* the Prohibited Activities section of SALES AND TRADING PRACTICES, p. 33.

### B.    Private Securities Transactions

Private securities transactions, which are governed by state and federal securities laws and by the provisions of self-regulatory organizations, have implications for both the participating employee and the Firm. Accordingly, employees that want to, or are solicited to, engage in a private securities transaction outside the regular course or scope of their employment are to seek the approval of their

supervising principal or RSM and Compliance in advance by providing a written request detailing the terms and the employee's role in the proposed transaction. If approval is granted, the Firm will be required to supervise the employee in the transaction and may, accordingly, condition the approval on certain conditions or terms relative to the employee's participation.

Employees with any questions relative to whether a transaction would be subject to or exempt from the regulations governing private securities transactions should consult with their supervising principal, RSM, or Compliance.

### C. Selling Away

Selling any financial instrument by an RR outside of LFS is strictly prohibited. Financial instruments include, but are not limited to, any security or insurance product. Providing advisory or financial planning services outside the Firm also is strictly prohibited.

### D. Outside Business Activities

Employees are encouraged to be good citizens and to participate voluntarily in community, philanthropic, or charitable activities as they wish. Activities that would require significant amounts of the employee's time or attention during regular business hours or that would necessitate the employee's soliciting money from or having interaction with the Firm's customers must be approved in writing by the employee's business unit manager in advance. RRs must submit an Outside Business Activity Notification form to their business unit manager who will review it and forward it to Compliance for final review. A hyperlink to the current version of the Outside Business Activity Notification form is included as Exhibit 15.

Employees may accept employment or compensation for outside activities (including speaking engagements, teaching, or writing), run for public or elected office, or become affiliated as an officer or director with another organization or entity only with the prior approval of their business unit manager and Compliance. When deciding whether to grant approval, the nature and extent of the employee's job responsibilities, the proposed activity, and any actual or potential conflict or relationship between the entity or organization and the Firm will be considered. Material information on approved employment and affiliations is to be reported to Compliance when requested. LFS may in its discretion restrict any outside business activity that is deemed to be a potential conflict of interest or is considered inconsistent with any agreement the RR has with the Firm.

No employee may accept a finder's fee from any third party, other than an affiliate of the Firm, without the prior approval of their business unit manager. Employees seeking approval to accept such a fee are to submit the request with all appropriate documentation in writing to their business unit manager who may, after consulting the Director of Compliance, require the fee to be paid to the Firm which, in turn, will issue its own check to the employee.

Employees are precluded from having a controlling ownership or financial interest in any organization or entity engaged in whole or in part in any securities, financial, or similar business, other than those affiliated with the Firm.

### E. Gifts and Gratuities

Employees may only give or accept anything of value in connection with the business activities of the Firm if such gifts or gratuities are:

- valued at less than $100 per year, per recipient; or
- customer entertainment involving an occasional meal, a ticket to a sporting event or the theater, or any comparable entertainment, which is neither so frequent nor so extensive as to raise any question of propriety. Such customer entertainment should have a legitimate business purpose and such expenses should be reasonable.

**PROFESSIONAL CONDUCT**

In addition, insurance laws in all but two states (California and Florida) prohibit rebating. Rebating is a sales practice in which an insurer or an insurance producer offers a prospect an inducement to purchase an annuity contract or insurance policy. For example, an insurance producer might provide a rebate by sharing the commission the producer earns on a sale with the purchaser of an insurance policy. Anti-rebating laws are one of several methods the states use to ensure all insureds are treated fairly and that all insureds in the same underwriting classification are treated alike. Please make certain that no promotions exist where customers are given a "gift" or "free service" for purchasing an annuity or insurance product.

Employees offering or giving gifts to customers or others in connection with the business of the Firm consistent with the above policy should be sensitive to the potential conflicts of interest and appearance of impropriety which such gifts may create. Employees are encouraged to consult with their supervising principal, RSM, or Compliance regarding the giving, or receiving, of any gift or gratuity which is likely to be misunderstood or reflect poorly on the employee or the Firm.

RRs are to complete the Gift form and forward it to Compliance. A hyperlink to the current copy of the form is included as Exhibit 16.

### F. Reportable Matters

RRs and other persons registered with LFS are reminded it their responsibility to keep their Form U-4 current and to notify Compliance promptly of any changes. An RR must immediately notify his or her supervising principal and Compliance if the RR is, or becomes, engaged in the following circumstances:

- any suspension or revocation of the employee's license or any refusal of registration by any self-regulatory organization or government body;
- is charged, convicted of, or pleads no contest to any felony; regardless of whether or not the matter involves the employee acting in the course of employment with the Firm;
- is charged, convicted of, or pleads no contest to any misdemeanor involving the purchase or sale of any security or crime involving dishonesty (e.g., fraud, bribery, perjury, forgery); regardless of whether or not the matter involves the employee acting in the course of employment with the Firm;
- is named in any civil complaint;
- files for personal bankruptcy, either voluntary or involuntary;
- is in control of an organization that filed for bankruptcy;
- name change (e.g., marriage);
- changes in personal residence address; or
- engages or changes in outside business activity.

Generally updates to Form U-4 must be made within 30 days through NASD's WebCRD, and the Firm may be subject to fines of $10 per day up to a maximum of $300 for late disclosure. If the Firm is subjected to a late disclosure fee due to failing to receive timely notice from an employee regarding an update to their Form U-4, any such fine will generally be charged to the employee.

### G. Fraudulent Schemes

On occasion, employees may be approached by individuals who claim to have access to substantial sums of money and who seek to make that money available to the Firm or to employees for loans or investment at advantageous rates or on terms more favorable than those usually available. Solicitors may be seeking up front fees or expenses or a written acknowledgment from the employee or the Firm that could be used to attest to a third party that it is a bona fide transaction. Indicators that a proposed transaction may not be legitimate can include the following:

- a borrower's interest cost well below prevailing interest cost on funds from usual sources;
- no repayment of principal by borrower until the term of the loan expires;

**PROFESSIONAL CONDUCT**

- a loan to be secured by government-backed securities with coupon interest payments paid to borrower;
- an undisclosed foreign principal has deposited money in an undisclosed bank in Europe or the Caribbean;
- promises that money will be transferred to the borrower's U.S. bank as soon as pertinent documents are executed; or
- the borrower is asked to pay an advance fee before the transfer is effected and the identities of the lender and foreign bank are revealed.

Under no circumstances should an employee give a solicitor any statement in writing or provide any documents, such as letters, agreements or proposals, guaranteeing the availability of quantities of securities, without their business unit manager.

### H.  Continuing Education

The Securities Industry Continuing Education Program was approved by the SEC and the various self-regulatory organizations in 1995.  The program is divided into two components: the Regulatory Element and the Firm Element.

#### 1.  Regulatory Element

The Regulatory Element of the Securities Continuing Education Program requires all registered persons to complete a prescribed computer-based training session within 120 days of the second anniversary of their initial registration and every three years thereafter.  The Compliance Department will send a memo to the RR when the continuing education notification is received from the NASD. Registered persons that do not complete the regulatory element within the prescribed time frame will have their registration deemed inactive until such time as the requirements of the program have been satisfied.  Any person whose registration has been deemed inactive shall cease all activities as a registered person and will be prohibited from performing any duties and functioning in any capacity requiring registration.

#### 2.  Firm Element

The Firm Element of the Securities Industry Continuing Education Program is applicable to all registered persons and their supervisors who have direct contact with clients in the conduct of the Firm's securities sales, trading, or investment banking business.  Firm Element is an annual education program administered by the Firm that is designed to enhance the securities knowledge, skill, and professionalism of the Firm's covered persons.  The content of Firm Element training is derived from a self-analysis of the Firm's training needs.  The analysis takes into consideration the size of the firm, organizational structure, business activities, and regulatory developments, to name a few.  The Firm's annual anti-money laundering training will be incorporated into the annual Firm Element training program.

### I.  Annual Compliance Meeting

Each RR is required to attend an annual compliance meeting, given by the Director of Compliance or their designee.  Compliance will keep a written record of attendees and store it in the Compliance Department located at the Chicago OSJ.  The topic(s) and any presentation material for the meeting will be approved in advance by the Director of Compliance.  General topics from which specific material will be chosen include but are not limited to, current regulatory issues or developments affecting the financial products LFS offers, current Firm compliance issues, or matters raised by inquiries of the Firm by regulatory bodies.

**PROFESSIONAL CONDUCT**

### J. <u>Annual Employee Questionnaire</u>

Each associated person is required to complete the employee questionnaire. Each associated person will complete the employee questionnaire upon hiring and at least annually thereafter. The questionnaires will be maintained by the Compliance Department.

## IX.    REGISTRATIONS

It is the policy of the Firm that both it and its employees be appropriately qualified and registered with all applicable regulatory bodies relative to the business conducted and job functions performed. Further, no employee of the Firm may solicit for sale or sell any security that is not properly registered or exempt from registration pursuant to federal rules and regulations and those of the jurisdiction where the customer involved in such sale or offer resides.

### A.  Individual Registrations

Prior to conducting business for or on behalf of the Firm, employees are to be appropriately qualified and licensed for products and investments sold or offered for sale and for job functions performed.

Each supervisory principal or RSM is responsible for ensuring no employee in their area of responsibility:

- conducts any securities business on behalf of the firm in any jurisdiction where the Firm and that employee are not properly registered or exempt from registration; or
- performs any job function requiring a qualifying license or registration that employee does not have.

All activities required to be performed by a securities principal are to be performed only by individuals appropriately qualified and registered.

### 1.  Regulatory Filings

Employees are responsible for providing all requested information at the time of their employment with the Firm and thereafter to ensure that regulatory filings made in connection with their application as registered persons with the Firm are complete and accurate. Employees are to immediately notify Compliance if they become aware that any personal or professional information previously provided to the Firm or to a regulatory body has become inaccurate, and they are to cooperate fully in supplying such information as is necessary to bring regulatory filings and Firm records into complete accuracy.

The Compliance Department is responsible for filing the forms necessary to register employees with regulatory bodies as appropriate to an employee's qualifications and job responsibilities;   It is the RSM or designated principal's responsibility to obtain a Pre-Hire Consent Form from prospective employees so that Compliance can check their record on the NASD's WebCRD. Employees should direct questions concerning their registrations to Compliance.

Any supervisor that becomes aware of a job assignment, whether by promotion, demotion, leave of absence, or termination that affects the accuracy of the Firm's regulatory filings is to promptly notify the Compliance Department, who will make any necessary filings to ensure the Firm's records are complete and accurate. In addition, the Compliance Department will provide a copy of such filings to the employee.

As a matter of policy, the Firm will not carry registrations for individuals not actively engaged in the securities business of the Firm. Registration for non-employees of the Firm who provide compliance, audit, or other legitimate administrative support to the Firm may be carried consistent with regulatory rules and with the approval of the Director of Compliance.

### 2.  Activities of Registered Personnel

Only RRs that are appropriately registered may open new accounts, solicit customers, orders and perform the inquiries necessary to know a customer.

If a customer is a part-time resident of two states, the customer must at the time of each trade be domiciled in a state where the RR is registered. The new account form should record the address

that corresponds to the state of domicile (even if the mailing address is different) and should include a brief statement explaining the two state residences. In other instances, RRs may not accept an account or transaction for a customer who is domiciled - or whose primary domicile - is in a jurisdiction in which the RR is not registered to conduct securities business.

Personnel who are authorized and licensed to sell non-deposit investment products may receive incentive compensation for transactions entered into by customers. However, incentive compensation programs must not be structured in such a way as to result in unsuitable recommendations of sales being made to customers.

### 3.   *Activities of Unregistered Personnel*

Unregistered employees of the Firm may perform routine administrative and clerical functions at the direction of the RR or others. RRs, however, are generally responsible for the actions of their sales assistants. Thus, any transcription or clerical errors by a sales assistant may be charged to the RR's net or gross commission. Unregistered personnel may assist the RRs in an administrative capacity only and may perform other routine clerical duties. Unregistered personnel may not accept orders, distribute any sales literature or advertising, recommend securities, or handle customer funds or securities except in an administrative fashion.

When permitted by applicable regulations, the Firm may agree to pay employees of the Firm's affiliates a referral fee for directing a potential customer to a registered person. Any such fee cannot be dependent upon the opening of an account, the size of an account opened, the execution of a transaction, or the volume of such customer's business. The referral fee is to be a nominal, one time per referral, flat dollar amount paid solely for the referral. The amount and use of referral fees must be approved in advance by Compliance.

### B.   <u>Employee and Employee-Related Brokerage Accounts</u>

Employees are required to notify the Firm of brokerage accounts held at another broker/dealer ("outside brokerage account"). This includes accounts in which the employee has a financial interest (e.g., other household accounts) or over which they may exercise discretionary authority. The notification shall be in writing prior to opening the account or at the time the employee becomes associated with the Firm for accounts that exist prior to the employee's affiliation with LFS. The Compliance Department will in turn send the broker/dealer holding the account a "407 letter" granting permission for the employee to hold the account at the outside broker/dealer and instructing the broker/dealer to provide duplicate account statements and confirmations to the Compliance Department (or the employee's business unit manager). For a sample 407 letter, refer to this hyperlink to Exhibit <u>17</u>.

Employee and employee-related brokerage accounts are also subject to the Firm's Code of Ethics, effective January 7, 2005. Under the Code of Ethics, certain employees ("Covered Employees") are required to pre-clear certain of their personal securities transactions. For a hyperlink to the Code of Ethics, see Exhibit <u>18</u>.

Generally, employees may freely trade securities and commodities in their own employee accounts consistent with their financial resources, investment objectives, and trading experience. Employees may not use an employee-related account or any other customer account to do any trade or act for their benefit which would be prohibited in an employee account.

Employees are responsible for ensuring that all trading in their employee accounts, regardless of whether such accounts are at the Firm or elsewhere, conforms to the following principles:

- Employees may not trade, attempt to trade, or cause to have trades executed on their behalf or for their benefit while in possession of or after exposure to material, nonpublic information relating to the subject of the trade.

- Employees may not trade their employee accounts in such a way that the trading interferes with the fulfillment of their business duties and responsibilities.
- Employees may not execute or cause another to execute their employee trades at the Firm in any manner or in any way that would disadvantage or take unfair advantage of any customer transaction. If, on any given day, an employee or employee-related account receives a more advantageous price than that received for a customer's solicited order for the same security, a contemporaneous memorandum substantiating the unusual or extenuating circumstances affecting the price differential and indicating the approval of the Director of Compliance is to be made and retained by the RR entering the order for the employee account.
- Employees may not deliberately trade in tandem with or ahead of any customer or in contemplation of any customer trade.
- Employees may not deliberately structure their trades or timing of trades such as to create an appearance of activity or liquidity or to affect or influence improperly the bid, offer, or market price of any security.
- Employees may not trade in "hot issues." *See* Initial Public Offerings/Freeriding & Withholding, p. 36.

## C.  Surveillance of Employee Accounts

Trades in employee and employee-related accounts are subject to regular review by their supervisory principal, RSM, or Compliance, who may at their discretion, place special constraints or restrictions on any employee or employee account if deemed necessary or appropriate. Such restrictions may include, for example, the following:

- prohibiting trading in certain investments for certain periods,
- directing that an employee or employee-related account be closed, or
- requiring that an employee trade only on a cash basis.

Any such restrictions are to be strictly adhered to regardless of whether the accounts are maintained at the Firm or elsewhere. If an employee violates any account restrictions, the Firm, at its discretion, may cancel any trade, keep all profits (or donate them to a charity) and require the employee to absorb any losses.

## X.    SALES AND TRADING PRACTICES

It is the policy of the Firm that each transaction executed or taken for execution by an employee for any of its customers or prospective customers conform to all applicable state and federal securities laws, the rules and regulations of the NASD and the Firm's policies as contained in this Manual.

In particular, all purchases and sales of securities are to be consistent with the Firm's intention to achieve:

- full and fair disclosure of the character of the product to the customer;
- a thorough understanding by the customer of the investment product involved; and
- strict adherence to the highest business ethics and to just and equitable principles of trade.

*See also* <u>MUTUAL FUNDS</u>, p.<u>20</u>

### A.  <u>Prohibited Activities</u>

All employees are to refrain from the following concerning the Firm's customers and their activities:

- offering tax or legal advice in connection with any solicitation or transaction;
- warranting or guaranteeing, either verbally or in writing, the present or future value or price of any product, or that any company or issuer of securities will meet its promises or obligations;
- agreeing to repurchase at some future time a product from a client for the employee's own account, for the account of the Firm, or for any other account, except for a bona fide repurchase transaction made in the regular course of the Firm's business;
- acting as a personal custodian of securities, stock powers, money or other property belonging to a customer or holding a power of attorney relative to securities or financial transactions (other than for a customer who is a relative of the employee);
- borrowing from, lending to, or arranging for the extension or maintenance of credit to, a customer (other than for a customer who is a relative of the employee);
- sharing with any customer either profits or losses resulting from a security transaction, funding a customer's account or guaranteeing the payment of any debit balance in a customer's account (other than through the joint participation in an established employee account, approved as required by Compliance);
- rebating to any person or entity any part of the compensation received for orders taken and executed;
- forwarding or agreeing to forward confirmations or statements (other than interested party duplicate confirmations and statements) other than to the official mailing address of the customer; and
- acting as Trustee, Successor Trustee, Executor, Administrator, Personal Representative, Guardian, Conservator, Custodian, or other fiduciary capacity for the account of a customer or customer's estate (other than for family or related accounts);
- effecting customer securities transactions that are not authorized by the customer (unauthorized trades); and
- recommending excessive trading activity in customer accounts ("churning") in light of the customer's investment objectives and financial situation.

*See also* <u>PROFESSIONAL CONDUCT</u>, p.<u>25</u>.

## SALES AND TRADING PRACTICES

### B. Suitability

#### 1. General

Employees are to ensure that in opening as well as in maintaining accounts for customers sufficient information is obtained about the customer for the RR to know the customer and to make a determination as to whether it is appropriate for the Firm to do business with such customer. RRs are to be cognizant of the information known on their customers and its accuracy, completeness, and currency. As many customers effect only periodic transactions, the RR should confirm with such customers that the information on which the Firm and the RR base their suitability determination is current and that no significant changes have occurred since the customer's last transaction.

The determination of suitability requires the RR to exercise good judgment on a case by case basis. If a customer insists on purchasing a product that, in the opinion of an RR, is inconsistent with the customer's account information on file and known to the RR, the customer should be told of the RR's concerns and the Firm's obligation to resist a customer's efforts to acquire an inappropriate investment. If the customer wishes to disregard the RR's advice and execute a trade that is clearly unsuitable, the trade should be refused.

#### 2. Senior Citizens/Elderly Customers

Regardless of the type of product sold, care should be taken when dealing with suitability issues for elderly persons. To help address this matter, RRs are required to ask their customers who have attained the age of 75 or greater with whom they consult for their financial affairs and if the customer would like to include this person in their decision making process. The RR also must offer to speak with the customer's "trusted advisor" by phone or in person concerning the recommended investment and document such discussions. RRs must document in the Notes section of the Customer Profile their discussions with the customer about any such "trusted advisor."

As with all clients, RRs must conduct a thorough review of the customer's financial situation, including their current asset allocation. As a general rule, an individual should have no more than the remainder of 100 minus their age at market risk. For example, an 80 year old person generally should have no more than 20% of their assets invested in the equity markets. Obviously, circumstances can vary, but this is a good starting point.

#### 3. Selling to Non-English Speaking Customers

Because of the possibility of customer confusion or misinterpretation when assisting customers that do not read or speak English, such customers must be accompanied by a "trusted advisor" during any sales presentation. The trusted advisor must be of legal age; must speak and read English; and must speak the customer's foreign language. Further, if the RR does not speak the customer's language, a Bank or other affiliate employee who also speaks that language must be present during the sales presentation. The RR must document the name and relationship of the advisor and, if applicable, the name of the Bank or other affiliate employee.

### C. Discretion

If specifically requested by a customer, RRs may exercise time and price discretion relative to a particular transaction. However, the time and price discretion shall expire as of the end of the business day on which it is granted, absent a specific, written indication signed and dated by the customer. RRs may not exercise time or price discretion on a good-til-canceled (GTC) basis unless it is pursuant to an order in an institutional account with valid GTC instructions issued on a "not held" basis. RRs may not accept discretionary authority, either written or oral, from a customer other than that which is specifically limited to time and price discretion. Any exercise of time and price discretion must be reflected on the order ticket.

## SALES AND TRADING PRACTICES

RRs are to accept orders only from the customers named on an account or from an individual specifically empowered by written authorization to exercise discretion as to trades for that customer. Thus, for retail accounts, if an account owner wants someone else to be able to direct transactions in their account, the account owner must appoint that third party by executing a limited trading authorization, or pursuant to a valid power-of-attorney.

### D.  Bond Transactions

When discussing a bond's rating with a customer, RRs are to disclose the name of the service providing the rating and carefully identify the specific bond to which the given rating applies.

RRs must make full disclosure of the relevant features, costs, risks and characteristics on solicited bond and other fixed income transactions.  For example, an RR should explain to the customer the inverse relationship between interest rates and fixed income prices and the impact of interest rate movements on the value of a customer's principal as reflected on their statement; how "premium" or "discount" bond prices work, where applicable; accrued interest; how call features operate (the instrument is callable only at the discretion of the issuer); interest payments (the "coupon"); and other risks that may be involved in each particular case (e.g., credit risk, inflation risk, etc.).  Investors must be aware that they may not receive back the full amount of their principal invested if they sell prior to maturity or call date or if they purchase a fixed income instrument at a premium.  In general, these same issues affect investors who purchase bond or fixed income mutual funds, but there may be other features of bond mutual funds that are unique and which must also explained to the investor.  For example, in a bond fund there is generally no maturity date as such and thus unlike a purchaser of an individual bond who knows they will receive par value back at maturity, there is no guarantee of what value will be received back by a bond fund investor at any future time of redemption.

### E.  Refusing Transactions

If an employee has reason to believe that doing business with, or any specific transaction for, a customer would violate the rules or regulations of any federal or state governmental body or any self-regulatory organization, the transaction or business is to be refused and Compliance promptly notified.

Employees are to immediately report to their supervisory principal any situation they have reason to believe a customer or prospective customer placing a trade may be in possession of material, nonpublic information relating to the subject of the trade.  Under no circumstances is an RR to accept or process such an order without the explicit approval of their supervisory principal.

RRs are not to accept a sell order from a customer in any situation in which they have reason to believe the customer or prospective customer offers or seeks to sell stolen securities.  All such instances are to be promptly reported to Compliance.

RRs are to refuse to accept or to execute any order:

- for a product as to which they are not licensed;
- for a customer that resides in a state where the RR is not registered to do business; or
- for a security which is not registered or exempt from registration under federal and state securities laws.

RRs are to refuse any transaction that they have reason to believe may have been structured or timed to create an appearance of activity or liquidity or to affect or influence improperly the bid, offer, or market price of any security.  Situations in which such structuring may be implicated are to be brought to the attention of a supervisory principal or a compliance officer immediately.

### F.  Errors

Errors are expensive and can damage the Firm and an employee's reputation.  Errors can result from misunderstandings with the customer as to the terms of an order, from data entry or processing

## SALES AND TRADING PRACTICES

mistakes, or from an unscrupulous act. Financial responsibility for errors that are controllable by the diligence of an employee may be charged against the employee's compensation at the discretion of the employee's supervising principal, RSM, or the Chief Operating Officer. Under no circumstances should an employee change the Firm's documentation or attempt to resolve an error in contravention of the appropriate involvement of the RR's supervisory principal, RSM, or Compliance.

Customers should be reassured that losses in and charges to their accounts resulting from legitimate errors will be promptly corrected. Under no circumstances should an RR suggest, imply, or promise a customer that the customer's account is guaranteed against loss or risk of loss due to market fluctuations.

### G. Markups and Commissions

It is the Firm's policy that markups on securities must be in full compliance with the rules of the NASD relating to markups and markdowns. For agency transactions, customers normally are charged commissions consistent with the Firm's published commission rate tables.

### H. Restricted Securities and Beneficial Ownership Rules

Customers presenting restricted or "legended" securities for sale are to have such restrictions cleared prior to acceptance of the order. Sales of restricted securities that will be made pursuant to the "safe harbor" provisions of SEC Rule 144, 144A, or 145 are subject to special restrictions, including holding and sale periods, quantities which can be sold, and documentation. Normally, customers that seek to sell restricted securities are responsible for seeking their own legal counsel concerning the limitations and requirements of the rules and the filing of all necessary regulatory forms.

Beneficial owners of more than 5% of any registered class of voting equity securities are subject to special integrated disclosure rules under Sections 13(d) and 13(g) of the federal securities laws.

Questions relating to these matters should be referred to the Operations Department.

### I. Penny Stock Transactions

Penny stock, as used and referred to in this policy, means an equity security which is not traded on a national securities exchange or included in the NASDAQ National Market System and which in a particular transaction trades below $5.00. It is the Firm's policy to accept penny stock orders on an unsolicited basis only. As such, each RR is required to have the customer complete an Unsolicited Customer Acknowledgment form prior to placing the order. A hyperlink to the Unsolicited Customer Acknowledgment form is located as Exhibit 4.

### J. Initial Public Offerings/Freeriding & Withholding

Employees of the Firm are prohibited from purchasing an initial public offering of a security that trades at a premium to the public offering price in the secondary market ("hot issues"). In addition, RRs are not to execute purchases of such securities for any of the following individuals or accounts:

- employee and employee-related accounts;
- accounts of directors, officers, employees, and associated persons of any NASD member firm;
- senior officers of banks, insurance companies, registered investment companies, registered investment advisory firms, and any other persons within such organizations whose activities influence or include the buying or selling of securities; or
- accounts in which any of the above named individuals have a beneficial interest or which are for members of their immediate families.

**SALES AND TRADING PRACTICES**

### K.   Retail Options Sales

It is the Firm's policy to accept option orders on an unsolicited basis only. Accordingly, each RR is required to have a completed Unsolicited Customer Acknowledgment form on file prior to placing the order.  *See* Exhibit 4.

Procedures for opening option accounts are included on page 19.

### L.   Fee-Based Accounts

RRs who recommend the opening of a fee-based account must ensure that this is an appropriate arrangement for the customer in each case.  Similarly, RRs should generally avoid recommending loaded mutual funds in fee-based accounts, since the combination of the sales charge (front-end or back-end) and the asset-based fee may result in total fees charged to the customer that may be excessive.  An RR who recommends a fee-based account must make full disclosure to the customer of the fees and the alternative types of arrangements which are available.

**INSURANCE & ANNUITY PRODUCTS**

XI.    **INSURANCE & ANNUITY PRODUCTS**

A.    **Variable Annuities**

Variable Annuities are designed as retirement vehicles for individuals allowing for tax-deferred accumulation of earnings.  As such, they may not be appropriate for younger investors (who generally have long enough time horizons to ride out fluctuations in the market), or for the very elderly (see discussion below).  Upon withdrawal (systematic or lump sum), earnings are paid out first and are taxable as ordinary income.  Variable annuities provide the ability to choose a series of income payments that can be customized to meet a client's needs and that cannot be outlived.  Payments made in this manner are paid on a tax-advantaged basis with a portion of each payment considered a return of principal and, therefore, non-taxable.  The balance is considered earnings and subject to ordinary income taxes.

1.    *Suitability*

The following items should be considered before recommending that a client purchase a variable annuity:

a)    **Investment Objective**

The client's investment objectives should include tax-deferred accumulation for and during retirement, *unless* the variable annuity is being placed within a tax-qualified account (IRA or qualified plan).  In the latter case, there must be a rationale other than tax-deferral which establishes the suitability of the transaction.

b)    **Time Horizon**

The client should generally have a long-term investment horizon.  The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first five to ten years, depending on the contract.

c)    **Liquidity Needs**

Some contracts provide for an annual free withdrawal of 10% to 15% of premiums (or account value).  Withdrawals in excess of the free amount will be subject to the stated surrender charge.  In addition to surrender charges, the client may incur a 10% tax penalty on withdrawals of earnings prior to age 59½.

d)    **Tax Considerations**

Your client's tax bracket should also be considered when making a recommendation to purchase a variable annuity.  While the tax laws and tax brackets may change, generally investors in lower tax brackets may not derive much benefit from tax deferral.  Generally, the lower the current tax bracket, the longer the time horizon should be. High tax bracket clients should also consider longer time horizons since all annuity earnings are taxed as ordinary income rather than capital gains. Another tax consideration to keep in mind is that all withdrawals during the accumulation phase are treated as a withdrawal of earnings first and, thus, are reported as ordinary income.

e)    **The Aggregation Rule**

All annuity contracts entered into after October 21, 1988, which are issued by the same insurance company to the same policyholder during one calendar year, will be treated as one annuity contract for the purpose of determining the taxable portion of any distributions. The aggregation rule does not apply to distributions received under qualified plans or immediate annuities.  If a policyholder withdraws more than the accumulated interest from one of the (multiple) contracts the insurance company must report the distribution as the interest from all of the contracts first and the balance of the withdrawal as a return of principal.

## INSURANCE & ANNUITY PRODUCTS

### f)  Diversification

As with all investments, diversification is important because it can help reduce (but does not eliminate) the risk of loss of principal. Clients should limit their investment in variable annuities to a manageable percentage of their net worth and diversify their investments within the variable contract to meet their investment objectives and risk tolerance level.

### g)  Market Fluctuation

Variable annuities may be subject to fluctuation due to changing market conditions. Investors with a low tolerance for market risk may be more comfortable in assuming that risk in a variable annuity contract due to the guaranteed death benefit. However, the death benefit should not serve as a basis for an overly aggressive investing strategy.

### h)  Other Retirement Plans

Clients generally should consider the availability of other available tax-qualified accounts (401(k), 403(b), tax deductible IRA or any other employer-sponsored plan) in connection with a purchase of a variable annuity. Variable annuities, however, do offer benefits generally not available in other tax qualified accounts.

### i)  Qualified Accounts

Variable annuities can be purchased within qualified accounts. Clients, however, should be informed that there may be less expensive options than a variable annuity that provide the same tax advantages and that there are no additional tax benefits associated with purchasing a variable annuity in a qualified account. Annuities, however, do provide certain benefits not available in other types of investments including guaranteed income your client cannot outlive as well as the guaranteed death benefit feature available in many contracts. Not only should clients be made aware of the additional benefits offered by the variable annuity contract but also the additional cost of providing these benefits.

### j)  Bonus Credits

Generally, it is Firm policy that bonus credit variable annuities are not permitted for sale.

### k)  Elderly Customers

Special care must be taken in making recommendations to elderly customers (age 75 and older). The following issues must be carefully considered and documented on the customer profile. RRs must ask the customer with whom they consult for their financial affairs and note the customer's response in the Notes section of the customer profile. Where there is a family member or advisor, the RR must give the customer the opportunity to discuss the investment with their advisor either in person or on the phone. In addition, notes detailing discussions about the investment objectives and suitability of the recommended product should include such topics as:

- Cash reserves and liquidity (elderly customers generally need more liquid funds on hand for medical care, nursing home costs and other health related issues or emergencies that could occur).
- The percentage of the customer's total liquid assets that is at market risk. An elderly client may not have the time horizon needed to ride out market fluctuations.
- The time horizon of the client relative to the surrender charge or CDSC period.
- Investment experience.
- Detailed notes that describe discussions with the customer regarding volatility, loss of principal, fees and costs, etc.
- All other relevant facts that explain why the investment is suitable and necessary for the customer.
- The level of an advisor's involvement or the customer's decision not to include the advisor.

l)    **Summary**

Variable annuity contracts are not for everyone. There are many factors that need to be considered when determining whether a variable annuity is appropriate for a client. In addition to the factors specifically cited in this section, all of the standard suitability factors should considered. This includes the financial information detailed in the account application (*e.g.,* annual income, liquid assets, estimated total investments/net worth, risk tolerance, and experience).

## 2.  Prospectus Delivery Requirement

When RRs present any sales literature to clients or prospects that describes a specific variable annuity, the RRs are required to provide a current prospectus for each variable annuity mentioned. If no sales literature is presented, a current variable annuity prospectus must be provided to the client at or prior to the sale of the annuity. A current prospectus is one that is no older than thirteen months from date of issue. The dates of issue for variable annuity prospectuses are usually printed on the front or inside cover. RRs are permitted to print a current variable annuity prospectus directly from the respective annuity carrier's web site.

## 3.  Replacement of Variable Annuities/1035 Exchanges

Replacing an old policy with a new one can be a legitimate part of selling annuity products. The key question, however, is whether the replacement is appropriate for the client. Before recommending a replacement, the customer's overall financial picture should be reviewed carefully to determine if it is in the best interests of the customer (*e.g.,* what benefit will accrue to the customer as a result of the exchange). Specific factors to review with your client in determining whether or not the replacement is appropriate must include:

- Changes in investment objectives/risk tolerance (*e.g.,* replacing an existing fixed annuity with a variable annuity or replacing a mutual fund or other security with an annuity product.)
- Surrender charges, if any, on the existing annuity.
- Client's need for liquidity. Disclose the duration of the surrender charge period; availability or access to funds without penalty; and charges associated with partial withdrawals and surrenders.
- Tax treatment of the surrender or exchange.
- The value of death benefit lost due to transfer / 1035 exchange (if applicable)

Special attention should be given to the exchange from a variable annuity to a fixed annuity. During times of declining markets, customers may experience a market loss in their variable annuity and may desire to exchange their existing variable annuity to a more stable, fixed annuity. When considering this exchange, RRs must take into consideration and notify the client of the potential loss in guaranteed death benefit if the client exchanges their variable annuity at a time when the current market value is less than the guaranteed death benefit amount. RRs should notify the client that fixed buckets, or other conservative sub-accounts, might be available within the existing variable annuity as an alternative to exchanging to a fixed annuity. Fixed bucket(s) will allow the client to receive a stated rate of return while preserving the guaranteed death benefit. Other conservative sub-accounts within the existing variable annuity might consist of bond funds with various quality levels and maturities. Although these sub-accounts do not typically provide a guaranteed return, they can be used to reduce volatility.

If, after a thorough review of the client's financial situation, an RR determines that the replacement is appropriate, the client must complete a Customer Acknowledgment Switch Letter prior to submitting the 1035 exchange/transfer paperwork to Operations for processing. *See* Exhibit <u>11</u>.

## INSURANCE & ANNUITY PRODUCTS

### B. Fixed Annuities

Fixed Annuities are designed as a long term retirement vehicle for individuals seeking tax deferred accumulation of earnings. Upon withdrawal (systematic or lump sum), earnings are paid out first and are taxed as ordinary income. Fixed annuities also provide the ability to choose a series of income payments that can be customized to meet client needs and that cannot be outlived. Payments made in this manner are paid on a tax-advantaged basis with a portion of each payment considered a return of principal and, therefore, non-taxable. The balance is considered earnings and subject to ordinary income taxes.

### 1. Suitability

The following items should be considered when making the recommendation for your client to purchase a fixed annuity:

#### a) Investment Objective

The client's investment objective(s) should include tax-deferred accumulation of earnings for and during retirement.

#### b) Time Horizon

The client should generally have a long-term investment horizon of at least 5 years for the benefits from tax deferral to outweigh the costs of early surrender for most annuities. The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first five to eight years, depending on the contract.

#### c) Liquidity Needs

Some contracts provide for an annual free withdrawal of 10% or accumulated interest of the premiums (or account value). Withdrawals in excess of the free amount will be subject to the stated surrender charge. In addition to surrender charges, the client may incur a 10% tax penalty on withdrawals of earnings prior to age 59½.

#### d) Tax Considerations

All withdrawals during the accumulation phase (prior to annuitization) are treated as a withdrawal of earnings first and are reportable as ordinary income. Your client's tax bracket should also be considered when making a recommendation to purchase a fixed annuity. High tax bracket clients should consider longer time horizons since all annuity earnings are taxed as ordinary income rather than capital gains.

#### e) The Aggregation Rule

All annuity contracts entered into after October 21, 1988, which are issued by the SAME insurance company to the SAME policyholder during one calendar year, will be treated as ONE annuity contract for the purpose of determining the taxable portion of any distributions. The aggregation rule does not apply to distributions received under qualified plans or immediate annuities. If a policyholder withdraws more than the accumulated interest from one of the (multiple) contracts the insurance company must report the distribution as the interest from all of the contracts first and the balance of the withdrawal as a return of principal.

#### f) Other Retirement Plans

Clients generally should consider the availability of other available tax-qualified accounts (401(k), 403(b), tax deductible IRA or any other employer-sponsored plan) before purchasing an annuity. Annuities, however, do offer benefits generally not available in other tax qualified accounts.

#### g) Qualified Accounts

Fixed annuities can be purchased within qualified accounts and many of them are transferred from another IRA. Your customer needs to know that a fixed annuity in an IRA or qualified plan does not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified plan the customer is transferring the money from, regardless of whether it is a qualified CD, mutual fund, or another fixed annuity. On the other hand, there are valid reasons (which need to be

## INSURANCE & ANNUITY PRODUCTS

documented) for transferring the money (*e.g.,* guaranteed returns, safety of principal, or the guaranteed lifetime income option that the customer cannot outlive).

### 2.  Insurance Licenses and Appointments

All salespeople must be licensed with the Department of Insurance in states where they intend to do business before engaging in any insurance sales-related activities.  Generally, insurance regulations require the agent to be appropriately licensed in the state where the product sale occurs (*i.e.,* where the customer signs the application).

### 3.  Replacement of Fixed Annuities/1035 Exchanges

Replacing an old policy with a new one can be a legitimate part of selling fixed annuity products.  The key question, however, is whether the replacement is appropriate for the client.  Before recommending a replacement, the customer's overall financial picture should be reviewed carefully (by means of the Customer Profile form) to determine if it is in the customer's best interests. Specific factors to review with your client in determining whether or not the replacement is appropriate may include:

- Changes in investment objectives/risk tolerance (*e.g.,* replacing an existing variable annuity with a fixed annuity or replacing a mutual fund with an annuity product.)
- Surrender charges, if any, on the existing annuity.
- Client's need for liquidity.  Disclose the duration of the surrender charge period; availability or access to funds without penalty; and charges associated with partial withdrawals and surrenders.
- Tax treatment of the surrender or exchange.

If, after thorough review of the client's financial situation, the salesperson determines that the replacement is appropriate, properly complete the insurance carrier transfer paperwork, the Customer Acknowledgment Switch Letter, and document the rationale of the switch recommendation on the customer profile. Consideration also should be given when a RR recommends a 1035 exchange/IRA transfer between fixed annuities.  Customers typically will consider this transaction when their existing fixed annuity is out of surrender and another fixed annuity carrier offers a higher rate on new policies. Prior to submitting paperwork for this exchange, RRs should thoroughly discuss the new contingent deferred sales charge (CDSC) schedule with the customer to determine if the new rate justifies the lack of liquidity on the new fixed annuity.  For example, if the new rate available on the new contract is only slightly better than the existing rate the customer is receiving, a new five or six year CDSC schedule may not be worth the increase in return.

RRs are reminded that Licensed Bank Employee's (LBE) may not discuss, or make recommendations regarding the replacement of a customer's securities holdings. As such, RRs may not encourage LBEs to engage in this type of discussion with customers.

### C.  <u>Variable Universal Life</u>

Variable life insurance policies are designed primarily as insurance products. Variable life insurance products are subject to both insurance and securities laws (unless otherwise indicated, references to variable life insurance include both scheduled premium variable life insurance and flexible premium variable universal life insurance). These products allow the cash value of the policy to be invested in stock, bond, or money market portfolios (sub-accounts).  Investors can elect to move from one portfolio to another or can rely on the company's professional money managers to make such decisions for them.  As in whole life insurance, the annual premium is fixed, but part of it is earmarked for the investment portfolio.  The policy owner bears the risk of securities investments, while the insurance company usually guarantees a minimum death benefit unaffected by any portfolio losses as long as the established premium is paid on schedule.  When portfolio investments rise substantially, a

## INSURANCE & ANNUITY PRODUCTS

portion of the increased cash value is put into additional insurance coverage. The death benefit and cash value of this type of policy may vary to reflect the performance of the product's variable sub-accounts or the fixed account, depending on how premium payments and cash values are invested and the choice of asset allocations. A drop in the investment results of the separate account will cause a decrease in the death benefit from the value in the previous year, but not below the guaranteed minimum.

As with usual whole life policies, borrowings can be made against the accumulated cash value, or the policy can be cashed in. Also, as with an IRA, earnings from variable life policies are tax deferred until distributed. Income is taxed only to the extent that it exceeds the total premiums paid into the policy. Death benefits are not subject to income taxes, but they may be subject to estate taxes.

Variable life insurance is different from universal life insurance. Universal Life Insurance allows policyholders to increase or decrease premiums and change the death benefit. It also accrues interest at market-related rates on premiums over and above insurance charges and expenses.

Variable universal life combines many of the features of variable life and universal life. Variable universal life incorporates the flexibility of universal life, the investment features of variable life, and the tax advantages of all life insurance products. It also is regulated as a security.

### 1.  Suitability

In making a recommendation about the purchase of a variable life product, the RR is required to make reasonable efforts to obtain information concerning the customer's financial and tax status, the customer's financial objectives, and such other information used or considered to be reasonable in making recommendations to the customer. Certain situations or statements made by a customer may make the purchase of a variable life policy unsuitable. These include, but are not limited to:  (i) a representation by a customer that his or her life insurance needs were already adequately met; (ii) the customer's express preference for an investment other than an insurance product; (iii) the customer's inability to fully appreciate how much of the purchase payment or premium is allocated to cover insurance or other costs, and a customer's ability to understand the complexity of variable products generally; (iv) the customer's inability or willingness to invest a set amount on a yearly basis; (v) the customer's need for liquidity and short-term investment; (vi) the customer's immediate need for retirement income; and (vii) the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

The following items should be considered when making a recommendation to a client to purchase a variable life insurance product:

#### a)  Investment Objective
The client's investment objectives should include passing money on to beneficiaries, as well as tax-deferred savings.

#### b)  Time Horizon
The client generally should have a long-term investment horizon. The surrender charge periods in most contracts encourage long-term investing with charges applicable upon surrender for the first seven to ten years, depending on the contract.

#### c)  Liquidity Needs
The policy owner has access to the cash values either through a policy loan or a cash withdrawal. A policy loan will result not only in interest being charged, but the amount of cash value representing collateral for the loan is transferred out of the separate account and into the company's general account where it will earn a lower rate of interest. The total cost of the loan then would be the interest rate plus the separate account earnings lost minus the interest credited from the general account. Money can also be withdrawn from the policy without incurring interest consequences of a policy loan. The death benefit is usually reduced by the amount of the withdrawal. There may also be a processing fee. Most contracts provide for an annual free withdrawal of 10% or the increase in the contract value.

## INSURANCE & ANNUITY PRODUCTS

Withdrawals in excess of the free amount will be subject to the stated surrender charge. In addition to surrender charges, the client may incur a 10% federal income tax penalty on withdrawals prior to age 59½.

### d)  Diversification

As with all investments, diversification is important because it helps reduce (but does not eliminate) the risk of loss of principal. Clients should limit their investment in variable life insurance to a manageable percentage of their net worth and diversify their investments within the variable contract to meet their investment objectives and risk tolerance level.

### e)  Market Fluctuation

Variable universal life policies may be subject to fluctuation due to changing market conditions. Investors with a low tolerance for equity volatility risk may be more comfortable in a traditional life product.

### f)  Elderly Customers

Special care must be taken in making recommendations to our elderly customers (75 and older). The following issues must be carefully considered and documented on the customer profile:

- Representatives must ask the customer with whom they consult for their financial affairs and note the customer's response in the notes section of the profile. Where there is a family member or advisor, the representative must give the customer the opportunity to discuss the investment with their advisor or discuss the investment with the representative either in person or on the phone.
- Notes detailing discussions with family members about the investment objectives and suitability of the recommended product.
- Cash reserves and liquidity.
- The percentage of the customer's total liquid assets that is at market risk. The elderly client may not have the time horizon needed to ride out market fluctuations.
- The time horizon of the client relative to the surrender charge or CDSC period.
- Investment experience.
- Detailed notes that describe discussions with the customer regarding volatility, loss of principal, fees and costs, etc.
- All other relevant facts which explain why the investment is suitable and necessary for the customer.

### g)  Summary

Variable life policies are not for everyone. There are many factors that need to be considered when determining whether a variable life product is appropriate for a client. In addition to the factors specifically cited in this section, all of the standard suitability factors should be considered. This includes the financial information detailed in the account application (*e.g.,* annual income, liquid assets, estimated total investments/net worth, risk tolerance, and experience). Also, RRs must ensure customers understand and execute a Variable Insurance Product Acknowledgment form. A hyperlink to this form is attached as Exhibit 2.

INVESTMENT ADVISORY SERVICES
_____

XII.    **INVESTMENT ADVISORY SERVICES**

A.    <u>Registration</u>

LFS is a Registered Investment Adviser (RIA), registered with the U.S. Securities and Exchange Commission under the Investment Advisers Act ("Advisers Act") of 1940. Its principal office and place of business is in Chicago, Illinois. As such, LFS complies with the regulations promulgated under the Advisers Act

As an RIA, LFS has a fiduciary duty of loyalty and good faith to its advisory clients. In carrying out this fiduciary duty, LFS shall protect the interests of its advisory clients and shall place their interests first and foremost. LFS shall provide full and fair disclosure of all relevant facts and any potential conflicts of interest to its advisory clients, shall provide recommendations that are suitable, and shall seek best execution of all client transactions.

Registration requirements for Investment Advisory Representatives (IARs) are governed by the respective states. IARs of LFS who solicit business or provide investment advice within a given state must meet that state's requirements and must ensure that the Firm also is authorized to do business in that state. IARs must generally pass a qualifying examination, either the Series 65 or Series 66 examination. The Series 66 examination is available only to a person who holds the Series 7 license. Series 6 licensed individuals must pass the Series 65 examination. .

B.    <u>Wrap Accounts</u>

LFS offers two distinctive wrap account programs. In all cases, the IAR and the Firm must ensure that the program is consistent with the client's stated risk tolerance, investment objectives, and financial goals. In addition, the IAR and the Firm must ensure that any wrap program account is managed based on the individualized investment needs of the client.

LFS sponsors a wrap fee program known as Portfolio Manager I (Program Option I on the advisory contract), managed by Fundquest, Inc., an independent registered investment advisor. Fundquest will create a portfolio consisting exclusively of various mutual funds.

LFS also acts as sponsor and manager of its own wrap fee program, known as Portfolio Manager II (or Program Option 2). Accounts within Portfolio Manager II are managed by LFS on a discretionary basis, based on the goals and objectives of the client. Fundquest will provide administrative support for Portfolio Manager II accounts.

C.    <u>Disclosure Document</u>

The Advisers Act requires that LFS provide all clients and prospective clients with a written disclosure document. This document consists of Part II of the Firm's Form ADV. Wrap fee clients must in certain instances receive a separate wrap fee disclosure document (brochure). The disclosure document informs clients of the firm's services, fees, business practices, possible conflicts of interest and material affiliations.

The disclosure document shall be delivered to the client or prospective client either:

- not less than 48 hours prior to entering into any written or oral investment advisory contract, or
- at the time of entering into any such contract if the advisory client has a right to terminate the contract without penalty within five business days after entering into the contract.

A copy of the disclosure document must be maintained in the client's file.

LFS must also deliver or offer in writing to deliver the current disclosure document to each of its advisory clients, without charge, on an annual basis.

## INVESTMENT ADVISORY SERVICES

It is LFS' policy that the separate disclosure document (brochure) shall be given to an investment advisory client, in addition to Part II of Form ADV, in situations involving investment advisory contracts where Program Option 2 is selected. If Program Option 1 is selected, Fundquest acts as investment manager and the IAR must then also give to the client Fundquest's Form ADV Part II.

### D. Advisory Contract

LFS' policy with respect to wrap account customers is that written investment advisory contracts with clients are required. Among other things, the Agreement contains an acknowledgment that the client has received the requisite disclosure document(s). The Agreement also incorporates the applicable fee schedule.

IARs also must complete the normal brokerage customer new account documentation and establish the customer's account with NFS. The customer's investment objectives and other suitability matters are addressed on the Customer Profile and on a wrap account questionnaire rather than on the Advisory Contract.

The Advisory Contract may be terminated by any party upon 30 days written notice. Any unearned prepaid fees will be returned to the client.

### E. Other Advisory Services

LFS also provides other investment advisory services to clients not involving a wrap fee program. Such services are provided on an advisory fee basis. For example, LFS offers financial planning services and will provide clients with a written financial plan. IARs are reminded that they are required to comply with the disclosure document rule in such cases as discussed above.

For a more detailed discussion of LFS' investment advisory program, refer to the separate Investment Advisory Compliance Manual. For a hyperlink to this manual, refer to Exhibit 19.

**EXHIBITS**

XIII.    EXHIBITS

1. *Mutual Fund/Unit Investment Trust Acknowledgment form*

2. *Variable Insurance Product Acknowledgment form*

3. *Fixed Annuity/Insurance Policy Acknowledgment form*

4. *Unsolicited Customer Acknowledgment form*

5. *Noncooperative Countries Regarding Anti-Money Laundering*

6. *Photo Identification Matrix*

7. *Anti-Money Laundering Handbook*

8. *Option Account Agreement*

9. *Margin Application and Disclosure Agreement*

10. *Statistical Market Information Disclosure*

11. *Customer Acknowledgment Switch Letter*

12. *NASD's Expense Analyzer*

13. *B Share Customer Acknowledgment form*

14. *Approved Product List*

15. *Outside Business Activity Notification form*

16. *Gift form*

17. *407 Letter*

18. *Code of Ethics*

19. *Investment Advisory Compliance Manual*

# EXHIBIT C

# Introduction

Dear Colleagues,

ABN AMRO's Corporate Values, Business Principles and Standards of Conduct govern our business from how we treat our colleagues and clients to our interactions with the communities we serve. They are at the core of who we are, and our success is contingent upon our commitment to these tenets in every aspect of our work.

The Corporate Values – Integrity, Teamwork, Respect, and Professionalism – only begin to define what we believe as an institution. Our Business Principles take the Values a step further, describing how they guide our attitudes and behaviors with stakeholders. Together, our Values and Business Principles help to ensure that we conduct business in the most ethical and responsible manner.

Our Standards of Conduct further elaborates on our Corporate Values and Business Principles, making them more specific for employees in our region. It establishes the fundamental rules that guide our actions, informs each of us about our responsibilities as members of ABN AMRO and addresses important laws, rules and regulations that apply in our region and to our businesses.

Every employee in the US is required to abide by the Standards of Conduct. Moreover, we hope that you follow these standards to not only the letter, but also the spirit in which they were written. These standards represent the values that we seek to put into action every day, acting with integrity in all we do.

The Standards of Conduct may be amended from time to time. It is the responsibility of all US employees to be familiar with the current version of the Standards of Conduct as posted on the organization's intranet.

Thank you for your support and cooperation in ensuring that we live our Corporate Values to their fullest.

Sincerely,


Robert J. Moore
Head of BU North America
President and CEO LaSalle Bank Corporation

Annemieke van der Werff
Executive Vice President
Head of Human Resources North America


Herbert A. Biern
Executive Vice President
Head of Compliance North America

Guy Rounsaville, Jr.
Executive Vice President
General Counsel North America




# Standards of Conduct

## I. OUR CORPORATE VALUES

As an employee of the ABN AMRO Group doing business in the US (ABN AMRO Bank N.V. and its majority-owned subsidiaries operating in the United States, collectively, the "Company"), you must exercise good faith in your dealings with both the Company and its customers consistent with the high degree of trust and confidence that is placed in you by the Company.  This can be accomplished only through your individual commitment to our Corporate Values:

**Integrity**: Above all, we are committed to integrity in all that we do, always, everywhere.

**Teamwork**: It is the essence of our ability to succeed as a trusted preferred supplier of financial solutions to our clients. Our overriding loyalty is to the good of the whole organization. We learn from each other and share our skills and resources across organizational boundaries for our clients' benefit and our own.

**Respect**: We respect every individual. We draw strength from equal opportunity and diversity, at the same time supporting personal growth and development. We value and we all benefit from the entrepreneurial spirit of each individual.

**Professionalism**: We are committed to the highest standards of professionalism, we pursue innovation, we deploy imagination, we are open to new ideas and we act decisively and consistently. We are determined to deliver outstanding quality so that our relationships with our clients will be long-lasting and close.

No attempt to delineate guidelines for proper conduct can cover every potential situation that may arise during your service with the Company. Whenever there is any doubt about the propriety of any action, you should discuss the matter with your manager. You may be requested from time to time to certify your understanding of and compliance with the Standards of Conduct. Any violation of the Standards of Conduct constitutes grounds for disciplinary action, up to and including termination of your employment with the Company. The Standards of Conduct must be applied fully and fairly without reliance upon technical distinctions to justify questionable conduct.

As a general matter, in the event that any section or requirement of the Standards of Conduct is inconsistent with the global bank's set of policies, which are set forth in AIM, you should consult with Legal and Compliance for guidance.

The Standards of Conduct may be amended from time to time. It is the responsibility of all employees to be familiar with the most current version of the Standards of Conduct. The Standards of Conduct, which is part of the Employee Handbook and subsequent amendments, is posted on the intranet site.  Employees are obligated to comply with the Standards of Conduct as a condition of continued employment with the Company.

Any questions concerning the interpretation of any provision of the Standards of Conduct should be referred to Human Resources.

 

## II. OUR BUSINESS PRINCIPLES

While our Corporate Values define what's important to us, our Business Principles define what our Values mean for our stakeholders. Together, they define the attitudes and actions we should demonstrate in our work.

The Business Principles cannot and should not try to provide pre-packaged solutions to every type of dilemma the business faces, but provide direction in solving them. They also guide us in our dialogues with external and internal stakeholders. They are:

> **For our employees**
> We are the heart of our organization.
> We pursue excellence.

> **For our shareholders**
> We aim to maximize long-term shareholder value.
> We manage risk prudently and professionally.

> **For our clients**
> We strive to provide excellent service.
> We build our business on confidentiality.

> **With our Business Partners**
> We assess business partners on their standards.

> **In society**
> We are a responsible institution and a good corporate citizen.
> We respect human rights and the environment.

> **Compliance**
> We are accountable for our actions and open about them.

## III. CONFLICTS OF INTEREST

All employees, including officers and directors, have an obligation to conduct themselves in an honest and ethical manner and act in the best interest of the Company. All employees should endeavor to avoid situations that present a potential or actual conflict between their personal interest and the interest of the Company.  Employees may not engage in personal activities that are in conflict with the interests of the Company's customers.

A conflict of interest occurs when a person's private interest interferes in any way, or even appears to interfere, with the interest of the Company, its clients or its employees. A conflict of interest can arise when an employee takes an action or has an interest that may make it difficult to perform his or her job objectively and effectively. Conflicts of interest may also arise when an employee (or the employee's family members, other persons residing in the same household, or any investment or securities account in which the employee has a financial interest or over which the employee exercises discretion or control) receives an improper benefit as a result of the employee's position with the Company.

The Company considers itself to be every employee's primary employer, regardless of the number of hours an individual works each week.  Employees should at all times be aware that the name, reputation and credibility of the Company are valuable assets and must be safeguarded.  Care should be exercised to avoid the unauthorized use of the Company's name in any manner that can be misinterpreted to indicate a relationship between the Company and any other entity or activity.  If there is any doubt as to the propriety of the use of the Company's name, please contact the Legal Department for advice.

 

The following list should serve as a guideline of what constitutes a conflict of interest:

- Working for a competitor, customer or supplier while employed by the Company
- Competing with the Company for the purchase or sale of property, products, services, or other interests
- Having an interest in a transaction involving the Company, a competitor, customer, or supplier (other than as an employee, officer or director of the Company and not including routine investments in publicly traded companies)
- Receiving a loan or guarantee of an obligation as a result of your position with the Company
- Directing business to a supplier or service provider owned or managed by, or which employs, a relative or friend or for which you gain personally
- Attempting to influence an analyst issuing a report to benefit a client of the Company or the employee personally
- Making or maintaining an investment in the securities of a corporation that you know is being financed by the Company, unless the securities of the Company have a broad public market and are listed on NASDAQ or a national securities exchange
- Permitting a customer to arrange an investment for your account or to participate in investments arranged, sponsored or participated in by a customer under circumstances that might create, or give the appearance of, a conflict of interest
- Making or maintaining an investment in any business with which the Company has a business relationship, if the investment is of such a character (whether because of the size or value of the investment or for any other reason) that it might create or give the appearance of a conflict of interest
- Purchasing any new securities of any customer of the Company or to purchase any new securities of any company through an investment banking or securities firm having a business relationship with the Company unless the demand for such new securities is such that purchases are not restricted or allocated among prospective purchasers
- Entering into a securities transaction when you are aware that such action will anticipate or parallel any investment action of the Company, whether the Company is acting for itself or in a fiduciary capacity
- Borrowing money from a customer of the Company unless such borrowing is from a bank or other financial institution made in the ordinary course of business on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with members of the general public and does not involve more than the normal risk of repayment or include other features unduly unfavorable to the employee
- "Front-running" proprietary or client transactions
- Soliciting transactions from a client based on rumors
- Suggesting investment recommendations without a reasonable basis
- Guaranteeing of profit or against loss to any client
- Personally representing a customer of the Company in a fiduciary capacity, such as executor, administrator, trustee, guardian, attorney-in-fact, or otherwise, if your relationship with the customer was initiated as a result of your providing products and/or services as a Company employee to the customer

Situations involving a conflict of interest may not always be obvious or easy to resolve. Employees should discuss any potential conflict with a manager, Human Resources or your Business Unit Compliance Officer. In the event that an actual or apparent conflict of interest arises between the personal and professional relationship and activities of an employee, the employee is required to handle such conflict of interest in an ethical manner in accordance with the provisions of these Standards of Conduct and pursuant to the guidance and instruction of the Legal and Compliance Departments.

## IV. CONFIDENTIAL INFORMATION AND CHINESE WALLS

In the normal course of business, employees may be given or may acquire information about the business of the Company, its subsidiaries, affiliates, customers, or employees that is not available to the general public. This information is confidential and may include, but is not limited to: financial data, business plans, strategies concerning specific lending or trading decisions, computer software programs

 

or code, employee, and client information including social security numbers, restricted list information, investment decisions, or research opinions.  All employees are responsible for respecting and maintaining the confidential nature of such information.  Clients conduct business with the Company with the expectation that the Company will maintain in absolute confidence all information provided to it regarding them and their business.  The Company and its employees must meet their responsibility for confidentiality throughout the relationship with the client and even after a transaction or relationship has ended.

The duty to protect the confidence of the Company, its subsidiaries, affiliates, customers, and employees includes avoiding intentional disclosures, as well as taking care to avoid accidental disclosures. All employees are to exercise extreme care in how and where they discuss, document and store the confidential information that relates to the business activities of the Company, its customers and its employees.

Whether orally or in writing, confidential customer, Company or employee information only may be disclosed within the Company to those who need to know the information to perform their job functions. Confidential business, customer and employee information is not to be disclosed outside of the Company except for legitimate business reasons or as required by law. Heightened awareness of identity theft/fraud should be a concern to all employees.

Chinese Walls are established management and control structures, policies and procedures designed to separate the different business activities and control the flow of information between these activities. These procedures generally enable the sales and trading areas of the Company to continue to engage in transactions or recommend securities even when the advisory side of the Company possesses material non-public information about those securities or their issuer. These procedures also serve to avoid the risk that a client's interest may be prejudiced as a result of conflicts of interest between the Company and its customers and between customers themselves.

The Company has established policies and procedures to prevent the misuse of material non-public information, including the creation and maintenance of Chinese Walls, to satisfy the requirements of federal and state law, as well as the rules of Self-Regulatory Organizations such as the NYSE and NASD and to uphold the principles of good business practice.  The existence and operation of the Chinese Walls permit the Company to conduct concurrently disparate business activities that otherwise would not be permitted.

## V. PERSONAL BUSINESS TRANSACTIONS

When personally transacting business with the Company, you must not use your position with the Company to gain access to information about the transaction or in any way attempt to influence the customary processing of the transaction.  In addition, you must not personally process any business transaction or direct or request another employee to process a business transaction between yourself, your spouse, a family member or a friend, and the Company.  This includes transactions involving checking or savings accounts, investment accounts, loans of any nature, including mortgage loans, or processing any document authorizing payment from the Company to yourself, your spouse, or a family member or friend.  Processing or attempting to influence any such transaction is a violation of Company policy and will lead to corrective action, up to and including termination of your employment with the Company.

If you are approached by an employee and asked to participate in any way in a business transaction between the Company and that employee, the employee's spouse, family member or friend, and your involvement in the transaction would be outside the customary processing of the transaction, you must decline to become involved in any way in the transaction.  Further, you must report the fact that you were approached by a coworker to management, your Business Unit Compliance Officer or Human Resources.

 

## VI. PERSONAL FINANCIAL MATTERS

You should exercise sound judgment in making personal investments in order to avoid situations contrary to the best interests of the Company.  You may not trade your personal investment accounts in such a way that the trading interferes with the fulfillment of your business duties and responsibilities.

You should avoid investment activity that gives even rise to the appearance of impropriety.  You should not conduct a personal investment transaction if it can be reasonably foreseen that doing so could give rise to the appearance that you had access, or could have had access, to material, non-public information or other confidential information.

Some employees may be required to maintain their investment accounts with certain designated outside brokers.  In addition, an employee may be required by the brokerage firm to obtain a letter (the 407 letter) from the Company authorizing the opening and maintenance of such an account. Contact your Business Unit Compliance Officer if such a letter is required.

## VII. FIDUCIARY DUTIES

Employees may not accept an appointment to act as an administrator, executor, guardian, trustee or to act in any other fiduciary capacity, except when acting in such capacity for a person related to you by blood or marriage, without the approval of the appropriate manager (or his or her designee) and the General Counsel for North America or his or her designee.  Where such duties are accepted for a relative or approval is obtained, the Company and the law demand the highest standards of good faith in discharging such activities.

## VIII. OUTSIDE ACTIVITIES

The Company encourages employees to become involved in civic and professional activities outside of the Company. These external experiences can be very rewarding and beneficial to the employee in terms of developing and complementing professional skills. An employee must be careful to avoid engaging in activities outside the Company that make it difficult for them to perform their work objectively and effectively.  Employees engaged in outside activities have an obligation to conduct themselves in an honest and ethical manner and to act in the best interest of the Company.

A conflict of interest occurs when an employee's private interest interferes in any way, or even appears to interfere, with the interest of the Company, including its subsidiaries and affiliates.  All employees should endeavor to avoid situations that present a potential or actual conflict.

To protect the Company and its employees from situations that may give rise to a conflict of interest for either party, employees are required to comply with the following approval process. In the event that a potential or actual conflict of interest arises between the personal and professional activities of an employee, the employee involved is required to handle such conflict of interest in an ethical manner in accordance with the provisions of this policy.  Compliance with this policy is required and mandatory for all employees.

### A. Outside activities requiring approval

The following are outside activities that require approval:

- Acting as a board member of a not-for-profit organization
- Acting as a board member of a for-profit corporation
- Running for elected political office or accepting a political appointment

If an employee wishes to become involved in any of these outside activities, he or she must complete the Outside Activities Approval Form, which can be found on the Company's intranet.

The employee's manager must determine whether the outside activity is permissible. Managers may consider factors including, but not limited to, the nature of the outside activity time commitment required, compensation arrangements and whether the activity conflicts with the business of the Company.  If the manager approves the request, he or she must sign the form




and submit it to the Group Compliance/BU NA Policy Center for review and final determination. In accordance with ABN AMRO's global policy, the position of Chairman of any external for-profit board will generally not be favored.

Similarly, employees who no longer wish to continue their involvement in an outside activity should complete the Termination or Resignation from Outside Activity Form. This process provides notification to the Group Compliance/BU NA Policy Center that an employee is no longer serving in the previously approved capacity.

### 1. Board membership (for profit/not for profit)

An employee may not become a member of the board of directors (or similar governing body acting in a fiduciary or decision making capacity) with any not-for-profit organization or for-profit corporation without first obtaining the approval of the employee's manager/supervisor using the appropriate Outside Activities Approval Form.  After the employee obtains a manager's and/or supervisor's approval, the signed form must be submitted to the Group Compliance/BU NA Policy Center for final review and approval. In accordance with ABN AMRO's global policy, the position of Chairman of any external (for-profit) board will generally not be favored.

#### a. Serving on a Board of Directors:  Duty of Care, Obedience and Loyalty

All employees who donate their time to serve on a board of directors of a nonprofit organization should understand the duties that are attached to such service.  Generally, board members have three basic duties: Care, Obedience and Loyalty.

> **Duty of Care:** Requires a board member to discharge his or her duties in good faith, with the care that an ordinary prudent person in a like position would reasonably believe appropriate under similar circumstances.

> **Duty of Obedience:** Requires the board member to act in furtherance of the organization's goals and prohibits board members from engaging in transactions or activities that are outside of the scope of the organization's by-laws or charter.

> **Duty of Loyalty:** Prohibits self-dealing (i.e., using board position for personal advantage).  A board member may not usurp an opportunity of interest to the organization without first giving the organization an opportunity to decline it.  Board members are also prohibited from disclosing non-public information about the organization's activities.

> An employee's failure to discharge these duties while serving as a board member can subject the employee to personal liability including lawsuits, government investigations and even criminal indictments. Questions concerning the legal duties associated with serving as a board of director should be referred to that organization's legal counsel.

### B. Political office and political appointments

An employee may not run for full-time elected office or accept a political appointment without first obtaining the approval of his or her manager using the appropriate Outside Activities Approval Form. After obtaining the manager's approval, the signed form must be submitted to the Group Compliance/BU NA Policy Center.  The final approval will be given by the Group Compliance/BU NA Policy Center after review and consultation with the Government Relations Group.

Employees are encouraged to become involved in local government and to run for local part-time elected office, such as school boards or town councils. However, a number of public entities are customers of the Company and conflict of interest situations may arise even when it is not




expected so each proposed outside activity should be reviewed.  Additionally, campaigning for an elected position or the duties associated with such position may interfere with an employee's responsibilities and duties at the Company.  Employees should consult with their manager/supervisor and the Group Compliance/BU NA Policy Center prior to election or acceptance of such positions.

**C. Exempt activities: Outside activities requiring no pre-approval**
Certain outside activities do not require the advance approval of the employee's manager or the Group Compliance/BU NA Policy Center. Examples of such exceptions include:

- General (non-board) membership in a non-profit organization
- Volunteer activities
- Participation in civic organizations
- Participation in homeowner's associations or condominium boards
- Membership or other affiliation with religious organizations
- Participation in your local parent teacher association or alumni associations
- Membership in any professional networking association (e.g., Rotary, CPA Society, Society for Human Resources Management, American Bar Association, etc.) if you are joining as a member and not serving on the governing board

*Note:* Employees may submit a Not-for-Profit or For Profit Outside Activity Approval Form to the Group Compliance/BU NA Policy Center for review.  The Group Compliance/BU NA Policy Center may determine that the described outside activity is an Exempt Activity not requiring approval.  In such cases, the employee will be notified via e-mail that prior approval is not required.

## IX. POLITICAL CONTRIBUTIONS AND ACTIVITIES
Government authorities and their officials shape the legal and regulatory environment in which the Company operates. If you interact with government officials or candidates for public office, or if you provide gifts or contributions to such individuals, you must understand the laws that control the Company's participation in the political process.

The Company is interested in good government and encourages you to support the candidate or party of your choice both through service and financial support. However, any affiliation with a candidate or party that suggests the Company supports that candidate or party is strictly prohibited. You may not use the Company or its property for political purposes.  Employees may not use the name of the Company to further any political cause or candidate.

The Federal Election Campaign Act prohibits a national bank (such as LaSalle Bank National Association and LaSalle Bank Midwest National Association) and its subsidiaries from making political contributions in connection with federal, state and local elections. In order to comply with the law, all political contributions must be made by a LaSalle Bank Corporation sponsored Political Action Committee (PAC). Political contributions include contributions made to individual candidates, candidate committees and political party organizations.

Accounts Payable will not reimburse any employee for political contributions made outside of the PACs and thus, will not process (i) check requests for political contributions, (ii) requests for reimbursement of personal political contributions or (iii) requests for reimbursement for political contributions charged to a corporate credit card.

If the Company provides services or products to any governmental entity, the Company is subject to various regulations governing gift-giving and entertaining (including meals and transportation).  To ensure compliance with these regulations, an employee must submit to the Government Relations Group a Pre-Clearance Form prior to sending a gift, extending an invitation or purchasing a meal for a government employee or elected official.  The Government Relations Group reviews the form, determines if the item or activity is within the allowable limits and returns the form to the employee in a timely manner with a

 

determination. A verification form is sent to the employee shortly after the occurrence to verify the actual cost of the item or activity.

Please direct all inquiries regarding political contributions and activities to the Government Relations Group.

## X. GIFTS AND ENTERTAINMENT
Below are the circumstances for which offering and accepting gifts and entertainment are allowed and not allowed.

### Receiving Gifts and Entertainment

**Allowed**

- You may accept a non-cash gift of nominal value not to exceed $100 from any one employee, customer, or vendor of the Company in a calendar year.
- You may accept a customary and reasonable meal or attend an entertainment event at which the customer or vendor of the Company or a representative of the gift giver is present, such as the occasional business meal or sporting or cultural event. If the customer or vendor of the Company is not present at the entertainment event paid for by the customer or vendor, then the entertainment is regarded as a gift and is subject to the $100 limit.
- You may accept reasonable entertainment, such as a meal, and reimbursement for travel and lodging from an event sponsor if you participate in an educational or industry-wide seminar or conference.
- You may accept promotional items of nominal value such as pens, calendars and mugs.
- You and members of your family may accept a gift of modest value, for commonly recognized special events such as weddings, holidays, births, or bar/bat mitzvahs, from an employee, customer or vendor of the Company when the gift is given based on a personal or family relationship with the gift giver. In the event that the gift exceeds $500 in value, you should report the gift to your manager and to your Business Unit Compliance Officer.

**Not Allowed**

- You may not accept a gift of cash or its equivalents, such as a gift certificate or gift card, in any amount from an employee, customer, or vendor of the Company.
- You may not accept anything that could even appear to be a bribe or part of an agreement or understanding to do anything in return for the gift or entertainment.
- You may not accept a gift or entertainment under circumstances in which it could even appear that your business judgment has been compromised; similarly, you may not accept or allow a close family member to accept a gift, service, loan or preferential treatment from an employee, customer or vendor of the Company in exchange for a past, current or future business relationship with the Company if it would even appear that your business judgment has been or will be compromised.
- You may not participate in any entertainment that is unsavory, sexually-oriented or otherwise violates or appears to violate the Company's commitment to mutual respect and Corporate Values.

### Offering Gifts and Entertainment

**Allowed**

- You may offer a gift of a Company promotional product to an employee, customer or vendor of the Company.
- You may offer entertainment, such as a meal or sporting or cultural event, to a Company customer or vendor or potential customer or vendor that is for a specific business purpose and in

 

good taste provided you or a member of your staff acting under your direction participates in the entertainment.

**Not Allowed**

- You may not offer a gift of cash or its equivalents, such as a gift certificate or gift card, in any amount to an employee, customer or vendor of the Company.
- You may not offer a non-cash gift that exceeds $100 in value to any one employee, customer or vendor of the Company in any calendar year.
- You may not offer a gift or entertainment that could even appear to be a bribe or part of an agreement or understanding to do anything in return for the gift or entertainment.
- You may not offer a gift or provide entertainment to a government employee unless the gift or the value of the entertainment is within the limits allowed by the written rules of the employee's government agency.  This topic is discussed further below in Section XI.

**General Matters**

- It is your responsibility to exercise good judgment when receiving or giving a gift or entertainment. Accepting and offering gifts and entertainment is appropriate provided there is a specific business purpose, the expenses incurred are ordinary and necessary, the gift or entertainment falls within the policy described, and any expenses incurred as a result of the gift or entertainment are processed through the appropriate Company expense control systems.
- If you have been offered a gift that exceeds the minimal value allowed under this policy and therefore cannot be personally accepted, you may accept the gift on behalf of the Company if refusal, reimbursement at fair market value, or return would cause offense or embarrassment or would otherwise adversely affect the relationship of the Company to the gift giver.  A tangible gift of more than the minimal value allowed under this policy is deemed accepted on behalf of the Company and, upon acceptance, becomes the property of the Company.
- If you receive or anticipate receiving a gift or entertainment from an employee, customer, or vendor of the Company and are unsure whether your acceptance is in compliance with this policy, you **must** promptly make a full written disclosure to your manager (or his or her designee) and your Business Unit Compliance Officer. The Company may, in its sole discretion, approve the acceptance of the gift or entertainment if the acceptance is otherwise consistent with this policy.  Any such approval must be in writing.

## XI. IMPROPER PAYMENTS, BRIBES AND KICKBACKS

You have an obligation not to take any action that might result in a violation by the Company of the laws of the United States, the State of Illinois, or any other jurisdiction in which the Company does business. The Foreign Corrupt Practices Act provides that in no event may payment of anything of value be offered, promised or made to any government, government entity, government official, candidate for political office, political party or official of a political party (including any possible intermediary for any of the foregoing persons or entities), foreign or domestic, which is, or could be construed as being, for the purpose of receiving favorable treatment or influencing any act or decision by any such person, organization or government for the benefit of the Company or any other person.

## XII. MONEY LAUNDERING AND TERRORIST FINANCING

Persons involved in criminal activity such as narcotics dealing, smuggling, fraud, or other illicit activities may try to launder the proceeds of their crimes to hide them or to make the proceeds appear legitimate. Terrorists and terrorist organizations need to finance their activities and regularly attempt to use the legitimate financial system to do so.  The Company is committed to complying fully with all applicable anti-money laundering and anti-terrorism financing laws, including Know Your Customer and related due diligence rules, and to taking reasonable steps to ensure that we only conduct business with reputable customers involved in legitimate and lawful business activities.  The Company's integrity and reputation can be severely damaged by failing to detect any customer relationships or transactions that place us at risk.  The Company's commitment to a strong, global anti-money laundering program is evident in the way we do business and in the high value we place on compliance.

 

You should understand how laws prohibiting money laundering and terrorist financing and the reporting of cash transactions apply to your business activities. You should follow all applicable Client Acceptance and Anti-Money Laundering (CAAML) policies and procedures and Know Your Customer policies and procedures, which help to ensure that prospective customers are involved in only legitimate and lawful business activities and that their funds come from legitimate and lawful sources. You should follow all applicable Anti-Money Laundering procedures. You should participate actively in the training programs that are part of the Company's Anti-Money Laundering program. These programs identify the types of customers and transactions that may pose an increased risk of potential money laundering and terrorist financing red flags.

Any suspected violations of the Bank Secrecy Act (BSA) or potential money laundering or terrorist financing must immediately be reported to the AML Transaction Surveillance Unit, your Business Unit Compliance Officer or your local CAAML Compliance Officer.

## XIII. ECONOMIC SANCTIONS

Under the International Emergency Economic Powers Act, the President of the United States may impose sanctions such as trade embargoes, freezing of assets and import surcharges. The Office of Foreign Assets Control (OFAC) of the US Department of the Treasury promulgates regulations dealing with economic sanctions. Therefore, no employee on behalf of the Company may intentionally transact business with those countries or specially designated nationals against which economic sanctions have been imposed, unless the appropriate license has been obtained from the OFAC allowing such transaction. It is your obligation to ensure compliance with applicable sanctions. If you have any questions, contact your local CAAML Officer.

## XIV. PROHIBITION ON THE USE OF INFORMATION FROM YOUR PREVIOUS EMPLOYER

You should not bring any documents, software or other items to the Company that may contain your previous employer's confidential, trade secret or proprietary information. This includes but is not limited to computer disks, rolodexes, customer lists, financial reports, and other materials that belong to your previous employer. If you have such materials in your possession, they should be returned to your former employer immediately.

## XV. PROHIBITION ON THE USE OF INFORMATION AFTER LEAVING THE COMPANY

If you leave the Company for any reason, you may not take and must return all Company property received by you in the course of your employment. This includes but is not limited to computer, printer, fax machine, pager or telephone, and all paper and electronic Company documents and data including memoranda, customer information, financial reports, personnel information, and all copies thereof. All such items, documents and data are the property of the Company. In addition, you may not divulge any confidential information obtained by you during your employment regarding the Company's business to a new or prospective employer. This includes, but is not limited to, any proprietary information or trade secrets such as customer lists, financial information, business plans, personnel information, and any other information not available to the public.

## XVI. SOLICITATION AND DISTRIBUTION

In order to maintain a professional work environment, solicitation of money, donations or time or distribution of personal materials by employees (other than of the Company's products and services) are not allowed during work time. This applies to any solicitation of employees by other departments or employees during any work time. Solicitation may include, but is not limited to, requesting contributions (except for Company-sponsored charitable efforts coordinated through the Corporate Contributions and Volunteerism department), signatures, promoting membership in any organization, and purchasing or selling products. In addition, distribution of literature or printed matter is not allowed in work areas at any time.

Non-employees are prohibited from soliciting or distributing on Company property unless they have the express approval of the Company for a Company related or Company sponsored event or cause.




## XVII. CONTACT WITH REGULATORS

The banking, securities, commodities, and insurance industries are highly regulated. Consequently, there is often a need for contact with regulators.  If the employee is directly contacted by a regulator (e.g., Federal Reserve Board, Office of the Comptroller of the Currency, Securities Exchange Commission, New York Stock Exchange, etc.) whether by telephone, letter, electronic mail, or office visit, the employee should not engage in any discussion or take any other action in response to the contact prior to notifying the Regulatory Affairs Group within Compliance at regulatory.affairs.na@abnamro.com.

## XVIII. CONTACT WITH THE MEDIA

All communication with the press must be conducted by, or with authorization from the Company's Public Relations Group.  BU NA employees are not permitted to communicate directly with the news media about any bank-related matter without coordination through a member of the Public Relations Group. The Company's Press Officers will provide strategic counsel, guide message development and facilitate media interviews.

Additionally, no newspaper reporters, photographers or TV camera crews are allowed on Company property without the Public Relations Group's authorization and involvement.  Reporters who phone or email an employee or stand outside or enter a bank property must be redirected immediately to the Public Relations Group.

## XIX. CONTACT WITH LAW ENFORCEMENT AGENCIES

To ensure consistency and clarity in communication, the Regional Security Office of North America serves as the primary communication channel with law enforcement and intelligence agencies in matters pertaining to suspected criminal and fraudulent activity.  Communication with law enforcement and intelligence agencies is coordinated through the Regional Security office of North America by contacting (800) 295-6601 or NA.security.desk@abnamro.com. The Regional Security Office of North America will refer, escalate and appropriately coordinate communication in order to fully cooperate with law enforcement and intelligence agencies.

## XX. COOPERATION WITH CORPORATE INVESTIGATIONS

All employees are required to provide their full cooperation with Company investigations.

## XXI. USE OF COMPANY EQUIPMENT AND PROPERTY

All Company equipment and property is provided and maintained to assist employees and customers in conducting the Company's business.  To safeguard and protect the proprietary, confidential and business-sensitive information of the Company and to ensure that the use of equipment and property is consistent with the Company's legitimate business interests, authorized individuals may monitor the use of such equipment and property from time to time.  Therefore, employees should have no expectation of privacy in using the Company's equipment and property, and you consent to the Company exercising the right to retrieve, listen to and disclose, as well as record or transcribe, your telephone conversations and any electronic or voice messages, composed, sent, or received by you.

Ongoing or extended use of the Company's computer system, including browsing the internet, for purposes not related to Company work is prohibited.  The Company's computer system may not be used to i) participate in internet news groups, chat rooms, blogs, or the like, or ii) intentionally receive or internally disseminate programs, games, photographs, graphics, or other multimedia files.

Under no circumstances may any employee send messages that may be considered offensive, disruptive or harassing.  The intentional access, viewing, storage, printing, or retransmission of pornographic, lewd, offensive, or discriminatory material, photographs, cartoons, or jokes is forbidden.

While communicating via e-mail is often used in a fashion similar to telephone conversations, e-mail messages result in the creation of written records.  As should be evident from a number of recent scandals in which e-mail messages were integral evidentiary items, employees should use care when drafting and sending such messages and put the same thought into e-mails as they would attach to other written correspondence.

 

Internet e-mail is the medium of choice for spreading computer viruses worldwide; you should, therefore, be wary of opening any messages from an unknown external source.

## XXII. ESCALATION OF SECURITY, COMPLIANCE AND RISK ISSUES

To continue to safeguard our institution and its reputation, all employees of the Company are required to promptly escalate security, compliance and risk issues, particularly those issues that may result in a financial loss to the bank or may result in a disciplinary action against a bank employee.  Do not try to resolve an issue before escalating it – make your manager or the appropriate staff aware immediately, so that the proper resources are brought in to help address it.  Promptly reporting issues allows us to take a proactive approach in managing these situations, minimizing the risk of loss and preventing them from happening again.

## XXIII.  REPORTING OF SECURITY, COMPLIANCE AND RISK INCIDENTS

There are several types of security, compliance or risk incidents that could disrupt our operations, result in losses, harm our staff or clients, or negatively influence ABN AMRO's reputation.

All employees of the Company are required to report suspected or actual security, compliance or risk incidents as a part of your professional and prudent risk management activities.  Incidents include but are not limited to theft, fraud and acts of violence.  Reports must be made known to your manager to ensure that the appropriate parties are involved immediately (e.g., Group Security and/or local Compliance Officers). Under the Whistleblowing policy, any reports you make will be kept anonymous (see below).

Security incidents cover all criminal incidents including attempts, and all incidents threatening the life and safety of staff and clients and/or (potentially) causing substantial damage to the continuity of business, regardless the cause.  Examples are:

- Damage or loss to property from theft, embezzlement and robbery
- Acts of violence, aggression, abuse or harassment involving staff
- Fraud and attempted fraud, both by external and internal parties
- Violation of systems security, both by external and internal parties
- Willful damage and terrorism

Compliance incidents are contraventions of industry specific laws and regulations and in general all staff conduct conflicting with ABN AMRO's Corporate Values and Business Principles.  Examples include:

- Client confidentiality
- Conflict of interest
- Market abuse
- Money laundering
- Insider trading
- Personal account dealing
- Chinese walls
- Irregularities in (financial) reporting

Risk incidents refer to how the examples above may result in losses that could be categorized as credit, operational or market risk losses.  These are subject to the applicable policies on credit, operational and market risk including loss reporting.  The incident reporting policy does not replace nor is it a substitute for the risk loss reporting required under the risk management policies.

## XXIV. EMPLOYEE WHISTLEBLOWING

Integrity is one of the Company's Corporate Values. The Company is committed to integrity in all that we do always, everywhere.  A failure to act with integrity puts the reputation of the Company at risk.  The

 

Company is, therefore, committed to ensuring that it is run honestly at all times and that it is operating in a climate of transparency where employees who raise concerns in good faith can do so without fear of suffering detriment by reason of making a disclosure under this policy. The Company takes all reports of suspected criminal or unethical conduct very seriously.

The Company and its employees are subject to legal and regulatory requirements to report known or suspected violations of federal laws and other suspicious activities to regulatory and law enforcement authorities. A consistent and effective mechanism is necessary to achieve this. The Company has established programs to ensure the filing of appropriate Suspicious Activity Reports and other federal forms (such as Currency Transaction Reports) with its regulators and law enforcement agencies.

The Company also adopted a Global Whistleblowing Policy, which is available on the local intranet or from your Business Unit Compliance Officer. The policy provides a framework for employees to report, in good faith, suspected or known incidents of malfeasance, fraud and the like, with no risk of retribution or adverse effect. The Company welcomes and encourages good faith reports pursuant to the Whistleblowing Policy. Employees are encouraged to use the telephone hotline number, (800) 879-8203, if they wish to make a verbal report over the phone or the secure e-mail address at whistle.na@abnamro.com if they wish to submit their concerns in writing. Information gathered through Whistleblowing claims will help the Company comply with its suspicious activity reporting obligations under federal and state laws and to address wrongdoing by its employees.

## XXV. OTHER COMPANY POLICIES AND PROCEDURES

Conflicts of interest may arise in situations other than those listed above and are discussed in the Employee Handbook, (as amended from time to time). The Standards of Conduct is just one part of the Handbook and should be read in conjunction with the other sections of the Handbook and with applicable policies and procedures.

All employees are required to ensure compliance with all rules, regulations and laws that apply to their position. Other handbooks, manuals or guidelines may apply to your position. While you are expected to conform to the Standards of Conduct, your employment with the Company is at will and nothing contained in the Standards of Conduct or the Employee Handbook is intended, or should be interpreted, as a binding contract or promise of continued employment or otherwise.

The Company is an equal opportunity employer and it does not discriminate against any person on the basis of sex, race, color, gender, physical or mental disability, age, religion, nation origin, sexual orientation, uniformed military service, protected activity, or any other characteristic protected by applicable law.

 

# EXHIBIT D

# LaSalle Financial
ABN AMRO

LaSalle Financial Services, Inc.
135 South LaSalle Street
Suite 2111
Chicago, Illinois 60603
(800) 554-5507

December 10, 2007

Dear Mr. Brymer:

I recently learned of your resignation from LaSalle Financial Services, Inc. ("LFS") and am writing to wish you success in your new venture. As a reminder, you signed a written agreement that, among other things, expressly prohibits you from, directly or indirectly, taking, using, or disseminating any of LFS's information. To the extent that you have any "Confidential Information," as that term is defined in your agreement, LaSalle hereby demands the immediate return of such information in whatever form it exists, as well as any documents and data created or compiled by you that contains, is based upon, or derived from any Confidential Information. In addition, your agreement prohibits you, for a period of one year from the date of your departure, from directly or indirectly soliciting or diverting the business of any LFS customer whom you have serviced under this agreement.

I look forward to your cooperation in this matter and thank you for your prompt attention. Feel free to contact me should you have any questions.

Sincerely,

Anthony Pecora
Group Senior Vice President
Director of Compliance

Products offered through LaSalle Financial Services, Inc., member NASD/SIPC and a licensed insurance agency, are not insured by the Federal Deposit Insurance Corporation (FDIC) or any government agency, are not deposits or other obligations of, or guaranteed by the bank or its affiliates, and are subject to investment risks, including possible loss of the principal amount invested.

**LaSalle Financial**

ABN AMRO

LaSalle Financial Services, Inc.
135 South LaSalle Street
Suite 2111
Chicago, Illinois  60603
(800) 554-5507

December 10, 2007

Dear Mr. Kibiloski:

I recently learned of your resignation from LaSalle Financial Services, Inc. ("LFS") and am writing to wish you success in your new venture. As a reminder, you signed a written agreement that, among other things, expressly prohibits you from, directly or indirectly, taking, using, or disseminating any of LFS's information. To the extent that you have any "Confidential Information," as that term is defined in your agreement, LaSalle hereby demands the immediate return of such information in whatever form it exists, as well as any documents and data created or compiled by you that contains, is based upon, or derived from any Confidential Information. In addition, your agreement prohibits you, for a period of one year from the date of your departure, from directly or indirectly soliciting or diverting the business of any LFS customer whom you have serviced under this agreement.

I look forward to your cooperation in this matter and thank you for your prompt attention. Feel free to contact me should you have any questions.

Sincerely,

Anthony Pecora
Group Senior Vice President
Director of Compliance

Products offered through LaSalle Financial Services, Inc., member NASD/SIPC and a licensed insurance agency, are not insured by the Federal Deposit Insurance Corporation (FDIC) or any government agency, are not deposits or other obligations of, or guaranteed by the bank or its affiliates, and are subject to investment risks, including possible loss of the principal amount invested.



**LaSalle Financial**

ABN AMRO

LaSalle Financial Services, Inc.
135 South LaSalle Street
Suite 2111
Chicago, Illinois 60603
(800) 554-5507

December 10, 2007

Dear Mr. Swanson:

I recently learned of your resignation from LaSalle Financial Services, Inc. ("LFS") and am writing to wish you success in your new venture. As a reminder, you signed a written agreement that, among other things, expressly prohibits you from, directly or indirectly, taking, using, or disseminating any of LFS's information. To the extent that you have any "Confidential Information," as that term is defined in your agreement, LaSalle hereby demands the immediate return of such information in whatever form it exists, as well as any documents and data created or compiled by you that contains, is based upon, or derived from any Confidential Information. In addition, your agreement prohibits you, for a period of one year from the date of your departure, from directly or indirectly soliciting or diverting the business of any LFS customer whom you have serviced under this agreement.

I look forward to your cooperation in this matter and thank you for your prompt attention. Feel free to contact me should you have any questions.

Sincerely,

Anthony Pecora
Group Senior Vice President
Director of Compliance

Products offered through LaSalle Financial Services, Inc., member NASD/SIPC and a licensed insurance agency, are not insured by the Federal Deposit Insurance Corporation (FDIC) or any government agency, are not deposits or other obligations of, or guaranteed by the bank or its affiliates, and are subject to investment risks, including possible loss of the principal amount invested.